## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-3713 |
| | ) | |
| INDIANA UNIVERSITY, | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
## AND JURY TRIAL DEMAND

Plaintiff, John Doe[1] ("John"), by counsel, for his Complaint against Defendant Indiana University (the "University"), alleges as follows:

## I.
## NATURE OF THE ACTION

1.      By this action, John seeks to obtain an injunction, reinstatement, and damages for the University's wrongful suspension of him based on sexual assault allegations.

2.      John enrolled at the University for the 2016–2017 school year and has been enrolled continuously as an undergraduate student until his wrongful suspension on November 27, 2018.

3.      Before his suspension, John was in his first semester of his junior year at the Kelley School of Business. John has a final examination scheduled for November 28, 2018, and another final examination due the week of December 3, 2018.

4.      On November 6, 2018, a disciplinary hearing panel decided allegations of sexual

---

[1] Contemporaneously with the Complaint, John Doe is filing a Motion to Proceed Anonymously given his substantial privacy interests implicated in this Complaint. Additionally, to preserve the privacy rights of John's accuser, the Complaint refers to her as "Jane Doe" (or "Jane").

misconduct against John and determined that he should be suspended from the University for four years.

5.      John appealed the four year suspension on November 10, 2018, but the University denied John's appeal on November 27, 2018.

6.      The suspension deprives John of the opportunity to continue and complete his education and it will have a negative and substantial impact on his education and career.

7.      John is entitled to preliminary and permanent injunctive relief to allow him to complete the current school year, to have the University's decision vacated and his academic records expunged of the suspension, and to compensatory and punitive damages for the University's discriminatory processes and procedures, breach of contract, and false statements.

**II.**
**JURISDICTION  AND VENUE**

8.      This Court has federal question jurisdiction over the allegations in the Complaint pursuant to 28 U.S.C. § 1331 because the claims involve questions arising under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88. The Court also has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367 because they arise out of the same case or controversy giving rise to the federal claims.

9.      John is a citizen of the United States and is domiciled in the State of Illinois because he because he intends to return to his home state of Illinois permanently upon completing his education.

10.      The University is an Indiana public university and receives federal financial assistance.

11.      Venue properly lies in this district pursuant to 28 U.S.C. § 1391 because University is considered to reside in this judicial district, i.e., Monroe County, Indiana, and a substantial part

of the events or omissions giving rise to this claim occurred in this judicial district.

## III.
## FACTUAL ALLEGATIONS

### *John Doe's Background*

12.    John began his studies at the Kelley School of Business as a direct admit in the Fall of 2016. He is working towards a triple major in Supply Chain Management, Business Analytics, and Technology Management.

13.    Before starting his postsecondary education at the University, John spent his summers volunteering at Walcamp Outdoor Ministries, where he cared for adults with disabilities and facilitated Bible games and other activities. John continued his community service during college by volunteering with Cru, one of the University's Christian organizations, to provide relief to victims of Hurricane Harvey last year.

14.    John has maintained an excellent academic record at the University and is an incoming Business Technology Analyst Summer Scholar at Deloitte Consulting.

15.    John was in the first semester of his junior year at the University when he was suspended for four years. Because of John's successful academic record, graduating before his expected graduation in 2020 was a possibility.

### *Incident on September 4, 2017*

16.    In the afternoon of September 4, 2017, John and Jane were socializing at a Sigma Phi Epsilon fraternity house party on the University's campus.

17.    At the party, Jane announced, "Who am I going to f*ck today"?

18.    Jane began to flirt with John, and, after a while, the two started kissing with John's back against a wall.

19.    Jane grabbed John's hand and began leading him around the party.

3

20.     John did not witness Jane consuming any alcohol during the fraternity party and did not witness any signs of intoxication.

21.     John and Jane left the party together, first stopping at Jane's sorority house and then going to the Sigma Nu fraternity house.

22.     John was a member of Sigma Nu, but did not live in the fraternity house.

23.     John and Jane walked up the stairs of the Sigma Nu house together and entered John's friend's room.

24.     Once John and Jane were in the room, they began kissing, taking off each other's clothes, and engaging in sexual activity.

25.     John asked Jane whether she consented to him touching her breast and digitally penetrating her vagina, and she said yes.

26.     John asked Jane whether she wanted to have sexual intercourse, and she said yes.

27.     John and Jane began having sexual intercourse.

28.     While John's back was to the door, he heard someone come into the room, say, "oh, sorry," and leave.

29.     Later, at least two others came into the room, and John told them to leave. Unbeknownst to John, one of these individuals ("Individual 1") took a photo of John and Jane having sexual intercourse before leaving the room.

30.     John then initiated the end of the intercourse, saying to Jane, "let's be done." Then, John and Jane each put on their own clothes, and John walked Jane back to her sorority house.

31.     Within an hour, John learned that an individual ("Individual 2") took a screen shot of the photo from SnapChat and then sent it in a GroupMe chat amongst fraternity brothers who lived in the Sigma Nu house.

4

32.     John did not consent to the photo being taken, nor did he consent to the dissemination of the photo.

33.     As soon as he learned about the photo, John immediately went to the Sigma Nu president to get it removed from the GroupMe chat. However, the photo was already removed by the time John reached him.

34.     John also texted Jane asking how she was doing and stated that he felt that they "should talk about what just happened."  (Ex. 1, p. 1.)

35.     Jane replied that she was fine, texted "#yolo" (understood by John to mean, "you only live once"), and stated "Idgaf" (understood by John to mean, "I don't give a f*ck" about the photo because she was not visible in the it, and expressed that "[i]t is just life." (*Id.* at 2.)

36.     On or about September 7, 2017, Jane's sister spoke with the Interfraternity Council President about the incident and told him that Jane had consensual sex on September 4, 2017.

### *Investigation: John as the Complainant*

37.     On or about September 12, 2017, the Interfraternity Council President reported to the University's Office of Student Conduct ("OSC") that the photo had been posted in a GroupMe chat.

38.     OSC investigated the alleged misconduct of Individuals 1 and 2 ("Photo Investigations").

39.     OSC emailed John on September 27, 2017, stating that the University had information that John "may have experienced sexual misconduct" and explaining that it may proceed with a formal investigation. (Ex. 2, p. 1.)

40.     On September 29, 2017, as a part of the Photo Investigations, an OSC Assistant Director and an Investigator interviewed John regarding the photo, and John gave a verbal

statement.

41.     According to the Investigative Reports, an Assistant Director explained to John that the purpose of the meeting was "to talk about a picture that was circulating of Complainant 1 [John] and another person (Complainant 2 [Jane]) engaging in sexual activity." (Ex. 3, p. 2; Ex. 4, p. 2; Ex. 5, p. 6; *id.* at 6 (stating that John "provided a verbal statement in reference to the picture that was taken of him and [Jane]").)

42.     The Investigative Reports in the Photo Investigations included allegations that Individuals 1 and 2 took and/or disseminated the photo "without [John's or Jane's] consent." (Ex. 3, p. 1; Ex. 4, p. 1.)

43.     John was never informed that his September 29, 2017, verbal statement given as a Complainant could later be used against him as a Respondent for "allow[ing] another individual" to take the photo or for more serious charges. (*See* Ex. 6, p. 2.)

44.     Had John been provided this information, he would have consulted an advisor and would have provided more information about consent and the entirety of the circumstances. The Photo Investigations are ongoing, and both Individuals 1 and 2 have accepted responsibility for taking and/or disseminating the photo without John's or Jane's consent. Individual 1 accepted responsibility on November 1, 2018, and Individual 2 accepted responsibility on November 8, 2018. (Ex. 7; Ex. 8.) OSC asked John whether he would like to give a statement regarding what sanction he feels is appropriate for both Individual 1 and Individual 2 on each respective date. John still has not received notification of which sanctions were imposed on Individuals 1 and 2.

45.     ***Investigation: John as the Respondent***

46.     More than eight months after the incident occurred, and eight months after John gave his statement regarding the photo, Jane accused John of sexually assaulting and exploiting

her in May of 2018.

47.     On May 25, 2018, a Confidential Victim Advocate and University investigators met with Jane regarding her allegations, and she gave a statement.

48.     On May 29, 2018, the Indiana University's Police Department ("IUPD") asked OSC if they could wait to notify Respondent of the University process until *after* IUPD spoke with Respondent. OSC agreed.

49.     On June 1, 2018, John received a call from IUPD regarding a sexual misconduct case involving his statement given on September 29, 2017.

50.     John met with IUPD that day and gave another statement.

51.     John was never provided a copy of that statement.

52.     It was not until the end of the meeting that IUPD informed John that he was under investigation for rape.

53.     OSC received John's June 1, 2018, statement on June 5, 2018.

54.     On June 6, 2018, the University notified John of Jane's allegations and that he was required to attend a meeting on June 8, 2018, with the OSC investigators.

55.     At the June 8, 2018, meeting, John gave another statement.

56.     Jane gave a second statement to OSC on June 12, 2018.

57.     Both of Jane's statements indicate that her memory of the events is spotty, at best. (Ex. 5, pp. 2–6.)

58.     On May 25, 2018, eight months after the event, Jane told the IUPD that the "sexual activity was hard to remember." (Ex. 5, p. 3.)

59.     On June 12, 2018, Jane stated that she was blacked out during the event and had only partial memory of the event.  She stated that she likely assisted in removing her clothes, but

could not remember the details as to how she removed her clothes.  (*Id.* at 5.)

60.     On July 13, 2018, John gave a statement to the Monroe County Prosecutor's Office, which the prosecutor sent to OSC on August 17, 2018. John provided the names of two women with whom he had previously had intercourse who could testify that he habitually sought verbal consent during sexual activity with a new partner.

61.     John has consistently maintained that all contact with Jane was consensual and that he never consented to the photo being taken and disseminated.

62.     The prosecutor did not press charges against John. (Ex. 9.)

63.     John was provided a Preliminary Report regarding the University's investigations, which he could had access for ten days, but could not print, copy, or share it. John's advisor, his father, was unavailable to come to Bloomington within this limited time span to view the report alongside John. Thus, John was essentially on his own in reviewing and analyzing the report.

64.     John discovered additional evidence that he believed to be pertinent after the ten day period, but the University did not allow him to use the evidence at the hearing because the ten day period had concluded.

65.     On October 3, 2018, OSC proposed hearing dates of either October 12th or October 19th. (Ex. 10, p. 3.) It was not until *October 8th* that OSC made the Final Investigation Report and supporting documentation available. (Ex. 11.)

66.     The University never provided John with a complete copy of the Final Investigation Report with the supporting documentation and/or exhibits, even though John required a complete copy to be fully prepared for the hearing and told John that the whole case file would be available on Box.[2] (*Id.*)

---

[2] "Box" is a file transfer and sharing platform hosted by the University.

67.     The University never provided John with the recorded witness statements used to create the Final Investigation Report. Thus, the University apparently cherry-picked portions of witness statements to include in the Final Investigation Report without even giving John the chance to review or comment on them.

68.     Furthermore, the University restricted John's access to the complete Final Investigation Report while within the OSC office, and did not permit John to print, copy, or share it. John's advisor, his father, was unavailable to come to Bloomington to view the report alongside John. Thus, John was essentially on his own in reviewing and analyzing the report.

69.     The University's incomplete and limited system prevented John from determining what changes, if any, were made between the Preliminary Report and the Final Report.

70.     Further, the Final Investigation Report did not contain the real names of the witnesses, so John was unable to prepare specific questions for particular witnesses in advance of the hearing.

71.     The University only attempted to contact the individual who disseminated the photo in the GroupMe chat via phone and email, despite the University's ability to reach the individual by other means. As a result, the University failed to obtain a statement from that individual, thus depriving John the ability to ask him questions.

72.     Throughout the investigation, the University did not follow its own policies and procedures, including, but not limited to, failing to promptly inform John of the allegations against him and investigate those allegations.

### *The Hearing*

73.     The University conducted a hearing on October 19, 2018, regarding the allegations against John via an OSC Panel.

74.     The University provided John only minimal information as to how the hearing process worked. The University merely told John that the hearing would include three, panelists who would decide whether he was responsible, that he could not speak to Jane directly, and that they could both present information.

75.     The University also did not tell John the identity of the witnesses it would be calling ahead of time. John was thus left to guess.

76.     At least two witnesses provided live testimony on Jane's behalf.

77.     However, the witnesses were not required to provide live testimony. Instead, the Panel contacted most witnesses by telephone.

78.     Some of the witnesses answered the phone, while others did not. If the witness did not answer, they would not provide testimony at the hearing at all.

79.     Of the witnesses who were available to testify, the Panel did not always ask questions. Instead, several of the witnesses would introduce themselves, and the Panel would merely ask whether they had additional evidence.

80.     One of the panelists rarely asked any questions.

81.     A witness attempted to provide testimony regarding Jane, but the Panel cut him off, and he was not allowed to continue his testimony.

82.     Jane's sister began her on-the-phone testimony by stating that she had just hit her head and was on the way to the hospital. Nevertheless, she was permitted to testify.

83.     The individual who took the photo came to the hearing to present live testimony, but left after waiting three hours. He eventually testified by phone.

84.     The Panel told another witness an approximate time it would call him, but the Panel did not call until two to three hours after the approximate time given.

85.     The Panel called the individual who disseminated the photo, but he did not answer the phone. No accommodations were made for the fact that he was currently under investigation himself for overlapping conduct.

86.     Likewise, neither the investigator nor the Panel ever bothered to contact John's ex-girlfriend and close friend as character witnesses and regarding his habit of seeking verbal consent from sexual partners, even though John provided their names to the University. They were not even mentioned in either investigation report.

87.     However, the University contacted Jane's friends and permitted them to testify. At the hearing, they were permitted to vouch for her character and her sexual history.

88.     As a result, the Panel heard character evidence about Jane, but not about John. Additionally, the Panel did not have a complete opportunity to hear from eye witnesses who saw John and Jane together on September 4, 2017.

89.     Before the hearing, the University never told John the potential duration of the hearing. The hearing was scheduled to begin at 1:00 p.m. and actually started around 1:30 p.m. The day of the hearing, John was told that it could potentially last until 5:30 or 6:00 p.m., yet it concluded at about 8:55 p.m. Because the day was so exhausting, John and Jane agreed to skip the portion of the hearing in which they would ask the investigator questions.

90.     John found it very difficult to manage his own defense for such serious allegations by himself.

91.     Throughout the hearing, the University did not follow its own policies and procedures, including, but not limited to, failing to provide John and Jane equal opportunities to present information.

***The Panel's Decision***

92.     On November 6, 2018, the Panel issued a final decision. This was more than five months after the University began investigating and over a year after the incident.

93.     The University never provided John any "special circumstance[s]" that justified such a drawn-out investigation and decision-making process. (Ex. 12, p. 10.)

94.     The Panel concluded that John was "responsible for penetrating IU student [Jane's] vagina with [his] penis without her consent and allowing another individual to photograph or take a video of [him] engaging in sexual intercourse with [Jane] without her consent. (Ex. 6, p. 1–2.)

95.     The Panel determined that Jane was incapacitated, but that John **"did not know or reasonably should not have known that [Jane] was incapacitated."** (*Id.* at 2–3.)

96.     Nevertheless, the Panel determined that Jane did not communicate consent through voluntary actions and that John was to blame. (*Id.* at 3.)

97.     The Panel reached this conclusion despite Jane's own statements that she assisted in taking her clothes off and that she did not remember the event in detail. (Ex. 5, p. 5.)

98.     The Panel largely based its determination on consent based on supposed "inconsistencies" in John's statements. Specifically, John maintained that he asked for consent in later statements, but when asked *as the Complainant in the Photo Investigations ten months earlier*, John did not elaborate on verbal communication. (*Id.*)

99.     The Panel disregarded John's consistent statements that his sexual activity with Jane was consensual and that addition to verbal consent, Jane exhibited signs of sexual pleasure.

100.     The Panel apparently disregarded Jane's sister's statement three days after the incident that Jane had consensual sex on September 4, 2017, as this was not included in the Panel Decision.

101.    Moreover, despite the allegations in the Photo Investigations that John did not consent to the photo being taken or disseminated, the Panel determined that he was responsible for "exploitation."[3]  (*Compare* Ex. 3, p. 1 *and* Ex. 4, p. 1 *with* Ex. 6, p. 3.)

102.    During the investigation in June 2018, the Lead Investigator in John's case was publicly criticized for "letting a rapist off" on Twitter, and the University was tagged multiple times in tweets criticizing its handling of sexual assault cases. The first tweet has more than 2,000 retweets and 5,000 favorites. The individual who criticized the Lead Investigator started a march through Bloomington and campus shortly before the Fall 2018 semester began, criticizing the University's sexual assault policies. *See* https://www.idsnews.com/article/2018/07/iu-student-organizes-welcome-week-march-sexual-assault-critique.  Thus, the climate at the University made it impossible for John to receive a fair and impartial hearing. (*See* Ex. 13 (excerpts of Twitter page).)

103.    The Panel suspended John from the University for four years through October 25, 2022, even though Jane is expected to graduate within one or two years from now.

104.    The Panel also requires John to engage in counseling or an educational class and a re-entry meeting the month before he returns to campus; prohibits John from trespassing on the campus; and kept the no contact order with Jane in place. (Compl. Ex. 6, pp. 5–6.)

105.    In accordance with University procedure, John filed his Notice of Appeal of the Panel's decision on November 10, 2018. (Compl. Ex. 14.)

106.    The Panel denied John's appeal, thus effectuating the sanctions issued against him. (Compl. Ex. 15.)

---

[3] The Panel also apparently found that Individual 2's decision to disseminate the photo on GroupMe was a part of John's liability. (*See* Ex. 6, pp. 4–5.)

107.    The Panel's decision was arbitrary and capricious because, among other reasons, it concluded that John should not have known that Jane was incapacitated, yet found him responsible for nonconsensual sex. Additionally, the Panel based its decision, in large part, on alleged "inconsistencies" between statements that John made as a Complainant and statements that he made as a Respondent.

108.    Given the shoddy investigation and gross lack of process and unfairness afforded to John, compared to the robust and complete process and control over the scope and timing of the investigation afforded to Jane, it is apparent that gender bias motivated the University's overall handling and ultimate disposition of this matter.

### *Impact on John*

109.    From the beginning of the investigation to the present, the University's arbitrary process and decision-making has taken a physical and mental toll on John.

110.    Specifically, John has suffered from depression and fatigue since he was notified of the allegations in June of 2018.

111.    John also frequently wakes up in the middle of the night and is unable to go back to sleep for hours. John's sleep issues have worsened as time has passed.

112.    Other mounting symptoms include severe anxiety, social withdrawal, excessive sweat, weight gain, and a worsening of his tic disorder in terms of frequency and severity.

113.    John intends to seek therapy by the end of 2018.

**IV.**
**CAUSES OF ACTION**

**COUNT I:**
**VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972**
**ERRONEOUS OUTCOME**

114.     John incorporates by reference paragraphs 1–113 of this Complaint as though full asserted herein.

115.     Title IX of the Education Amendments of 1972 states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be deprived the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

116.     The University received federal financial assistance and is thus subject to Title IX.

117.     The University has created a campus environment in which John, an accused male student, was excluded from participating in and denied the benefits of an education at University and discriminated against because of his sex.

118.     The University's investigation, hearing, and appeals process was conducted in a manner that was biased against the male student, John, and causing the male student to be unjustly deprived of educational opportunities on the basis of his sex.

119.     John was treated unfairly because of his sex, as demonstrated by the following non-exhaustive list of behaviors:

a.     The University arbitrarily determined that John was responsible for "allowing" the photo to be taken—and never considered that Jane may have also "allowed" the photo to be taken.

b.     The University capriciously shifted John's status from the victim to the assailant. There is no explanation for this shift other than John's gender, especially given

15

John's unwavering position that he did not consent to the photo and the University's adoption of that position in the Photo Investigation's Final Report.

 c. The University performed an incomplete and shoddy investigation, failing to contact at least two witnesses named by John who would have been able to provide relevant information.

 d. The University failed to interview all eye witnesses to the events of September 4, 2017.

 e. The University denied John equal opportunity to allow his witnesses to provide testimony, as they cut his witnesses off (or never called them at all) and allowed Jane's witnesses to proceed.

 f. The University allowed Jane to present character witnesses and testimony as to her sexual history and practices, but refused to investigate and hear such testimony about John.  Notably, the Panel stopped one of John's witnesses from completing his testimony during the hearing.  Additionally, John named two witnesses who would testify as to his practice and habit of seeking verbal consent when entering into a sexual relationship, thus corroborating his testimony, but the University investigator did not even bother to contact either witness.

120. As a direct result of the University's discriminatory practices, John was denied a fundamentally fair investigation and hearing, and the University reached an erroneous outcome in finding against John.

121. The University violated John's Title IX right to be free from discrimination by sanctioning, tolerating, and endorsing procedures and policies which deprived John, a male student, or rights and privileges provided to female students.

122.    As a result of the University's discrimination, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, and costs.

## COUNT II:
## VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972 DELIBERATE INDIFFERENCE

123.    John incorporates by reference paragraphs 1–122 of this Complaint as though full asserted herein.

124.    The University had actual notice of the irresponsible, improper, and sexually biased manner in which the allegations against John were investigated and adjudicated.  Despite notice of the failures of its investigative and adjudicative processes, the University and its employees failed to correct the deficiencies in the investigation and process and were deliberately indifferent to the known failings of its employees responsible for those processes.

125.    The University's deliberate indifference was motivated by John's gender.

126.    The University sanctioned, tolerated, and endorsed procedures and policies which deprived John, a male student, of the rights and privileges of female students.

127.    As a result of the University's discrimination, John is entitled to damage in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, and costs.

## COUNT III:
## BREACH OF CONTRACT

128.    John incorporates by reference paragraphs 1–127 of this Complaint as though full asserted herein.

129.    Indiana law imposes an implied contract on the relationship between students and universities.

130.    The University provides its students the "University Policies on Sexual Misconduct," which outline the procedures the University must follow and give students accused

17

of sexual misconduct certain rights.

131.    John was given these Policies, and the Policies are prominently displayed on the University's website.

132.    The University breached its contract with John when it failed to follow its own policies and procedures, including, but not limited to, failing to complete the investigation and render a decision within sixty days; failing to promptly notify John of the allegations against him; failing to provide a full copy of the Final Investigation Report and supporting documents; misleading John into providing statements as a Complainant and then using them against him as a Respondent; and adopting mutually exclusive and conflicting conclusions about John's consent to the photograph.

133.    The University acted illegally, arbitrarily, capriciously, and in bad faith when it condoned and supported the discriminatory investigation, hearing procedures, and ultimate decision, and by affirming the decision on appeal.

134.    John has been substantially damaged by the University's breach of contract.

135.    John seeks all damages available to him under Indiana law as a result of his damages.

## COUNT IV:
## NEGLIGENCE

136.    John incorporates by reference paragraphs 1–135 of this Complaint as though full asserted herein.

137.    The University assumed a duty to comply with its own rules and regulations and to use reasonable care in conducting the investigation.

138.    The University has a duty not to deprive a student of educational opportunities on an impermissible basis and without cause.

139. The University was negligent in enforcing its own policies and procedures.

140. As a result of the University's negligence, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, and costs.

**COUNT V:**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

141. John incorporates by reference paragraphs 1–140 of this Complaint as though fully asserted herein.

142. As a direct and proximate result of the University's negligent actions, as alleged above, John has suffered direct and substantial physical injury that has caused emotional distress, including, but not limited to, an inability to sleep through the night and an exacerbation of his tic disorder, as well as depression and anxiety

143. As a result of the University's negligent infliction of emotional distress, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, and costs.

**COUNT VI:**
**PROMISSORY ESTOPPEL**

144. John incorporates by reference paragraphs 1–143 of this Complaint as though full asserted herein.

145. The University's regulations, standards, policies, and procedures constitute representations and promises that the University should have reasonably expected to induce John's reliance or forbearance.

146. John relied upon the express and implied promises of the University that he would not be subject to discrimination on campus, and he would not be denied his procedural rights should he be accused of the University's sexual misconduct policies.

19

147.    In relying on the University's promises, John invested a substantial amount of time and money into his education at the University.

148.    Indeed, John is now weeks from the conclusion of this semester's classes and final exams.

149.    John would not have given up this time and money absent the University's promises and representations.

150.    As a direct and proximate result of the University's promises and representations and its failure to fulfill those promises and representations, John has suffered substantial damages and requests any and all damages available under Indiana law.

**COUNT VII:**
**UNJUST ENRICHMENT**

151.    John incorporates by reference paragraphs 1–150 of the Complaint as though fully asserted herein.

152.    In providing tuition to the University, John conferred a measureable benefit upon the University.

153.    Because the University billed John for his tuition, the University expressly and impliedly requested that the monetary benefits that John conferred upon it.

154.    By paying tuition to the University, John expected that the University would confer a degree upon him within a consecutive, four-year time span.

155.    The University knew that it might eventually pursue sexual exploitation allegations against John while John was the Complainant, yet the University proceeded to interview John without informing him of this possibility.

156.    The University knew that if it pursued sexual exploitation allegations and if John was sanctioned, he might forfeit substantial tuition payments and not be able to obtain his degree

20

in a timely manner.

157.   Allowing the University to retain the benefits that John provided without restitution would be unjust.

158.   John therefore seeks restitution for his years of tuition paid to the University.

WHEREFORE, Plaintiff John Doe respectfully requests that this Court:

(a)   Enter a Temporary Restraining Order under Federal Rule of Civil Procedure 65, a Motion for which is filed contemporaneously with this Verified Complaint, that enjoins Defendant Indiana University from enforcing the sanctions issued against Plaintiff John Doe on November 6, 2018, and affirmed on November 27, 2018;

(b)   Set a hearing for a preliminary injunction within fourteen days of the Temporary Restraining Order to determine whether to extend the temporary relief sought in this Verified Complaint and the contemporaneously field Motion for Temporary Restraining Order;

(c)   Reinstate Doe at Indiana University and expunge his suspension from his record;

(d)   Award Plaintiff John Doe compensatory damages, including, but not limited to, damages to his physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and professional opportunities, damages to reputation; prejudgment and post-judgment interest, costs, and attorneys' fees; and punitive damages as the law permits, and

(e)   All other just and appropriate relief.

## DEMAND FOR JURY TRIAL

Plaintiff, John Doe, by counsel, hereby requests a trial by jury on all issues triable by right by a jury.

**VERIFICATION**

I affirm, under the penalties of perjury, the foregoing representations are true and correct to the best of my knowledge and belief.

22

Respectfully Submitted,

_____

Margaret M. Christensen, # 27061-49
Jessica Laurin Meek, # 34677-53
Bingham Greenebaum Doll LLP
2700 Market Tower
10 West Market Street
Indianapolis, IN 46204-4900
Telephone: (317) 635-8900
Facsimile: (317) 236-9907
mchristensen@bgdlegal.com
jmeek@bgdlegal.com

*Attorneys for Plaintiff John Doe*