**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-3713 |
| | ) | |
| INDIANA UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**BRIEF IN SUPPORT OF VERIFIED MOTION
PRELIMINARY INJUNCTION**

Plaintiff, John Doe[1] ("John"), by counsel, files his Brief in Support of his Verified

Motion Preliminary Injunction enjoining Defendant, Indiana University (the "University"), from

enforcing its decision to suspend John from the University for four years.

**INTRODUCTION**

On September 4, 2017, John Doe, a student at Indiana University, was the victim of

sexual exploitation. The day before his nineteenth birthday, someone took a photo of John and

"Jane" while they were having sexual intercourse and disseminated it among other University

students. Neither John nor Jane consented to be photographed in such an intimate setting—nor did

they want the photo spread around campus.

After learning of the photo and its dissemination, the University began to investigate.

John, as a named Complainant, provided a statement to the University regarding the photo in

---

[1] Contemporaneously with his Verified Motion for Preliminary Injunction, John Doe is filing a
Motion to Proceed Anonymously given his substantial privacy interests implicated in this
Complaint. Additionally, to preserve the privacy rights of John's accuser, the Complaint refers to
her as "Jane Doe" (or "Jane").

September of 2017, about three weeks after the incident. John did not discuss in detail the nature and extent of his communications with Jane during the sexual activity at that point. He had no reason to do so. After all, John was interviewed as a victim of sexual exploitation, and Jane's consent to engage in sexual activity with John was not in question.

Eight months later, Jane decided to bring allegations of sexual assault and exploitation against John. John did not know this when the Indiana University Police Department ("IUPD") called him in for questioning on June 1, 2018, as the University agreed not to inform John of the allegations against him until *after* IUPD spoke with him. John gave another statement that day, initially assuming that the questioning had to do with the investigation of the individuals who photographed and disseminated the photo. But the questions became more and more targeted towards John—who, at that point, was only the Complainant—and it was not until the end of the conversation that IUPD informed John that he was under investigation for rape.

The investigation only got worse from there. John soon discovered that the University's Office of Student Conduct ("OSC") only provided him limited access to the Preliminary Report and the Final Investigation Report. Without being able to print, email, or copy the Reports, and without being provided a full copy of the Final Investigation Report, John felt unprepared to prepare his defense. Further, the Final Investigation Report did not contain the real names of the witnesses, so John was unable to prepare specific questions for particular witnesses in advance of the hearing.[2]  To make things more difficult, the OSC ignored John's suggestion to interview two University students who would have served as character witnesses for John at his hearing, yet Jane's friends were permitted to testify as to her character and sexual history. John was also in

---

[2] This lack of information has also made it more difficult for John to remember who the University contacted.

disbelief when the OSC Panel cut-off one of his witness's testimony, while Jane's witnesses were allowed to testify to the full extent. As a result, Jane's witnesses testified as to her character and sexual history, while John had no opportunity to present the same information about Jane or about himself.

More than five months after opening the investigation, OSC found John responsible for having sexual intercourse with Jane without her affirmative consent and for allowing another individual to take the photo without her consent. OSC sanctioned John with a four year suspension, even though Jane is expected to graduate one to two years from now. Setting aside the University's blatant failures to follow their own procedures and treat John with equal dignity, the Panel's decision reflects arbitrary and capricious reasoning. For example, the Panel found that John "did not know or reasonably should not have known that [Jane] was incapacitated" during the incident, yet determined that John was culpable for his "severe" behavior. What is more, the Panel based its conclusion that Jane did not consent largely on John's supposed "inconsistencies" between his first statement about the *photograph*, given as a *Complainant*, and his later statements as a *Respondent*, which, logically, focused on the communications between Jane and John.

The University's inexcusable practices, which constitute Title IX violations and breaches of its contract with John, cannot stand. At a minimum, John has demonstrated a likelihood of success on the merits of his claims, that he would face irreparable harm if the suspension decision persists, and that he does not have an adequate remedy at law.  Accordingly, immediate injunctive relief is appropriate.

<u>**STATEMENT OF FACTS**</u>

**I.      John Doe's Background**

John began his studies at the Kelley School of Business as a direct admit in the Fall of 2016. He is working towards a triple major in Supply Chain Management, Business Analytics, and Technology Management. John has maintained an excellent academic record at the University and is an incoming Business Technology Analyst Summer Scholar at Deloitte Consulting. Before starting his postsecondary education at the University, John spent his summers volunteering at Walcamp Outdoor Ministries, where he cared for adults with disabilities and facilitated Bible games and other activities. John continued his community service during college by volunteering with Cru, one of the University's Christian organizations, to provide relief to victims of Hurricane Harvey last year.

**II.     Incident on September 4, 2017**

In the afternoon of September 4, 2017, the day before John's nineteenth birthday, John and Jane were socializing at a Sigma Phi Epsilon fraternity house party on the University's campus. At the party, Jane announced, "Who am I going to f*ck today"?  Jane began to flirt with John, and, after a while, the two started kissing with John's back against a wall, and Jane grabbed John's hand and led him around the party. John did not witness Jane consuming any alcohol during the fraternity party and did not witness any signs of intoxication. John and Jane eventually left the party together, first stopping at Jane's sorority house, and then going to the Sigma Nu fraternity house. John was a member of Sigma Nu, but did not live in the house.

At the Sigma Nu house, John and Jane walked up the stairs together and entered John's friend's room. They began kissing, taking off each other's clothes, and engaging in sexual activity. John asked Jane whether she consented to him touching her breast and digitally penetrating her

4

vagina, and she said yes. John also asked Jane whether she wanted to have sexual intercourse, and she said yes. While John and Jane were having sexual intercourse, John's back was to the door. He heard someone come into the room, say, "oh, sorry," and leave. Later, at least two others came into the room, and John told them to leave. Unbeknownst to John, the individual ("Individual 1") took a photo of John and Jane having sexual intercourse before leaving the room and sent it on SnapChat to others. John then initiated the end of the intercourse, saying to Jane, "let's be done." Then, John and Jane each put on their own clothes, and John then walked Jane back to her sorority house.

Within an hour, John learned that another individual ("Individual 2") took a screen shot of the photo from SnapChat and then sent it in a GroupMe chat amongst fraternity brothers who lived in the Sigma Nu house. John did not consent to the photo being taken, nor did he consent to the dissemination of the photo. As soon as he learned about the photo, John immediately went to the Sigma Nu president to get it removed from the GroupMe chat. However, the photo was already removed by the time John reached him. John also texted Jane asking how she was doing and stated that he felt that they "should talk about what just happened." (Compl. Ex. 1, p. 1.) Jane replied that she was fine, texted "#yolo" (understood by John to mean, "you only live once"), and stated "Idgaf" (understood by John to mean, "I don't give a f*ck" about the photo because she was not visible in it, and expressed that "[i]t is just life." (*Id.* at 2.) On or about September 7, 2017, Jane's sister spoke with the Interfraternity Council President about the incident and told him that Jane had consensual sex on September 4, 2017.

### III.   Investigation: John As the Complainant

On or about September 12, 2017, the Interfraternity Council President reported to the OSC that the photo had been posted in a GroupMe chat. The OSC investigated the alleged

misconduct of Individuals 1 and 2 ("Photo Investigations"). OSC emailed John on September 27, 2017, stating that the University had information that John "may have experienced sexual misconduct" and explaining that it may proceed with a formal investigation.  (Compl. Ex. 2, p. 1.)

On September 29, 2017, as a part of the Photo Investigations, an OSC Assistant Director and an Investigator interviewed John regarding the photo, and John gave a verbal statement. According to the Investigative Reports in the Photo Investigations, an Assistant Director explained to John that the purpose of the meeting was "to talk about a picture that was circulating of Complainant 1 [John] and another person (Complainant 2 [Jane]) engaging in sexual activity." (Compl. Ex. 3, p. 2; Compl. Ex. 4, p. 2; Compl. Ex. 5, p. 6; *id.* at 6) (stating that John "provided a verbal statement in reference to the picture that was taken of him and [Jane]").) The Investigative Reports in the Photo Investigations included allegations that Individuals 1 and 2 took and/or disseminated the photo "without [John's or Jane's] consent." (Compl. Ex. 3, p. 1; Compl. Ex. 4, p. 1.)

John was never informed that his September 29, 2017, verbal statement given as a Complainant could later be used against him as a Respondent for "allow[ing] another individual" to take the photo or for more serious charges. (*See* Ex. 6, p. 2.) Had John been provided this information, he would have consulted an advisor and would have provided more information about consent and the entirety of the circumstances. The Photo Investigations are ongoing, and both Individuals 1 and 2 have accepted responsibility for taking and/or disseminating the photo without John's or Jane's consent. OSC asked John whether he would like to give a statement regarding what sanction he feels is appropriate for both Individual 1 and Individual 2 on each respective date. John still has not received notification of which sanctions were imposed on Individuals 1 and 2.. (Compl. Ex. 7; Compl. Ex. 8.)

6

## IV.    Investigation: John As the Respondent

In May of 2018—eight months after the incident occurred and eight months after John gave his first statement regarding the photo, Jane accused John of sexually assaulting and exploiting her. John has consistently maintained that all contact with Jane was consensual and that he never consented to the photo being taken and disseminated. On May 25, 2018, a Confidential Victim Advocate and University investigators met with Jane regarding her allegations, and she gave a statement. Four days later, on May 29, 2018, IUPD asked OSC if it could wait to notify Respondent of the University process until *after* IUPD spoke with Respondent. OSC agreed.

On June 1, 2018, John received a call from IUPD because John's "name has come up in a case [the detective was] investigating." John met with IUPD that day and gave another statement, and was never given a copy of that statement. It was not until the end of the meeting that IUPD informed John that he was under investigation for rape. OSC received John's June 1, 2018, statement on June 5, 2018.

On June 6, 2018, the University notified John of Jane's allegations and that he was required to attend a meeting on June 8, 2018, with the OSC investigators. The parties then gave a series of statements. At the June 8, 2018, meeting, John gave another statement; on June 12, 2018, Jane gave a second statement to OSC; and on July 13, 2018, John gave a statement to the Monroe County Prosecutor's Office, which the prosecutor sent to OSC on August 17, 2018.  The prosecutor did not press charges against John. (Compl. Ex. 9.) John provided the names of two women with whom he had previously had intercourse who could testify his habit of seeking affirmative consent during sexual activities, but these witnesses were never contacted by IUPD or the OSC investigators.

John was provided a Preliminary Report regarding the University's investigations, which he had access to for ten days, but could not print, copy, or share it. John's advisor, his father, was unavailable to come to Bloomington within this limited time span to view the report alongside John. Thus, John was essentially on his own in reviewing and analyzing the report.  Additionally, John discovered evidence that he believed to be pertinent after the ten day period, but the University did not allow him to use the evidence because the ten day period had concluded.

On October 3, 2018, OSC proposed hearing dates of either October 12th or October 19th. (Compl. Ex. 10, p. 3.) It was not until *October 8th* that OSC made the Final Investigation Report and supporting documentation available. (Compl. Ex. 11.) After the Final Investigation Report was complete, the University never provided John with a complete copy with the supporting documentation and/or exhibits, even though John required a complete copy to be fully prepared for the hearing. (*C.f. id.*) The University never provided John with the recorded witness statements used to create the Final Investigation Report. Thus, the University apparently cherry-picked portions of witness statements to include in the Final Investigation Report without even giving John the chance to review or comment on them. Furthermore, the University only allowed John access to the complete Final Investigation Report while within the OSC office, and did not permit John to print, copy, or share it. John's advisor, his father, was unavailable to come to Bloomington to view the report alongside John. Thus, John was essentially on his own in reviewing and analyzing the report.  Further, the University's incomplete and limited system prevented John from determining what changes, if any, were made between the Preliminary Report and the Final Report.

V.      **The Hearing**

The University conducted a hearing on October 19, 2018, regarding the allegations against John in front of an OSC Panel. The University only provided John bare-bones information as to how the hearing process worked beforehand. The University merely told John that the hearing would include panelists who would determine whether he was responsible, that he could not speak to Jane directly, and that they could both present information. The University also did not tell John the identity of the witnesses it would be calling ahead of time. John was thus left to guess.

At least two witnesses provided live testimony on Jane's behalf, and Jane's virginity before the incident was discussed. However, the witnesses were not required to provide live testimony. Instead, the Panel contacted the witnesses by telephone. Some of the witnesses answered the phone, while others did not. If the witness did not answer, they did not provide testimony at the hearing at all.  Of the witnesses who were available to testify, the Panel did not always ask questions. Instead, several of the witnesses would introduce themselves, and the Panel would merely ask whether they had additional evidence. One of the panelists hardly asked any questions.[3]

A witness attempted to provide testimony regarding Jane, but the Panel cut him off, and he was not allowed to continue his testimony. In contrast, Jane's sister was permitted to testify, even though she began her on-the-phone testimony by stating that she had just hit her head and was on the way to the hospital. Additionally, Individual 1 came to the hearing to present live testimony, but left after waiting three hours. He eventually testified by phone. The Panel told another witness an approximate time it would call him, but the Panel did not call until two to three

---

[3] It is unclear whether the Panel received the recordings of the witness statements, and, even if it did, whether it even listened to them or just relied on the University's condensed report. John certainly did not receive copies of the recorded witness statements.

hours after the approximate time given. The Panel also called Individual 2, but he did not answer the phone. Throughout the investigation, the University only attempted to contact Individual 2 via phone and email, despite the University's ability to reach the individual by other means. As a result, the University failed to obtain a statement from Individual 2, thus depriving John the ability to ask him questions. Further, no accommodations were made for the fact that Individual 2 was currently under investigation himself for his own conduct victimizing John.

Problematically, neither the investigation team nor the Panel ever bothered to contact John's character witnesses, even though John provided their names to the University. Specifically, two female friends of John's advised him that they would testify as to his character and as to his habit of seeking verbal consent when entering into a sexual encounter.  Pursuant to the University's own Policy, such information was relevant and probative. (*See* Compl. Ex. 12, p. 9.) ("Prior or subsequent conduct of the respondent may be considered in determining pattern, knowledge, intent, or motive.").  In contrast, Jane's friends were permitted to testify and did vouch for her character and sexual history. John found it very difficult to manage his own defense for such serious allegations by himself.

Before the hearing, the University never told John the potential duration of the hearing. The hearing was scheduled for 1:00 p.m., and began at 1:30 p.m. The day of the hearing, John was told that it could potentially last until 5:30 or 6:00 p.m., yet it concluded at about 8:55 p.m. Because the day was so exhausting, John and Jane agreed to skip the portion of the hearing in which they would ask the investigator questions.

**VI.    The Panel's Decision**

On November 6, 2018, the Panel issued a final decision. This was more than five months after the University began investigating and over a year after the incident occurred. The University

10

never pointed to any "special circumstance[s]" that justified such a drawn-out investigation and decision-making process.

The Panel concluded that John was "responsible for penetrating IU student [Jane's] vagina with [his] penis without her consent and allowing another individual to photograph or take a video of [him] engaging in sexual intercourse with [Jane] without her consent. (Compl. Ex. 6, p. 1–2.) The Panel also determined that Jane was incapacitated, but that John **"did not know or reasonably should not have known that [Jane] was incapacitated."** (*Id.* at 2–3.)

Nevertheless, the Panel determined that Jane did not communicate consent through voluntary actions and that John was to blame, (*id.* at 3), even though Jane admitted she blacked out and could not remember portions of the day. The Panel largely based its determination on consent based on supposed "inconsistencies" in John's statements. Specifically, John maintained that he asked for consent in later statements, but when asked *as the Complainant in the Photo Investigations ten months earlier*, John did not elaborate on verbal communication. (*Id.*) The Panel disregarded John's consistent statements that his sexual activity with Jane was consensual, and apparently disregarded Jane's sister's statement that Jane had consensual sex on September 4, 2017. Moreover, despite the allegations in the Photo Investigations that John did not consent to the photo being taken or disseminated, the Panel determined that he was responsible for "exploitation."[4] (*Compare* Compl. Ex. 3, p. 1 *and* Compl. Ex. 4, p. 1 *with* Compl. Ex. 6, p. 3.) During the investigation in June 2018, the Lead Investigator in John's case was publicly criticized for "letting a rapist off" on Twitter, and the University was tagged multiple times in tweets criticizing its handling of sexual assault cases. Additionally, during the investigation, John's

---

[4] The Panel inexplicably found John liable for Individual 2's decision to disseminate the photo on GroupMe. (*See* Compl. Ex. 6, pp. 4–5.)

disciplinary proceeding may have been biased from the start and motivated by a desire to swing the pendulum in favor of accusing students. To illustrate, a student-led march through Bloomington and the University campus was held shortly before the Fall 2018 semester began, criticizing the University's sexual assault policies. *See* https://www.idsnews.com/article/2018/07/iu-student-organizes-welcome-week-march-sexual-assault-critique.

On November 6, 2018, the Panel suspended John from the University for four years through October 25, 2022 (Compl. Ex. 6, p. 5), even though Jane is expected to graduate within one or two years from the present. The Panel also requires John to engage in counseling or an educational class and a re-entry meeting the month before he returns to campus; prohibits John from trespassing on the campus; and has kept the no contact order with Jane in place. (*Id.* at 5–6.)

In accordance with University procedure, John filed his Notice of Appeal of the Panel's decision on November 10, 2018. (Compl. Ex. 14.) The Panel denied John's appeal on November 27, 2018, thus effectuating the sanctions issued against him.  (Compl. Ex. 15.)

## VII.   Impact on John

From the beginning of the investigation to the present, the University's arbitrary process and decision-making has taken a physical and mental toll on John. Specifically, John has suffered from depression and fatigue since he was notified of the allegations in June 2018. John also frequently wakes up in the middle of the night and is unable to go back to sleep for hours. John's sleep issues have worsened as time has passed. Other mounting symptoms include severe anxiety, social withdrawal, excessive sweat, weight gain, and a worsening of his tic disorder in terms of frequency and severity. John intends to seek therapy by the end of 2018, but is currently focusing

on his studies in the hope that he can sit for his final exams scheduled for the week of December 10, 2018.

## **STANDARD OF REVIEW**

A party moving for a preliminary injunction must demonstrate that "it is reasonably likely to succeed on the merits, it is suffering irreparable harm that outweighs any harm the nonmoving party will suffer if the injunction is granted, there is no adequate remedy at law, and an injunction would not harm the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). "If the moving party meets this threshold burden, the district court weighs the factors against one another in a sliding scale analysis . . . ." *Id.* In other words, "the district court must exercise its discretion to determine whether the balance of harms weighs in favor of the moving party or whether the nonmoving party or public interest will be harmed sufficiently that the injunction should be denied." *Id.*  "[T]he more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." *Id. Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 738 F.3d 768, 795 (7th Cir. 2013) (quoting *Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013)). The sliding scale approach "is not mathematical in nature, rather 'it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief.'" *Annex Books, Inc. v. City of Indianapolis*, 673 F. Supp. 2d 750, 753 (S.D. Ind. 2009) (quoting *Ty, Inc. v. Jones Group*, 237 F.3d 891, 895–96 (7th Cir. 2001)).

## ARGUMENT

I.    **John has demonstrated a likelihood of success on the merits for his claims against the University.**

   A.  **Title IX Claims**

   Title IX states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 § U.S.C. 1681(a). Given the University's sex-based discrimination against John in the disciplinary process, and its willfully blind eye towards its discrimination, John will likely prevail on his Title IX claims. *See also Marshall v. Indiana Univ.*, 170 F. Supp. 3d 1201, 1210 (S.D. Ind. 2016) (denying the defendants' motion to dismiss the Title IX claims of a student accused of sexual assault).

1.  John Demonstrates a Likelihood that Gender Bias Resulted in an Erroneous Outcome

   John has demonstrated a likelihood of success on his erroneous outcome theory. To prevail on an erroneous outcome theory, the plaintiff must demonstrate: "(1) '[F]acts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and (2) a 'particularized ... causal connection between the flawed outcome and gender bias.'" *Doe v. Miami Univ.*, 882 F.3d 579, 592 (6th Cir. 2018) (quoting *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016) (reversing the district court's dismissal of an erroneous outcome claim brought by a student accused of sexual assault).

   First, the University's decision-making process regarding sexual misconduct cases is clouded by bias given the emerging public outcry of sanctioning male assailants combined with recent attacks on the University's own handling of assault claims. In June 2018, the Lead Investigator in John's case was publicly criticized on Twitter for not disciplining an alleged rapist. (*See* Compl. Ex. 13 (excerpts of tweets).) The University was tagged in multiple public tweets

14

regarding its handling of sexual assault claims. (*Id.*). And, shortly before the Fall 2018 semester began, the individual who criticized the Lead Investigator started a march through Bloomington and campus criticizing the University's sexual assault policies. *See* https://www.idsnews.com/article/2018/07/iu-student-organizes-welcome-week-march-sexual-assault-critique.   Within this climate, there was at least a reasonable likelihood that the University was motivated to err on the side of discipline and that John could not get a fair investigation or hearing by virtue of being an accused man.

Second, the shoddy investigation and inconsistent allegations between John's case and the Photograph investigation cast doubt upon the Panel's ultimate decision and indicate gender bias. The University's transformation of John from a victim to an assailant is best described as a "bait and switch." After the incident on September 4, 2017, OSC emailed John on September 27, 2017, stating that the University had information that John "may have experienced sexual misconduct" and explaining that it may proceed with a formal investigation. (Compl. Ex. 2, p. 1.) When John gave a statement to OSC that same day, he was speaking *as a victim*. He thus was not asked about, nor did he have a reason to offer, details regarding Jane's consent. OSC also did not bother to tell John that his statements could later be used against him.

Yet that was exactly what happened. A significant reason that the Panel concluded that Jane did not consent to sexual intercourse was because of vague "inconsistencies" between John's earlier and later statements. (Compl. Ex. 6, p. 3.) The only "inconsistency" identified was John's "earlier statement" that "indicate[d] little to no verbal communication," compared to his statement to the prosecutor almost ten months later that he asked for consent. (*Id.*) If John had known that his September 29, 2017, statement given as the Complainant could be used against him in a subsequent investigation as the Respondent, John would have gotten an advisor to represent his

interests in September 2017. The University could have excluded John's September 29, 2017, statement from its investigation, but it chose not to do so. The Panel's emphasis on John's "inconsistencies" regarding its evaluation of consent is especially important because the Panel determined that John "**did not know or reasonably should not have known that Complainant was incapacitated**." (*Id.* at 2–3.)

Further, the University's process is questionable given its simultaneous prosecution and protection of John. The Panel determined that John was "responsible for . . . allowing another individual to photograph or take a video of [him] engaging in sexual intercourse with [Jane] without her consent." (*Id.* at 2.) The Panel's determination is incompatible with the allegations in the Photo Investigations. Both Investigative Reports state that the alleged behaviors include "recording and/or transmitting sexual utterances, sounds, and/or images involving [John] and [Jane] **without either individual's consent**." (Compl. Ex. 3, p. 1; Compl. Ex. 4, p. 1.) Yet the University ultimately blamed John for not stopping his assailants. Beyond the blatant contradiction in University records, the Panel never considered that *Jane* may have allowed the photo to be taken of *John*. The onus was thus on the male student to stop a third party's behavior.

Moreover, the University failed to investigate John's side of the case fully, while zealously investigating Jane's side. Most egregiously, despite the availability of multiple witnesses as to John and Jane's interactions on September 4, 2017, the University failed to interview even a fraction of these individuals. Additionally, the University did not contact John's ex-girlfriend and close friend as character witnesses, even though John gave them their names. John expected them to testify as to his character and his habit of always asking for affirmative consent before engaging in sexual activity. This omitted testimony may well have shaped the hearing's outcome, and it certainly casts doubt upon the outcome's accuracy. In contrast to the University's decision not to

contact John's character witnesses, the Panel allowed two of Jane's friends to testify in her favor, and they were permitted to discuss Jane's sexual history before the incident.

To make matters worse for John, the University only attempted to contact Individual 2 via phone and email. Given that the University had Individual 2's class schedule and address—not to mention that the University was simultaneously investigating *his* exploitation of John—the University could easily have reached Individual 2 by other means. As a result of the University's half-hearted efforts, it failed to obtain a statement from Individual 2. Along with the lack of potentially exonerating information that could have come from this statement, John was deprived of the ability to ask Individual 2 questions at the hearing. Further, at the hearing, the Panel cut-off another witness's testimony just as he was about to explain something that Jane said after the incident that was potentially relevant to her state of mind during the incident, including her attitude towards sex. In both the investigation and the limited testimony allowed at the hearing, John is unaware of any similar treatment that Jane faced.[5]

## 2.  John Demonstrates a Likelihood that the University Was Deliberately Indifferent to John's Plight as a Male Student Accused of Sexual Assault.

John also has demonstrated a likelihood of success on his deliberate indifference theory. To prevail on a deliberate indifference theory, the plaintiff "must ultimately show that an official of the institution who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct . . . ." *Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 751 (S.D. Ohio 2014) (rejecting the defendant's motion to dismiss the Title IX claim of a student accused of sexual assault).

---

[5] With the Court's permission, John requests expedited discovery to obtain critical documents not in its possession, such as the hearing transcript, John's recorded statements, and notes on John's statements.

There is no question that the University had notice of its biased approach to the investigation, as OSC, including its Lead Investigator, directed all investigations. OSC certainly could have instituted corrective measures every step of the way. For example, the University could have told John from the start that his statements could later be used against him; could have refused IUPD's request to question John before notifying him of the University's action; could have fully pursued John's key witnesses; and could have allowed witnesses favoring John's side to testify to the full extent as Jane's witnesses. The University's stream of decisions hurting John and favoring Jane placed them on fundamentally different footing, and the University could have—and should have—acted to correct these discrepancies.

### A. <u>Breach of Contract Claims</u>

The relationship between a student and a university institution is contractual. *Amaya v. Brater*, 981 N.E.2d 1235, 1240 (Ind. Ct. App. 2013). "It is generally well accepted that the catalogues, bulletins, circulars, and regulations of a university made available to the matriculant become of part of the contract." *Id.*; *see also Sung Park v. Indiana Univ. Sch. of Dentistry*, 692 F. 3d 828, 830–31 (7th Cir. 2012) (assuming the existence of an implied contract arising out of Indiana University's Student Handbook and Codes of Conduct between the School of Dentistry and the student). In assessing a breach of contract claim between a student and a university, the Court must "determine whether the educational institution acted illegally, arbitrarily, or in bad faith." *Amaya*, 981 N.E.2d at 1240; *see also Doe v. Univ. of Notre Dame*, 2017 WL 1836939, No. 3:17-cv-298-PPS/MGG, at *9 (N.D. Ind. May 8, 2017) ("I readily find that John Doe has more than a negligible chance of prevailing on his contention that Notre Dame's disciplinary process as applied in his case was arbitrary and capricious in a number of respects."), *vacated by* 2017 WL

7661416, at *1 (N.D. Ind. Dec. 27, 2017) (parties stipulating to dismissal and jointly requesting the court vacate its May 8, 2017 preliminary injunction opinion and order).

The University arbitrarily and capriciously breached its contract with John by several failures to follow its own policies and procedure. (Compl. Ex. 12, p. 10) (giving parties to a sexual misconduct proceeding the right to "adequate, reliable, and impartial investigation").) First, John was not given prompt notice of the allegations against him. Jane brought her complaint against John to IUPD on or about May 25, 2018. On May 29, 2018, OSC agreed not to tell John of the University's process until *after* IUPD received a statement from John. (Compl. Ex. 5, p. 2.) IUPD spoke with John on June 1, 2018, and it was not until June 6, 2018, that OSC notified John that there were allegations against him—almost two weeks after OSC had notice of the allegations. (*Id.*; *c.f.* Compl. Ex. 12, p. 10) ("The University will promptly respond to all reports of sexual misconduct alleged a University student . . . ."); *id.* ¶ 1.a., p. 11 ("If sexual misconduct proceedings are initiated, the Investigator will notify the complainant and the student alleged to have engaged in sexual misconduct . . . .").)

The University continued to give John insufficient notice throughout the proceedings. On October 3, 2018, OSC proposed hearing dates of either October 12th or October 19th. (Compl. Ex. 10, p. 2.) It was not until *October 8th* that OSC made the Final Investigation Report and supporting documentation available.  (Compl. Ex. 11.) As the hearing was ultimately scheduled on October 19th, John had less than two weeks to read and analyze the thirty page Investigation Report and prepare his defense on his own. *See also Doe v. Univ. of Notre Dame*, 2017 WL 1836939 at *10–11 (explaining that the accused student's limited time to review investigation materials may well be capricious and that the accused student "is essentially on his own" in the disciplinary process).

John's already difficult task was exacerbated by the University's failure to provide him a complete copy of the case file electronically; some materials were only available for inspection (but not copying, printing, or sharing in any form) at the OSC office. (Comp. Ex. 12, ¶ 1.g., p. 11 ("[T]he parties will be provided the Final Investigation Report); Ex. 11 ("During the file review, you are permitted to take handwritten notes, but may not photograph any section of the file. Additionally, an electronic copy of the Final Investigation Report **and case file** will be made available to you via Box.").) John could not fully prepare for the hearing with limited access to the supporting documentation, and he did not receive some of the information in the case file at all, such as Jane's text messages that she submitted. As a result, Jane went into the hearing with superior knowledge of the materials being reviewed by the Panel.

Further, the University provided only bare-bones information as to how the hearing process worked. The University told John merely that the hearing would include panelists who would determine whether he was responsible, that he could not speak to Jane directly, and that they both could present information. (*C.f.* Ex. 12, p. 10 (stating the Respondent's right "[t]o be fully informed of the University policies and procedures . . . "); *id.* ¶ 1.g., p. 11, (stating that if the Investigator places charges, the parties "will be notified of next steps of the sexual misconduct process).) The University also did not tell John the identity of the witnesses it would be calling ahead of time. John was thus left to guess. (*C.f. id.* at 1 (requiring the University to provide a "fair . . . resolution for complaints).)

Beyond issues regarding notice, preparation time, and information asymmetry, the University failed to give John "equal opportunities to present information." (*Id.* at 10; *see also id.* ("The University will have as a priority the interests of **all parties involved**, in regard to **fairness, dignity, privacy, and due process**.") (emphasis added).) John provided the names of his ex-

girlfriend and close friend to testify as character witnesses and as to his habit of seeking verbal consent from sexual partners. (*See id.* at 9 ("Prior or subsequent conduct of the respondent may be considered in determining pattern, knowledge, intent, or motive.") Nevertheless, the University did not bother to contact either of them. In contrast, two of Jane's friends were permitted to testify as her character witnesses in the hearing. *See also Doe v. Univ. of Notre Dame*, 2017 WL 1836939 at \*10 (criticizing Notre Dame's limits on hearing testimony and the discrepancy between what the accused and the accuser were allowed to present). To the extent that the University claims that it did not contact John's witnesses because prior sexual history is not allowed, the University acted arbitrarily because it unreservedly allowed Jane's friends to make statements regarding Jane's former virginity.

The University's apparent disregard for John's witnesses continued throughout the investigation and the hearing. The University attempted to contact Individual 2 only via telephone and email. But the University easily could have taken more steps to contact the individual, as they knew his class schedule and address. As a result, the University did not obtain a statement from him. The University's lack of diligence prevented John from asking potentially valuable questions at the hearing of Individual 2, thus stilting his ability to present information (particularly vis-à-vis Jane, whose witnesses, to John's knowledge, were all contacted by OSC). Further, at the hearing, the University cut off a witness favoring John as he was in the middle of providing testimony probative of Jane's state of mind during the incident, including her attitude towards sex. Given the multitude setbacks that the University placed upon John, he did not have the equal opportunity to present information as promised.

Another defect in the University's process was that the investigation took far too long. The University's Sexual Misconduct Policy provides that "[t]he investigation and determination

of responsibility will generally be concluded within 60 days of the report, absent special circumstances." (*Id.* at 10.) Here, Jane met with OSC for the first time regarding her allegations on May 25, 2018, and OSC determined John's responsibility *over five months later* on November 6, 2018, which was over a year after the incident. Yet OSC never presented John with any "special circumstances" justifying the substantial lapse in time. The University's inexcusable delay prejudiced John. Several of the witnesses testified that they could not recall details of what they saw or heard the day of the incident. These lapses in memory would have been diminished had the University completed its process within the standard 60 days. *See also Doe v. Univ. of Notre Dame*, 2017 WL 1836939 at *10 (explaining that the 111 day period between the beginning of the investigation and Notre Dame's ultimate decision supported the accused's breach of contract claim).

Further, the University violated its promise of a "fair and impartial investigation and resolution of complaints" in its handling of this case's unique circumstances. (*Id.* at 1.) As explained above, the University shifted John's role from the victim to the assailant, and used his prior statement *as a Complainant* against him in the proceeding *as a Respondent* in its final decision. The University then gave great weight to supposed "inconsistencies" between his first and later statements regarding consent, even though John had no reason to discuss the issue of consent in his first statement as a victim. (Compl. Ex. 6, p. 3.) For no apparent reason, the University overlooked this, and decided to equate John's omission of details regarding consent to mean that Jane did not consent.

The decision also fails to consider the implications of Jane's admissions that "the sexual activity was hard to remember due to her alcohol consumption," (Compl. Ex. 5, p. 3), that she was "blacking in and out" on her walk to the Sigma Nu house, (*id* at 4.), that she "blacked out" from

when she left her sorority with John to when she left Sigma Nu after the sexual activity occurred, (*id.* at 5.), and that she "remembers parts of that day, but not all of it," (*id.*). The panelists allegedly "considered Complainant's statement that she was blacked out, which is consistent with the sporadic portions of the evening she was able to recall." (Compl. Ex. 6, p. 2.) But if Jane blacked out, and her memory came and went throughout the day, what basis did the Panel have to refute *John's* version of the facts that he asked for consent? How could Jane have definitively stated that she did *not* consent when she admits to not remembering everything that happened? The University's failure to address this obvious possibility demonstrates its arbitrary and capricious reasoning and selective consideration of the evidence.

Finally, the University's decision fails to explain how John, as a Complainant in the Photo Investigations, did *not* consent to the photo being taken, yet also, as the Respondent, can be held responsible for "allowing" the photo to be taken. This incongruity is essentially victim blaming: the University has faulted John for not stopping others from exploiting him. The University thus cannot be said to have treated John with "fairness" and "dignity," (*see* Compl. Ex. 12, p. 10). Instead, the University has treated John arbitrarily and capriciously throughout the whole process.

## II.   John will be irreparably injured if the preliminary injunction is denied, and no remedy at law is adequate.

John faces irreparable injury, both in the short and long term, if his request for injunctive relief is denied, and he does not have an adequate remedy at law. The denial of injunctive relief would mean that John would remain suspended from the University for four years or until this case is resolved in his favor. As a Kelley student, John has a full class schedule and is working toward the ambitious goal of achieving a triple major. He is nearing the end of the semester and has one final exam scheduled to occur on November 28, 2018 at 4:00 p.m. John also has two group projects

due December 3, 2018, with a class presentation component.  If John remains suspended, he will lose an entire semester's worth of academic credit and the value of his time and effort put into his studies. No amount of money can make up for that, especially given John's ambitions to go to graduate school upon completing his undergraduate education and to eventually become a professor at the Kelley School of Business. John will also likely lose his internship for the summer of 2019 as a Business Technology Analyst Summer Scholar at Deloitte Consulting should he remain suspended. Losing such a prestigious position, one that may turn into a full time job upon graduation, would irreparably harm John.

Although the loss of his current work this semester would irreparably injure John, nothing can compare to the injury of having a glaring gap in his academic record. *See Doe v. Univ. of Notre Dame*, 2017 WL 1836939 at *12 (holding that an educational gap "constitutes irreparable harm to John's reputation and resume for purposes of career prospects and further economic advancement"). Future employers and graduate school admissions counselors would certainly ask John why he did not pursue his undergraduate education continuously, and he would inevitably have to explain the hole in his record. Prospective employers and graduate schools would likely reject him from consideration the moment he said "sexual misconduct allegations." For the same reasons, John's attempt to transfer to another university would likely be futile given a suspension on his record, thus creating an even larger resume gap.

### III.   John would suffer greater harm if injunctive relief is denied than the University would suffer if the injunctive relief is granted.

While John would suffer substantial harm if injunctive relief is denied, the University would suffer only minimal harm—if any—if the injunctive relief is granted. Allowing John to remain on campus and take classes does not pose any safety risk to other students. Since September 4, 2017, John has not gotten into any kind of trouble, nor have other allegations been flung at him.

Further, respecting Jane in particular, there is presently a no contact order in place, nor does John have any desire to contact Jane, anyway. Further, the University could employ other alternatives rather than completely ban John from campus, such as prohibiting him from attending social events. John does not even live on campus now, so his future entry onto campus could be limited to classes and class-related work.

### IV. An injunction allowing John to proceed with his education pending a hearing on the merits favors the public interest.

As the Federal District Court for Northern District of Indiana has recognized, "[t]he public has an interest in fundamentally fair and sound educational discipline that is not imposed arbitrarily or capriciously." *Doe v. Univ. of Notre Dame*, 2017 WL 1836939 at *13. Moreover, the University should be held to the procedural standards it set for itself. *See*, *e.g.*, *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1129 (Ind. 1995) (recognizing the public interest in enforcing private contracts). The University's arbitrary and capricious conduct in John's case should not be tolerated, and injunctive relief would send the message that due process in student disciplinary proceedings should be scrutinized. Relatedly, the public has an interest in ensuring that students are not deprived of educational opportunities because of their sex. Finally, as explained above, there is no safety risk to the public by allowing John to proceed with his education.

### <u>CONCLUSION</u>

John respectfully requests that the Court enjoin the University from enforcing its decision to suspend him from the University for four years. John has demonstrated a likelihood that he will proceed on the merits, and injunctive relief would prevent John from suffering irreparable harm that no amount of money could fix. The irreparable harm to John if injunctive relief is denied substantially outweighs any harm to the University if injunctive relief is granted.

All conditions precedent to the filing of this Motion have been satisfied or otherwise waived. The emergency injunctive relief that John now seeks is intended only to maintain the *status quo* pending a hearing on the merits.

**WHEREFORE**, Plaintiff John Doe respectfully requests that this Court ORDER the following:

    (a)    That a Preliminary Injunction under Federal Rule of Civil Procedure 65 is issued immediately and that Defendant Indiana University is enjoined from enforcing the sanctions issued against Plaintiff John Doe on November 6, 2018, and affirmed on November 27, 2018;

    (b)    That the Court set a hearing on this Motion for Preliminary Injunction before the start of Indiana University's Spring 2019 academic semester on January 7, 2019;

    (c)    All other just and appropriate relief.

**VERIFICATION**

I affirm, under the penalties of perjury, the foregoing representations are true and correct to the best of my knowledge and belief.

Respectfully Submitted,

_____

Margaret M. Christensen, # 27061-49
Jessica Laurin Meek, # 34677-53
Bingham Greenebaum Doll LLP
2700 Market Tower
10 West Market Street
Indianapolis, IN 46204-4900
Telephone: (317) 635-8900
Facsimile: (317) 236-9907
mchristensen@bgdlegal.com
jmeek@bgdlegal.com

*Attorneys for Plaintiff John Doe*

28

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on November 27, 2018, the foregoing was filed electronically via the Court's electronic filing system. I further certify that the foregoing was served via first class mail and by email.

Melissa A. Macchia
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204
T: (317) 713-3500
F: (317) 713-3699

/s/ *Margaret M. Christensen*
*An Attorney for John Doe*