**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-3713-TWP-MJD |
| | ) | |
| INDIANA UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**DESIGNATION OF EVIDENCE IN SUPPORT OF VERIFIED MOTION
PRELIMINARY INJUNCTION**

Plaintiff, John Doe ("John"), by counsel, Designates the Following Evidence in Support of his Verified Motion for Preliminary Injunction to enjoin Defendant, Indiana University (the "University"), against suspending John for four years:

**List of Exhibits**

For the convenience of the Court and the Parties, John Doe provides the following list of designated exhibits, with particular designations set forth below.

| | |
|---|---|
| **Exhibit 1** | John Doe Affidavit |
| **Exhibit 2** | John Doe Deposition |
| **Exhibit 3** | Hearing Panel Packet |
| **Exhibit 4** | September 27, 2017 E-mail to John Doe from OSC |
| **Exhibit 5** | Charge Letter to Individual 1 |
| **Exhibit 6** | Charge Letter to Individual 2 |
| **Exhibit 7** | Hearing Panel Decision |
| **Exhibit 8** | Individual 1's Acceptance Letter |
| **Exhibit 9** | Individual 2's Acceptance Letter |
| **Exhibit 10** | Simone Cardosa Deposition |
| **Exhibit 11** | University Training – Substance Use and Sexual Assault |
| **Exhibit 12** | University Training – Communication, Cues, & Sexual Consent |
| **Exhibit 13** | Kurt Zorn Deposition |

1

| **Exhibit 14** | Marjorie Treff Deposition |
|---|---|
| **Exhibit 15** | Simone Cardosa Affidavit |
| **Exhibit 16** | University Training – Serving on Sexual Misconduct Hearing Panels |
| **Exhibit 17** | Barry Magee Deposition |
| **Exhibit 18** | Latosha Williams Deposition |
| **Exhibit 19** | Excerpt of Historic Investigative Report Showing Transcript Received from |
| **Exhibit 20** | Jane Doe's Facebook Photos of September 4, 2017 |
| **Exhibit 21** | Libby Spotts Deposition |
| **Exhibit 22** | Witness 6 Affidavit |
| **Exhibit 23** | Affidavit of Sealed Witness |
| **Exhibit 24** | University E-mail Regarding Separate Hearings for John Doe, Individual 1, and Individual 2 |
| **Exhibit 25** | Excerpt of Historic Investigative Report with 2 Respondents |
| **Exhibit 26** | Marjorie Treff Affidavit |
| **Exhibit 27** | Panel Deliberation Worksheet |
| **Exhibit 28** | Video of Jane Doe at September 4, 2017 Party* |
| **Exhibit 29** | Williams Affidavit |
| **Exhibit 30** | Decision Draft – Treff Comments |
| **Exhibit 31** | Williams' Notes for Decision |
| **Exhibit 32** | Williams E-mail Regarding Decision Rationale and Timing of Decision |
| **Exhibit 33** | Kurt Zorn Affidavit |
| **Exhibit 34** | Spotts Affidavit |
| **Exhibit 35** | John Doe's Notice of Appeal |
| **Exhibit 36** | Appeal Decision Letter |
| **Exhibit 37** | Excel Spreadsheets Regarding Historical Data |
| **Exhibit 38** | University's Sexual Misconduct Policy |
| **Exhibit 39** | Hearing Audio (6 parts)* |
| **Exhibit 40** | Jane Doe's IUPD Recorded Statement* |
| **Exhibit 41** | John Doe's Recorded Statement to IUPD* |
| **Exhibit 42** | John Doe's Recorded Statement to Prosecutor* |
| **Exhibit 43** | Decision Draft – Magee Comments |

*Denotes Exhibits containing video or audio hand-filed on a DVD.

**Particular Designations**

1.      John enrolled at Indiana University in the fall of 2016 and has been enrolled continuously as an undergraduate student through the fall, 2018 semester. John has completed six semesters at Indiana University because he took a full semester of classes during the summer of 2018. (**Exhibit 1**, Doe Affdvt. ¶1).

2.      John began his studies at the Kelley School of Business as a direct admit in the Fall of 2016. (**Exhibit 1**, Doe Affdvt. ¶2).

3.      When John began the Fall, 2018 semester, he had senior standing based on the number of credits he had completed.  (**Exhibit 1**, Doe Affdvt. ¶3).

4.      John was working towards a triple major in Supply Chain Management, Business Analytics, and Technology Management. (**Exhibit 1**, Doe Affdvt. ¶4).

5.      Before enrolling at IU, John spent his summers volunteering at Walcamp Outdoor Ministries, where he cared for adults with disabilities and facilitated Bible games and other activities.   (**Exhibit 1**, Doe Affdvt. ¶5).

6.      As an IU student, John continued his community service by volunteering with Cru, one of the University's Christian organizations, to provide relief to victims of Hurricane Harvey last year. (**Exhibit 1**, Doe Affdvt. ¶6).

7.      At IU, John has a cumulative GPA of 3.779. For the fall of 2018 semester, his GPA was 3.964. (**Exhibit 1**, Doe Affdvt. ¶7).

8.      John has secured a position as a Business Technology Analyst Summer Scholar at Deloitte Consulting for the summer of 2019. (**Exhibit 1**, Doe Affdvt. ¶8).

9.      In the afternoon of September 4, 2017, John attended a fraternity party. (**Exhibit 1**, Doe Affdvt. ¶9).

10.     At the party, John was hanging out with friends and formally met Jane Doe. (**Exhibit 1**, Doe Affdvt. ¶10).

11.     At the party, Jane announced, "Who am I going to f*ck today?" (**Exhibit 1**, Doe Affdvt. ¶11).

12.     Jane began to flirt with John and was touching his shoulder a lot. Specifically, when she touched his shoulder, her hand would linger and would slightly rub down his arm. This was more physical contact than John is accustomed to receiving from new acquaintances. (**Exhibit 1**, Doe Affdvt. ¶12).

13.     Jane grabbed John's hand and began leading him around the party. (**Exhibit 1**, Doe Affdvt. ¶13).

14.     Eventually, Jane and John were kissing at the party, in an area removed from the crowd. John's back was against a wall. This was not as Jane has described as John pursuing a kiss and her turning her head away. (**Exhibit 1**, Doe Affdvt. ¶14).

15.     At that point, John and Jane discussed going somewhere more private. John suggested going to his apartment or going to his fraternity house. Jane stated that she wanted to go to the fraternity, but first, she wanted to change her pants. (**Exhibit 1**, Doe Affdvt. ¶15).

16.     John did not witness Jane consuming any alcohol during the party. John assumed she had consumed alcohol because we were at a party, but John did not believe that she was drunk to the point of incapacitation. (**Exhibit 1**, Doe Affdvt. ¶16; **Exhibit 2**, Doe Dep. 114:17-116:3.)

17.     Jane and John left the party together, first stopping at Jane's sorority house and then going to the fraternity house. John was a member of a fraternity, but did not live in the fraternity house. (**Exhibit 1**, Doe Affdvt. ¶17).

18.     When Jane and John arrived at her sorority house, Jane was holding his hand and

invited him into the house. John went up the stairs and stood outside of Jane's room while she was changing her pants. Then, Jane invited John into her room and the kissed more. (**Exhibit 1**, Doe Affdvt. ¶18).

19. When they got to John's fraternity house, they entered John's friend's room. Specifically, they entered a private room that was used as a living room, not a sleeping room. (**Exhibit 1**, Doe Affdvt. ¶19).

20. Once Jane and John were in the room, they began kissing.  They themselves ourselves.  John does not dispute Jane's statement that she helped him undress.  (**Exhibit 1**, Doe Affdvt. ¶20.)

21. John asked Jane whether she consented to him touching her breast and digitally penetrating her vagina, and she said yes. (**Exhibit 1**, Doe Affdvt. ¶21).

22. John asked Jane whether she wanted to have sexual intercourse, and she said yes. (**Exhibit 1**, Doe Affdvt. ¶22).

23. John and Jane began having sexual intercourse.  First, they were positioned so that Jane was lying on her back and John was on top of her.  This position was uncomfortable, and John asked Jane if she wanted switch positions so that she would be on her hands and knees and John would be behind her. (**Exhibit 1**, Doe Affdvt. ¶23).

24. Jane made a comment in the affirmative, rolled herself over, and propped herself up on her hands and knees.  John entered her vagina with my penis and she moaned in a way that John understood to indicate pleasure.  (**Exhibit 1**, Doe Affdvt. ¶24).

25. Jane moved her body with John as intercourse continued.  (**Exhibit 1**, Doe Affdvt. ¶25).

26. While John's back was to the door, he heard someone come into the room, say, "oh,

sorry," and leave.  John did not get a good look at the person, and at the time he thought that the individual was someone different than the person who later confirmed that he had entered the room. (**Exhibit 1**, Doe Affdvt. ¶26).

27.     Later, other people entered the room.  John was embarrassed to be caught in this intimate moment where people were laughing at me and he froze. He tried to laugh it off.  He greeted the intruders with a smile and a "peace sign" hand gesture and told them to get out.  Within seconds, they left the room. (**Exhibit 1**, Doe Affdvt. ¶27).

28.     After these interruptions, John suggested to Jane that they should stop having sex. They each dressed themselves. (**Exhibit 1**, Doe Affdvt. ¶28).

29.     While she was pulling up her pants, Jane said, "I only did this to get back at my ex-boyfriend."  That made John feel used, and he was at a loss for words.  He eventually stammered, "okay."  (**Exhibit 1**, Doe Affdvt. ¶29).

30.     John asked Jane, "do you want me to walk you home?"  Jane said "okay," and he walked her home.   (**Exhibit 1**, Doe Affdvt. ¶30).

31.     After leaving Jane at her sorority house, John learned that someone who had burst into the room while he and Jane were intimate had taken a photo of them. (**Exhibit 1**, Doe Affdvt. ¶31).

32.     John learned that the individual who took the photo posted it on SnapChat.  Then, someone who saw the photo on SnapChat captured a screen shot of the photo and circulated it to a group of fraternity brothers via a GroupMe chat.  John was not a member of the GroupMe chat group and thus it was not circulated to him at that time. (**Exhibit 1**, Doe Affdvt. ¶32).

33.     John was embarrassed to have been photographed having sexual intercourse and worried that Jane would also be embarrassed. (**Exhibit 1**, Doe Affdvt. ¶33).

6

34.     John immediately demanded to the fraternity president that the photograph be removed from the GroupMe posting.  The photo was already removed by the time he reached the fraternity president to make this demand. (**Exhibit 1**, Doe Affdvt. ¶34).

35.     John also texted Jane asking how she was doing and that he thought they "should talk about what just happened."  (**Exhibit 1**, Doe Affdvt. ¶8; **Exhibit 3** [Dep. Ex. 59], IU0001252-53.)

36.     By "what just happened," John was referring to the photo that he had just learned was taken of them. (**Exhibit 1**, Doe Affdvt. ¶36).

37.     Jane replied that she was fine, texted "#yolo" (which John understood to mean, "you only live once"), and stated "Idgaf" (which John understood to mean, "I don't give a f*ck" about the photo because she was not visible in the it, and expressed that "[i]t is just life." (**Exhibit 1**, Doe Affdvt. ¶37; **Exhibit 3** [Dep. Ex. 59], IU0001252-53.)

38.     The University's Office of Student Conduct ("OSC") apparently learned that the photo had been posted in a GroupMe chat and investigated the students who had taken the photo and reposted it (the "Photo Investigations") (**Exhibit 1**, Doe Affdvt. ¶38).

39.     OSC emailed John on September 27, 2017, stating that the University had information that he "may have experienced sexual misconduct" and explaining that it might proceed with a formal investigation. (**Exhibit 1**, Doe Affdvt. ¶39; **Exhibit 4** [Dkt. 1-2].)

40.     On September 29, 2017, as a part of the Photo Investigations, an OSC Assistant Director and an Investigator interviewed John regarding the photo, and he gave an oral statement. (**Exhibit 1**, Doe Affdvt. ¶40; **Exhibit 3** [Dep. Ex. 59], IU0001193.)

41.     John's understanding was that the purpose of the meeting was to talk about the photo.   (**Exhibit 1**, Doe Affdvt. ¶41.)

42.     John was instructed by his fraternity president to downplay his concerns about the photo.  (**Exhibit 2**, Doe Dep. 12:1-10, 25:6-13; 112:19-25.)

43.     John told Cardosa he was not bothered by the photo.  (**Exhibit 2**, Doe Dep. 12:13-15.)

44.     John did not disclose Jane's name during the meeting in order to protect her privacy.  (**Exhibit 39**, Hearing Audio, IU0000036, 1:44:19-1:44:41.)

45.     John had no reason to elaborate on my communications with Jane regarding consent during this meeting because that was not what the meeting was about.  John does not recall that anyone asked him about those communications. (**Exhibit 1**, Doe Affdvt. ¶42.)

46.     The Photo Investigations included allegations that Individuals 1 and 2 took and/or disseminated the photo "without [John's or Jane's] consent." This allegation is accurate with respect to John. (**Exhibit 1**, Doe Affdvt. ¶43; **Exhibit 5** [Dep. Ex. 45], IU0000207-208; **Exhibit 6** [Dep. Ex. 41], IU0000197-98.)

47.     John was never informed that my September 29, 2017, verbal statement given as a Complainant could later be used against him as a Respondent for "allow[ing] another individual" to take the photo or for more serious charges. (**Exhibit 1**, Doe Affdvt. ¶44; **Exhibit 7** [Dkt.1-6].)

48.     Had John been provided this information, he would have consulted an advisor and would have provided more information about consent and the entirety of the circumstances. (**Exhibit 1**, Doe Affdvt. ¶45).)

49.     At the end of his meeting with the OSC investigators, they asked John to clarify a few points.  John was not provided with a copy of the investigator's notes of the meeting or otherwise allowed to read and confirm the accuracy of the notes. (**Exhibit 1**, Doe Affdvt. ¶46.)

50.     Individuals 1 and 2 have accepted responsibility and been sanctioned for taking

8

and/or disseminating the photo without my or Jane's consent. Individual 1 accepted responsibility on November 1, 2018, and Individual 2 accepted responsibility on November 8, 2018. (**Exhibit 8** [Dep. Ex. 51], IU0000514-16; **Exhibit 9**, IU000506-508.)

51.     On May 25, 2018, Jane, with her parents present, made a report to OSC alleging that John had raped her on September 4, 2017.  (**Exhibit 3** [Dep. Ex. 59], IU0001223.)

52.     Jane then gave a statement to University Police Department Officer Garth VenLeewuen. (**Exhibit 3**[Dep. Ex. 59],  IU0001264-65.)

53.     Jane's statement alleged that she was so intoxicated on September 4, 2017, that she lacked capacity to consent. (**Exhibit 3**[Dep. Ex. 59],  IU0001264-65.)

54.     Jane provided Officer VanLeeuwen with a written timeline of her day, but that timeline was not given to OSC along with the recording of Jane's interview.  (**Exhibit 40**, Jane Doe's Recorded Statement to IUPD, 2:33:50; **Exhibit 10**, Cardosa Dep. 35:1-16.).

55.     On June 1, 2018, John received a call from Garth VanLeeuwen, an officer with the Indiana University Police Department ("IUPD"), stating that his name came up in connection with a case he was investigating and that he needed to talk to John. (**Exhibit 1**, Doe Affdvt. ¶48; **Exhibit 3**[Dep. Ex. 59],  IU0001266-67.)

56.     John was in class when he received Officer VanLeeuwen's call, so it went to voicemail.  (**Exhibit 1**, Doe Affdvt. ¶49.)

57.     During the class John read the auto-transcription of the voicemail on his phone.  He immediately ran out of class and returned Officer VanLeeuwen's call.  John told him he could meet right away and walked directly to the IUPD station.  (**Exhibit 1**, Doe Affdvt. ¶50.)

58.     John met with IUPD that day and was interviewed for over an hour.  John answered, to the best of his ability, all the questions that Officer VanLeeuwen asked of him.  However, nearly

nine months had passed since September 4, 2017, and he had not thought about that day much since the previous fall.  Thus, his memory of the day's events were not fresh.  (**Exhibit 1**, Doe Affdvt. ¶51-52; **Exhibit 3** [Dep. Ex. 59], IU 0001266-67; **Exhibit 41**, John Doe's Recorded Statement to IUPD.)

59.     At the end of that meeting, IUPD informed John that he was under investigation for rape. (**Exhibit 1**, Doe Affdvt. ¶52.)

60.     John was never provided a recording of that statement until it was produced with IU's discovery responses in this litigation. (**Exhibit 1**, Doe Affdvt. ¶53.)

61.     On June 6, 2018, the University notified John of Jane's allegations and that he was required to attend a meeting on June 8, 2018, with the OSC investigators. (**Exhibit 1**, Doe Affdvt. ¶54.)

62.     The University's Sexual Misconduct Policy requires investigators to have appropriate training to conduct sexual assault investigations.  (**Exhibit 38** [Dkt. 1-12], p.9.)

63.     Other than Jane, who voluntarily contacted IUPD, all female witnesses were interviewed only by OSC staff and all male witnesses were interviewed by IUPD officers. (**Exhibit 3** [Dep. Ex. 59], IU0001268, IU0001239-40, IU0001243, IU0001246, IU00047.)

64.     At the June 8, 2018, meeting, John gave another statement.  Again, he answered, to the best of his abilities, all questions posed by the investigator.  John had thought about the events of September 4, 2017, almost non-stop since his meeting with Officer VanLeeuwen and was able to recall more details than on June 1, 2018.  (**Exhibit 1**, Doe Affdvt. ¶55; **Exhibit 3** [Dep. Ex. 59], IU0001195.)

65.     At the end of his meeting with the OSC investigators, they asked him to clarify a few points.  John was not provided with a copy of the investigator's notes of the meeting or

otherwise permitted to review and confirm the accuracy of the notes. (**Exhibit 1**, Doe Affdvt. ¶56.)

66.     John also disclosed to OSC Investigator Cardosa the names of two women with whom he had previously had intercourse who could testify that he habitually sought verbal consent during sexual activity with a new partner. (**Exhibit 1**, Doe Affdvt. ¶57; **Exhibit 2**, Doe Dep. 116:11-117:2, 120:17-24.)

67.     John continued to think about the events of September 4, 2017, constantly, and then on July 13, 2018, John gave a statement to the Monroe County Prosecutor's Office, which the prosecutor sent to OSC on August 17, 2018.  Again, John answered, to the best of his ability, all questions asked by the deputy prosecutor.  (**Exhibit 1**, Doe Affdvt. ¶58.)

68.     John has consistently maintained that all contact with Jane was consensual and that he never consented to the photo being taken and disseminated. (**Exhibit 1**, Doe Affdvt. ¶59.)

69.     The prosecutor did not press charges against John. (**Exhibit 1**, Doe Affdvt. ¶60.)

70.     University employees and panel members are trained that men over-interpret women's sexual interest and that women are more likely to be the victims of sexual assault. (**Exhibit 11**, [Dep. Ex. 9] IU00000854; **Exhibit 12**, [Dep. Ex. 17] IU00000875; **Exhibit 13**, Zorn Dep. 38:3-24.)

71.     The Lead Investigator in John's case, Simone Cardosa, is a lawyer and has ample training in sexual assault matters.  (**Exhibit 15**, Cardosa Affdvt ¶2.)

72.     Cardosa was charged with investigating the claim made by Jane Doe and making the decision whether to charge John with a conduct violation.  (**Exhibit 15**, Cardosa Affdvt. ¶5; **Exhibit 16** [Dep. Ex. 7, IU0000726]; **Exhibit 17**, Cardosa Dep. 30:20-31:18.)

73.     The University defines relevant information as "anything that makes it more or less likely that something occurred." (**Exhibit 17,** Cardosa Dep. 15:6–8.)

74.    The investigators interview witnesses as a team, with one asking questions and another typing a summary of the witness's statement.  (**Exhibit 17**, Cardosa Dep. 23:24-24:9.)

75.    The University's "review" of statements with the witnesses consists of the investigator orally reviewing the Investigator's shorthand notes and asking if it is correct. (**Exhibit 17**, Cardosa Dep., 25:20–26:3.)

76.    Elizabeth Spotts, Cardosa's supervisor, did not review the final report.  (**Exhibit 21**, Spotts Dep. 49:12-22.)

77.    The Panel relied on what the investigation team include in the Final Investigation Report. (**Exhibit 17**, Magee Dep. 38:1–7 (stating that the Panel does not always determine whether is something is relevant to the decision-making process because it has already been determined for them); **Exhibit 18**, Williams Dep. 49:15–21, 50:5-7 (stating that the Panel was trained to depend on the framing that was provided in Final Investigation Report and to ask questions based on the Report).)

78.    The Final Investigation Report did not include summaries of non-party witness statements made to IUPD and omitted Witness 3's statement to IUPD that Jane seemed coherent because she turned her face away from him when he entered the room.  (**Exhibit 3** [Dep. Ex. 59], IU0001188-1221, IU0001268.)

79.    The panel did not watch or hear any recorded interviews taken by IUPD of the complainant or respondent. (**Exhibit 18**, Williams Dep. 14:17-24; **Exhibit 17**, Magee Dep. 28:8-12.)

80.    Cardosa did not watch the live videos of John's and Jane's respective statements to the IUPD. (**Exhibit 17**, Cardosa Dep., 36:4-9; 75:8-10.)

81.    Cardosa could have asked for a transcript IUPD's recorded interviews.  (**Exhibit**

**19,** IU0001498 (Final Investigation Report for another case stating that OSC "obtained" a transcript of the police report that the Complainant filed from the Bloomington Police Department).)

82.     Cardosa was unaware that Jane produced a written timeline and it was not included in the OSC file.  (**Exhibit 17**, Cardosa Dep. 35:8–16).

83.     Cardosa relied on John and Jane to develop evidence for her investigation.  The University's investigation team examined only the evidence that is submitted or suggested to them. (**Exhibit 17**, Cardosa Dep. 17:13-18:21.)

84.     Jane alleged that her incapacitation was obvious because she had worn her clothes into a pool that was at the party, while others were in swimsuits.  (**Exhibit 39**, Hearing Audio 24:30-25:30, 1:05-1:05:37.)

85.     Photos Jane posted of the party on Facebook on September 5, 2018, demonstrated that Jane's friends were all in street clothes and not swim attire.  (**Exhibit 20**.)

86.     John located the Facebook photos, but did not submit them to the University because he located them after the ten day window in which he was allowed to submit evidence. (**Exhibit 1**, Doe Affdvt. ¶63).

87.     The University did not look at Jane's public Facebook account because no one mentioned it.[1] (**Exhibit 17**, Cardosa Dep. 19:5-15.; **Exhibit 21**, Spotts Dep. 17:12–20)

88.     Cardosa can ask follow-up questions to clarify inconsistencies between a party's or witness's statements during the investigation. (**Exhibit 17,** Cardosa Dep. 44:7–8.)

89.     She also "sometimes" asks for clarification regarding inconsistencies between one witness's statements and another's, apparently if she deems it relevant. (*Id.* 44:10–16.)

90.     Similarly, if witnesses' IUPD statement conflicts with their OSC statement(s), Cardosa can ask about the difference and/or ask follow-up questions. (*Id.* 79:15–25.)

91.     Cardosa did not ask John to explain why he previously stated that he did not have anything to drink, whereas in subsequent statements he stated that he did—even though John had reasons that had nothing to do with the Incident for his inconsistencies. (**Exhibit 2**, John Doe Dep. 14:24–15:8 (explaining that he did not tell the truth about drinking because he was underage and wanted to protect the fraternity).)

92.     In his IUPD statement, Witness 6 stated that the party was at a particular fraternity. But in his OSC statement, he stated he could not remember where the party was located. (**Exhibit 3**, IU0001206 & IU0001268.)

93.     Cardosa did not raise this discrepancy during her meeting with Witness 6 because she did not consider the discrepancy relevant, (**Exhibit 17**, Cardosa Dep. 80:6–81:12), and she only puts in the Final Investigation Report information that she deems relevant, (*id.* 26:4–18).

94.     Cardosa reasoned that "it's not uncommon for students to not want to tell us what fraternity they were at or sorority in case that they don't want to get the organization in trouble."[2] (*Id.* 81:3–12.)

95.     Witness 6 testified that he did not want to get his fraternity into trouble.  (**Exhibit 22**, Witness 6 Aff. ¶ 19.)

96.     The Hearing Panel found this discrepancy relevant, as it asked Witness 6 about the discrepancy during the Hearing. (**Exhibit 39**, Hearing Audio, IU00000036, 26:44–27:38.)

97.     The University only enforced its prohibition against using evidence of either party's prior sexual history against John.  The University did not call John's past sexual partners after John

so requested because "past sexual relationships are not considered relevant in our investigation," (**Exhibit 17**, Cardosa Dep. 58:1–5), and information about the parties' prior sexual history is not included in the Final Investigation Report unless it was prior sexual history between the parties (*id.* 44:22–23.) (*See also* **Exhibit 14**, Treff Dep. 25:25–26:10 (stating that the panelists are taught that it is inappropriate to ask about the prior sexual history of either party "because it could potentially bias the case" because "someone [could] make a judgment in the present case based on prior sexual history" and "there's really no relevance").)

98.     Had the University contacted John's proposed witness, she would have testified that John asked her for consent every step of the way during their sexual encounter.  (**Exhibit 23**, Sealed Witness Affdvt. ¶ 12.)

99.     Cardosa intentionally included multiple statements regarding Jane's virginity before September 4, 2017, in the Final Investigation Report. (**Exhibit 3**, IU0001190 ("Complainant stated that she was a virgin and did not plan to lose her virginity to Respondent on a couch."); IU0001207 ("Witness 7 stated that, she thinks, Complainant was a virgin before her experience with Respondent"); IU0001208("Witness 8 stated that she knew that Complainant hadn't had sex before").)

100.    Cardosa's reasoning for why Complainant's repeated references to her virginity were relevant and permissible was because "virgin[ity] is more of an identity" rather than an "act" and that "the act of this identity that I hold, kind of goes to my state of mind . . . ." (**Exhibit 17**, Cardosa Dep. 58:19–22.)

101.    Jane was also permitted to testify about her prior sexual history during the Hearing, including her first kiss; that she is awkward around men; how a guy ended things with her because she did not want to have sex with him; that she never consented to sex before; and that she never

thought her first time would have been like this. (**Exhibit 39,** Hearing Audio, IU00000033, 14:38–14:54, 15:56–16:03, 16:34–37.)

102.     Kurt Zorn, the appellate officer in John's case, confirmed that the panel can ask about prior sexual history if it is "germane" or "material" and uses his "common sense" to make that determination.  (**Exhibit 13**, Zorn Dep. 20:11-20.)

103.     The summary of John's September 27, 2017 statement to IUPD in the Final Investigation Report segment of the hearing packet did not indicate that John provided that statement as Complainant, and thus had no reason to elaborate on affirmative consent for the sexual act. (**Exhibit 3** [Dep. Ex. 59], IU0001193 (omitting the context of John's position as a complainant) & IU0001229 ("The following information was provided in the event that [John] wanted to make a report in regards to his picture being taken without his consent" and explaining that John was provided with the Complainant Information Form, among other documents).)

104.     Additionally, Cardosa's omission of information regarding the Photo Investigations deprived the Panel the opportunity to consider Individual 1's motivations in providing his statement (i.e., his incentive to testify that John consented to the photo), even though the Panel is trained to consider motivation. (**Exhibit 17**, Cardosa Dep. 76:8–11.)

105.     Cardosa suggested that the panel could explore the witness's motivations by asking him for his motivation. (**Exhibit 17**, Cardosa Dep. 77:1–78:11.)

106.     The University ultimately found John responsible for "**allowing another individual to photograph** or take a video of [him] engaging in sexual intercourse with Jane without her consent." (**Exhibit 7** [Dkt. 1-6], Panel Decision (emphasis added).)

107.     After he was charged with allowing the photograph to be taken, the University charged Individual 1 and Individual 2 with taking and/or disseminating the photograph involving

John and Jane "**without either individual's consent**." (**Exhibit 5** [Dep. Ex. 45], IU0000207 &

**Exhibit 6** [Dep. Ex. 41], IU0000197.)

108.    The University states that John's, Individual 1's, and Individual 2's cases were all

separate and were "completely different files," and that there had not been findings made when

the charges were placed. (**Exhibit 21**, Spotts Dep. 62:24–64:15; **Exhibit 17**, Cardosa Dep. 72:7–

11 ("There are two different cases. There are two different investigations.").)

109.    The University included John's September 29, 2017, statement taken for the Photo

Investigations to his own investigation file. (**Exhibit 3** [Dep. Ex. 59], IU0001193.)

110.    The University admitted that the cases are related. (**Exhibit 21**, Spotts Dep. 67:4–

8 (explaining that Magee could not have served on the panel in John's case and in Individual 1's

case because "[t]hey were related cases and he already found a party who was a Complainant in

that case responsible in the other case.").)

111.    The University has the discretion pursue multiple respondents in a single

proceeding, and contemplated doing so in this case. (**Exhibit 24**, Email from Cardosa to Spotts,

IU0000263 ("I talked to Emily and Sally and they think separate hearings are best. I can connect

with you about the other two cases that involve these parties, but this is the one we would like to

be heard first."); **Exhibit 25**, IU00001483 (other sexual misconduct case involving two

Respondents in a single Final Investigation Report).)

112.    The panel chair determines the relevance of information presented during the

hearing.  (**Exhibit 16**, [Dep. Ex. 7], IU 00000738.)

113.    The panel chair prevented one of John's witnesses from providing additional

information during the hearing on the basis that it was not relevant, but admitted that she did not

know what the witness intended to say.  (**Exhibit 18**, Williams Dep. 83:8-15; **Exhibit 39**, Hearing

Audio, IU00000036, 1:44–2:50, 15:42–17:26.)

114.    The chair would have been permitted to take a break and privately ask the witness what he intended to say.  (**Exhibit 21**, Spotts Dep. 45:19-22.)

115.    The panel chair determined that the witness's information was not relevant because comments made by a complainant about the incident months to someone other than an investigator lose relevance.  (**Exhibit 18**, Williams Dep. 58:2-5.)

116.    The panel chair can share information about other cases and has knowledge of other cases.  (**Exhibit 17**, Magee Dep.14:6-9.)

117.    The panelists, other than the panel chair, were not aware of the photo investigations at the time of the hearing.  (**Exhibit 14**, Treff Dep. 39:12-18; **Exhibit 17**, Magee Dep. 56:20-57:20; **Exhibit 18**, Williams Dep. 83:16-84:23.)

118.    The panelists are trained to evaluate a witness's motivation in giving a statement. (**Exhibit 17**, Magee Dep. 30:25-31:3.)

119.    The panelists did not consider Individual 1's motivation for his statement because they were not aware of his status as a respondent in another investigation. (**Exhibit 18**, Williams Dep. 99:10-14.)

120.    The panelists did not discuss John's motivations for giving inconsistent statements about drinking.  (**Exhibit 17**, Magee Dep. 34:2-18.)

121.    The panel acknowledges that college students may like about drinking, especially when underage.  (**Exhibit 14**, Treff Dep. 50:8-12; **Exhibit 18**, Williams Dep. 89:11-90:6.)

122.    The panel was demonstrably hostile to male witnesses and demonstrably supportive of female witnesses.  (**Exhibit 39**, Hearing Audio, IU00000036, 42:02–43:15 (questioning John on his perception that John was being suggestive and flirtatious); IU00000036, 45:04-46:16

18

(Williams asks John, "so to clarify, very forward, very suggestive behavior on the part of the Complainant, and your response is nothing?"); IU00000034, 1:06:06–1:06:20 (Individual 1 tells Williams, "Nice to meet you" and Williams curtly responds, "okay."); IU00000035, 8:30–15:42 (repeatedly asking male student to rehash what he remembers); IU00000036, 32:52–34:07 (Witness 6 telling the Panel that John seemed "very bothered by the photo" and Magee attempting to dismiss this); IU00000036, 1:08:38–1:10:56 (Williams questioning why John would text Jane asking if she was okay instead of communicating with Individual 1); IU00000033, 34:02–34:18 (Jane asked whether she could talk to the Panel about how she was "processing" her "thoughts, feelings" when texting John);, IU00000034, 20:35–23:07 (asking female student about witnessing Jane crying after the incident); IU00000034, 32:46–33:19 (Treff introducing herself to female student); IU00000034, 1:06:49-1:07:08 (Treff introducing herself to Individual 1.)

123.    The panelists asked John and other witnesses to explain in detail whether the door was locked, and why or why not.  (**Exhibit 39**, Hearing Audio, IU0000036, 1:17:11-1:18:04, 1:21:17-1:22:37.)

124.    Witness 3 testified that the lock was not working.  (**Exhibit 39**, Hearing Audio, IU0000036, 14:22-15:19.)

125.    The panelists relied on Jane's testimony that she was crying after the sexual encounter but did not ask why she was crying.   (**Exhibit 14**, Treff Dep. 62:16-25 **Exhibit 26**, Treff Affdvt. ¶10(g); Magee Dep. 48:8-49:7.)

126.    The panelists did not ask Jane to explain her inconsistent testimony that she remembered crying in light of her other testimony that she did not remember crying.  (**Exhibit 39**, Hearing Audio, IU00000033, 57:37–58:08 (Jane stating saying she did not remember crying and her friends just told her), 1:01:49–1:02:20 (stating that she remembers sobbing).)

127.    When Jane testified that she did not get on top of John during sex because she did not want to, the panelists did not ask her to explain why this testimony conflicted with her other testimony that she lacked control.  (**Exhibit 39**, Hearing Audio, IU00000033, 37:19-38:12, 39:30–40:00.)

128.    When panelist Magee asked Jane to clarify whether she was on her hands or elbows during intercourse, she responded that she had her face down, but does not answer the question. The panel members did not press for clarification.  (**Exhibit 39**, Hearing Audio, IU00000033, 40:33–41:14.)

129.    Witness 6 did not testify during the hearing where the fraternity party was on September 4, 2017, but that information was available from his prior statements.  (**Exhibit 22**, Witness 6 Affdvt. ¶17-20; **Exhibit 3** [Dep. Ex. 59], IU0001268.)

130.    The panelists asked follow up questions of Witness 6 regarding why he could not recall the location of the party.  (**Exhibit 39**, Hearing Audio, IU0000036, 26:43-27:37.)

131.    The panelists are trained to confront and challenge respondent's statements but trained to be supportive of the complainant's testimony.  (**Exhibit 16** [Dep. Ex. 7]; IU0000748, 750; **Exhibit 14**, Treff Dep. 25:2-18 (admitting no training as to confronting or challenging the complainant's statements); **Exhibit 13**, Zorn Dep.19:14-20).)

132.    The panelists are trained to ask questions that are not "covered adequately in the investigation.  (**Exhibit 14**, Treff Dep. 13:6-9.)

133.    The panelists make credibility determinations by looking for inconsistencies in witness statements.  (**Exhibit 17**, Magee Dep. 30:2-10; **Exhibit 14**, Treff Dep. 17:12-18:24; **Exhibit 18**, Williams Dep. 78:7-14.)

134.    Most witnesses did not give live, in-person testimony at the hearing.  (**Exhibit 1**,

Doe Affdvt., ¶¶73-76; **Exhibit 39**, Hearing Audio, *passim*; *but see* **Exhibit 14**, Treff Dep.61:4.)

135.   Sometimes the panelists asked witnesses to explain the same information already covered in the witness statements.  (**Exhibit 39,** Hearing Audio, IU00000036, 6:20–6:52 (Witness 14 reiterating what he had stated before).)

136.   In other instances, panel members would not ask any additional questions.  (**Exhibit 26**, Treff Affdvt. ¶7.)

137.   Witnesses were asked whether they had anything to add to their statements, but the panel members did not know if the witnesses had their statements in front of them when answering this question.  (**Exhibit 18**, Williams Dep. 80:17-81:7.)

138.   John was permitted to submit questions for Jane Doe to the panel, which were reframed by the panel.  (**Exhibit 2**, Doe Dep. 76:5-18; **Exhibit 18**, Williams Dep. 101:7-103:19.)

139.   The panel completes a worksheet during their deliberation meeting based on their notes of the hearing and the documents in the hearing packet.  (**Exhibit 27** [Dep. Ex. 35], IU000001-8; **Exhibit 18**, Williams Dep. 13:3-16.)

140.   The panelists watched a video clip of Jane at the party in their deliberation process, and apparently concluded that her swaying to music was dancing "wildly." (**Exhibit 28**, party video; **Exhibit 17**, Magee Dep. 41:16-42:9.)

141.   The panel did not replay the hearing audio during their deliberation process.  (**Exhibit 18,** Williams Dep. 13: 20-24.)

142.   The University's policy requires a three-part consent analysis focused on capacity, consent, and force.  (**Exhibit 18**, Williams Dep. 53:21-54:3; **Exhibit 38** [Dkt. 1-12], Sexual Misconduct Policy.)

143.   The incapacitation analysis has two prongs: whether someone is so drunk that he

or she may not understand facts, nature, extent or implications of what was going on and whether the person initiating the sexual activity know or should have known that the other person is incapacitated.  (**Exhibit 18**, Williams Dep. 55:1-23.)

144.   A respondent cannot be liable for violating the policy if he did not know and should not have known that the complainant was incapacitated.  (**Exhibit 16** [Dep. Ex. 7], IU0000718; **Exhibit 38** [Dkt. 1-12], Sexual Misconduct Policy, p.3.)

145.   Despite being trained that a respondent must know or "should have known" of the other person's incapacitation, the panelists were trained that "[i]f a person is incapacitated, there can be NO consent, ***no matter what the person says or does***."   (**Exhibit 16** [Dep. Ex. 7], IU0000719.)

146.    The consent analysis addresses whether there was "affirmative, voluntary words or actions that are mutually understandable to all parties involved, to engage in a specific sexual act at a specific time." (**Exhibit 16** [Dep. Ex. 7], IU0000717.)

147.   There was no allegation of force in this case.  (**Exhibit 7** [Dkt. 1-6, Dep. Ex. 73], Hearing Panel Decision.)

148.   The panel concluded that Jane was incapacitated but that John "did not know or reasonably should not have known that Complainant was incapacitated." (**Exhibit 7** [Dkt. 1-6, Dep. Ex. 73], Hearing Panel Decision; **Exhibit 18**, Williams Dep. 103:20-104:20.)

149.   The panelists do not understand the University's policy that affirmative consent may be non-verbal.  (**Exhibit 18**, Williams Dep. 53, 93:23-94:3 ("So the discussion around the little to no communication was concerning our evaluation of consent. And in particular, if there were affirmative voluntary words that were exchanged."); **Exhibit 14**, Treff Dep. 14:14; 50:6-12; 11:1-6 ("consent has to be verbal and active").)

150.     The panel did not review the audio recording of the hearing to confirm testimony. (**Exhibit 18**, Williams Dep. 13:17-25; **Exhibit 17**, Magee Dep. 27:11-15.)

151.     The panel found that John's statements were inconsistent in that he indicated affirmative consent to all sexual activities and very little conversation.  (**Exhibit 14**, Treff Dep. 53:16-19 (consent every step requires quite a bit of conversation); **Exhibit 18**, Williams Dep. 93:23-95:13.)

152.     The panel did not ask John to clarify what he meant by "every step of the way," or to recount exactly what was said.  (**Exhibit 14**, Treff Dep. 51, 54:7-9).

153.     The panelists relied on incapacitation factors to conclude that Jane did not give affirmative consent to sexual activity.  (**Exhibit 27** [Dep. Ex. 35], IU0000001-2; **Exhibit 29**, Williams Affdvt. ¶15(j); **Exhibit** 26, Treff Affdvt. ¶10(j) ("I do not believe Jane Doe was in a physical or mental state that would have allowed her to communicate effectively during their sexual encounter.").)

154.     The panel considered Jane's testimony that she did not know what was going on in support of the incapacitation and the consent analysis.  (**Exhibit 18**, Williams Dep. 103:20-104:20.)

155.     The panel's decision letter indicates that the testimony as to Jane's body being "pretty still" with "no decisive movements" contributed to the panel's determination that consent was not communicated through voluntary actions.  (**Exhibit 7**, [Dkt. 1-6, Dep. Ex. 73], p.3.)

   a.   Magee testified that the panelists relied on evidence that Jane was still during the moments in which other students entered the room as an indication of "her capacity to continue with what was going on." (**Exhibit 17**, Magee Dep. 55:5-56:10.)

   b.   Magee also concluded that Jane's lack of reaction to people entering the room

indicated lack of consent.  (*Id.* 22:11-23:10.)

    c.   Treff's post-hearing commentary to the other panelists acknowledged that lack of body movement is relevant to incapacitation, not consent.  (**Exhibit 30**, IU0001854.)

    d.   The University trained the panelists that a complainant feeling frozen is a typical response when sex is nonconsensual**.  (Exhibit 14**, Treff Dep. 62:13-15.)

156.    The deliberation worksheet does not include the testimony that Jane led John around during the party, despite Treff's acknowledgement that it was a credible statement.  (**Exhibit 3** [Dep. Ex. 35]; **Exhibit 14**, Treff Dep. 46:25.)

157.    The deliberation worksheet does not include reference to John's statement that he and Jane kissed at the party.  (**Exhibit 27** [Dep. Ex. 35].)

158.    The panelists did not discuss the inconsistency between Jane and John's statements about kissing at the party.  (**Exhibit 14**, Treff Dep. 45:9.)

159.    The panelists dismissed the inconsistency as to Jane and John kissing as not relevant, despite having included these statements in the deliberation worksheet and in a draft of the hearing outcome letter.  (**Exhibit 27**, [Dep. Ex. 35], IU0000001; **Exhibit 31**, IU0001838; **Exhibit 14**, Treff Dep. 47:2-17; **Exhibit 18**, Williams Dep. 87:20-88:14; **Exhibit 17**, Magee Dep. 49:14-52:17.)

160.    Panelist Magee testified that Jane holding John's hand may indicate state of mind leading to up to sexual contact, but that it could also indicate drunkenness or mood.  (**Exhibit 17**, Magee Dep. 54:12-18.)

161.    Panelist Treff testified that she did not see any evidence that John actively sought consent.  (**Exhibit 14**, Treff Dep. 63:23-25.)

162. The panelists' deliberation worksheet does not acknowledge and weigh the concern that Jane's memory of giving consent may have been affected by her drunkenness.  (**Exhibit 35**, IU0000001-8; **Exhibit 30**, draft letter IU0001854; **Exhibit 18**, Williams Dep. 77:1-78:14; 79:1-16.)

163. Jane's hearing testimony was clear that she did not remember much about the sexual encounter.  (**Exhibit 39,** Hearing Audio, IU00000033, 33:26–33:48 (Jane asked whether she remembered other people coming into the room and stating that she did not and that she "just remember[ed] nothing really"); IU00000033, 43:44–44:43 (Magee asks about other conversations with John, and Jane replies that she didn't "really remember," that she "did not think there was much conversation," and that she was "so blacked out that [she couldn't] really remember much of it."); IU00000033, 50:23–51:19 (Magee prompting Jane that she may was becoming more conscious, and Jane agrees but states that it went "downhill" and that "time period was like no memory at all.").)

164. The panelists found John's statements to be inconsistent to the extent they contradicted Jane's statements, even if neither statement was corroborated by other witnesses. (**Exhibit 17**, Magee Dep. 52:18-53:24.)

165. Panelist Williams challenged John to address that Jane said that John attempted to kiss her, but does not ask Jane the same question. (**Exhibit 39**, Hearing Audio, IU00000036, 45:03–45:57.)

166. Panelist Williams question John about discrepancies in the testimony as to removal of clothing, when the only inconsistency was between John's statement and Jane's statement. (**Exhibit 39**, Hearing Audio, IU00000036, 1:22:52–1:23:22.)

167. The panelists disregarded inconsistencies in Jane's statements.  (**Exhibit 14**, Treff

Dep. 40:22-41:8; 42:15-24.)

168.    In contrast, the panel focused on inconsistencies in John's statements.  (**Exhibit 17**, Magee Dep. 24:6-25:14.)

169.    Both John and Jane stated initially that they were not upset by the photo, but the panel disregarded John's explanation for this inconsistency and accepted Jane's. (**Exhibit 3** [Dep. Ex. 59], IU0001252-53; **Exhibit 18**, Williams Dep. 91:7-21 ("So she said what she needed to say in those moments."); **Exhibit 39**, Audio Hearing, IU00000033, 34:48–35:06; Hearing, IU00000036, 32:52-34:07; 56:28-59:12); **Exhibit 7**, Hearing Panel Decision [Dkt. 1-6]; **Exhibit 30**, draft hearing outcome letter, IU0001840-41.)

170.    The panel relied on the photo to determine that Jane was non-responsive to John's movements.  (**Exhibit 18**, Williams Dep. 106:13-18, 107:10-108:6; **Exhibit 32**, e-mail regarding panel's decision, IU0001834.)

171.    The panelists relied on Jane's lack of movement without considering whether John was making sexual movements at that time.  (**Exhibit 17**, Magee Dep. 55:8-23; 56:15-19; **Exhibit 18**, Williams Dep. 111:1-115:15; 118:5-16; **Exhibit 26**, Treff Affdvt. ¶10(f).)

172.    The panel made the assumption that the sexual intercourse could not be consensual because it was painful.  (**Exhibit 14**, Treff Dep. 61:17-23; **Exhibit 26**, Treff Affdvt., ¶10(b).)

173.    The panel imposed its own interpretations on the meaning of the peace sign displayed by John in the photo.  (**Exhibit 18**, Williams Dep. 91:3-6.)

174.    The panel described the peace sign as symbolizing "conquest" in the deliberation worksheet, despite no witness having used the word "conquest."  (**Exhibit 3**, [Dep. Ex. 35], IU0000002; **Exhibit 18**, Williams Dep. 92:23-25.)

175.    Zorn describes the photograph of John and Jane having sex as "John Doe's badge

of honor," even though no one ever used those words in the investigation or hearing. (**Exhibit 33**, Zorn Affidavit ¶11.)

176.    The panel's deliberation worksheet lists "pervasiveness of the sexual exploitation" as an aggravating factor.  (**Exhibit 3**, [Dep. Ex. 35], IU0000007; **Exhibit 31**, draft hearing outcome letter, IU0001841.)

177.    There was no evidence or witness statement suggesting that John gave permission for the photo to be shared on social media.  (**Exhibit 3** [Dep. Ex. 59], *passim*; **Exhibit 39**, Hearing Audio Recording, *passim*.)

178.    The panel apparently reached the conclusion that is John had allowed the photo to be taken, he also impliedly authorized it to be shared on social media.  (**Exhibit 14**, Treff Dep. 55:2-7; **Exhibit 18**, Williams Dep. 96:1-19; **Exhibit 31**, draft of hearing outcome letter, IU0001841-42.)

179.    Professor Zorn approved of this rationale.  (**Exhibit 33**, Zorn Affdvt. ¶¶11–12 (stating that the sanction was proportionate because of the photograph, and then listing "additional" factors as an afterthought).)

180.    As a reason for the sanctions imposed, the initial draft of the hearing outcome letter stated that the photo was "posted, circulated, and discussed throughout the Greek community at Indiana University." (**Exhibit 30**, IU0001854 at 3.)

181.    The reference to the Greek community apparently came from Latosha Williams' notes. (**Exhibit 31**, IU0001842.)

182.    Marjorie Treff, one of the panelists, commented on this point: "This might be an overstatement. How do we know it was 'throughout the Greek community at IU?" It might have been limited to their particular frat group.'" (**Exhibit 30**, Treff comment to draft of hearing

outcome letter, p.4)

183.    The entire investigation and hearing process exceeded the 60-day period set forth in the University's policies.  (**Exhibit 3** [Dep. Ex. 59], IU0001188; **Exhibit 7**, Hearing Panel Decision; **Exhibit 32**, Williams e-mail acknowledging lateness, IU0001834; **Exhibit 1**, Doe Affdvt. ¶88.)

184.    The panelists' notes were returned to the Office of Student Conduct at the conclusion of their deliberation meeting on October 20, 2018, but before the outcome letter was finalized.  (**Exhibit 18**, Williams Dep. 15:3-10; **Exhibit 17**, Magee Dep. 8:16-9:1.)

185.    The file containing these notes was discarded by the University.  (**Exhibit 18**, Williams Dep. 14:25-15:10, 103:13-17.)

186.    The hearing outcome letter was drafted by Libby Spotts, the Associate Dean, Director, and Deputy Title IX Coordinator with the Office of Student Conduct at the University. (**Exhibit 34**, Spotts Affdvt. ¶18; **Exhibit 43**, Magee comments to draft outcome letter, IU0001825-26.)

187.    The panelists exchanged notes and comments by e-mail once the draft was circulated.  (**Exhibit 30**, IU0001854; **Exhibit 31**, IU0001838-43; **Exhibit 32**, IU0001834-35; **Exhibit 43**, IU0001825-26.)

188.    Additionally, because they had already turned in their notes, the panelists did not have access to refer back to their notes during the process of editing the outcome letter.  (**Exhibit 43**, IU0001825-26; **Exhibit 30**, IU0001854; **Exhibit 17**, Magee Dep. 8:16-9:1.)

189.    The panel's decision letter was dated November 6, 2018.  (**Exhibit 7** [Dkt. 1-6], Hearing Panel Decision.)

190.    John appealed the panel's decision by letter dated November 10, 2018.  (**Exhibit**

**35**, Notice of Appeal.)

191.    John's appeal argued that there were serious procedural errors and detailed the inconsistency of making him the complainant and the respondent for the same conduct.  (*Id.*, §III.)

192.    John's appeal argued that his sanction was grossly disproportionate.  (*Id.*, §IV.)

193.    John's appeal assert due process violations under the Federal and Indiana constitutions.  (*Id.*, §V.)

194.    Zorn did not have access to recorded witness interviews, just the summaries prepared by the investigators.  (**Exhibit 13**, Zorn Dep. 52:18-25.)

195.    Doesn't get audio of recordings of interviews—just gets written summaries. (**Exhibit 13**, Zorn Dep. 51:7-19.)

196.    Zorn concluded that the photograph, and that the photo had been shared justified the harsh sanction in this case.  (**Exhibit 13**, Zorn Dep. 62:7-10; 65:6-10.)

197.    Zorn concluded that John implicitly authorized sharing of the photo.  (**Exhibit 13**, Zorn Dep. 65:6-67:6; 66:2-5 ("Anybody that's aware of social media understands that pictures that are being taken are not necessarily going to stay on a particular device on which the photo is being taken.").")

198.    Zorn relied on Jane's positioning in the photo to indicate her lack of consent. (**Exhibit 13**, Zorn Dep. 67:7-68:19.)

199.    Zorn also supported his conclusion based on Jane's testimony that she did not know what was going on.   (**Exhibit 33**, Zorn Affdvt., ¶12(a).)

200.    Zorn acknowledges that Jane's confusion could be an indication of her drunkenness.  (**Exhibit 13**, Zorn Dep. 82:10-15, 21-23.)

201.    Zorn does not understand the University's definition of consent, stating it must be

"provided verbally."  (**Exhibit 13**, Zorn Dep.22:9).

202.    Zorn firmly believes that an incapacitated person cannot give consent, but makes no accommodation, as required by the University's policy, for a respondent who lacks knowledge that a complainant is incapacitated.  (**Exhibit 13**, Zorn Dep. 82:20-83:7; 82:10-15, 21-23.)

203.    Zorn did not review the panel training materials or hearing script in connection with his review.  (**Exhibit 13**, Zorn Dep. 20:17-24; 28:6-12; 47:15-18; 51:7-19.)

204.    Zorn agrees that when he is reviewing the procedure of a hearing and looking for a policy violation, considers whether the panel chair made the appropriate relevance determinations. (**Exhibit 13**, Zorn Dep. 24:23-25:9).

205.    Professor Zorn was not aware of the Photo Investigations during his appellate review.  (**Exhibit 13**, Zorn Dep. 55:8-12, 56:8-16.)

206.    Zorn's letter denying John's appeal and confirming the four-year suspension is dated November 26, 2018.  (**Exhibit 36**.)

207.    The University's four-year suspension of John Doe extends years beyond Jane's likely graduation date.  (**Exhibit 1**, Doe Affdvt. ¶93.)

208.    John has suffered from depression, interrupted sleep, insomnia, fatigue, severe anxiety, social withdrawal, excessive sweat, weight gain, and a worsening of his diagnosed tic disorder since learning of the rape allegations against him in June, 2018.  (**Exhibit 1**, Doe Affdvt. ¶¶97-101.)

209.    These issues make it more difficult for John to live life as he did before June, 2018. (**Exhibit 2,** Doe Dep. 11:21-111:2.)

210.    John is seeking professional treatment for these symptoms associated with his physical, mental, and emotional reaction to the University's charges against him.  (**Exhibit 2**, Doe

Dep. 111:3-6; 112:2-8.)

211.    If the University's suspension stands, it will delay or possibly ruin John's career prosects.  (**Exhibit 1**, Doe Affdvt. ¶¶ 102-109.)

212.    John's impression from the investigation process and structure of the hearing was that the panel had made a decision before they heard the case.  (**Exhibit 2**, Doe Dep. 118:12-119:13.)

213.    Other than the University's charges against him, and a high school detention that was overturned, John has never been the subject of a disciplinary proceeding at the University or any other school.  (**Exhibit 1**, Doe Affdvt. ¶110; **Exhibit 2**, Doe Dep. 6:8-13.)

214.    Based on the University's reports of sexual assault allegations from July 2017 to the present, 17 out of 33 males were ordered to attend a hearing after being investigated. In contrast, 0 out of 2 females proceeded to a hearing after being investigated. (**Exhibit 37**, IU00000705–707.)

215.    The University's Sexual Misconduct Policy requires an "[a]dequate, reliable, and impartial investigation." (**Exhibit 38** [Dkt. 1-12], Sexual Misconduct Policy, p.10.)

216.    The University's Sexual Misconduct Policy, Procedures for Responding to Incidents Involving Allegations of Student Sexual Misconduct provides for "fairness, dignity, privacy, and due process" to all parties involved.  (**Exhibit 38** [Dkt. 1-12], Sexual Misconduct Policy, p.10.)

217.    The University's Sexual Misconduct Policy requires the University to "provide a fair and impartial investigation and resolution for complaints."  (**Exhibit 38** [Dkt. 1-12], Sexual Misconduct Policy, p.1.)

218.    The University's Sexual Misconduct Policy provides a right for parties to "be fully

informed of University policies and procedures." (**Exhibit 38** [Dkt. 1-12], Sexual Misconduct Policy, p.10.)

219.    The University's Sexual Misconduct Policy provides, "The University will promptly respond to all reports of sexual misconduct alleged against a University student," (*Procedures, Preamble*), and will "notify the . . . student alleged to have engaged in sexual misconduct" if sexual misconduct proceedings are initiated." (**Exhibit 38** [Dkt. 1-12], Sexual Misconduct Policy, p.11.)

220.    The University's Sexual Misconduct Policy provides, "Throughout the process, the parties will have equal opportunities to present information." (**Exhibit 38** [Dkt. 1-12], Sexual Misconduct Policy, p.14.)

221.    The University's Sexual Misconduct Policy provides, "The Senior Student Affairs Administrator must render an [appeal] decision within 10 calendar days of receipt of the appeal." (*Procedures*, ¶ 5.c.) (**Exhibit 38** [Dkt. 1-12], Sexual Misconduct Policy, p.13.)

222.    John also designates the factual statements contained in in Verified Complaint, ([Dkt. 1], ¶¶1-113.)

Respectfully Submitted,

_____

Margaret M. Christensen, # 27061-49
Jessica Laurin Meek, # 34677-53
Bingham Greenebaum Doll LLP
2700 Market Tower
10 West Market Street
Indianapolis, IN 46204-4900
Telephone: (317) 635-8900
Facsimile: (317) 236-9907
mchristensen@bgdlegal.com
jmeek@bgdlegal.com

*Attorneys for Plaintiff John Doe*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on January 4, 2019, the foregoing, including Exhibits 1-27, 29-38, and 43, was filed electronically via the Court's electronic filing system. I further certify that Exhibits 28 and 39-42 were hand-filed on DVD.  I further certify that all electronically filed documents were served ECF and the hand-filed exhibits were served by hand-delivery to the following counsel of record:

Michael C. Terrell
Melissa A. Macchia
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204
T: (317) 713-3500
F: (317) 713-3699

/s/ *Margaret M. Christensen*
*An Attorney for John Doe*

19869951.1