*In the Matter Of:*

JOHN DOE

-vs-

TWP-DLP INDIANA UNIVERSITY

BARRY MAGEE

December 21, 2018



**CONNOR REPORTING**
111 Monument Circle, Suite 4350
Indianapolis, IN 46204
Phone: 317-236-6022
Fax: 317-236-6015
Toll Free: 800-554-3376

Barry Magee
December 21, 2018                                                Confidential

---

**Page 1**

```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF INDIANA
                   INDIANAPOLIS DIVISION
                   CAUSE NO. 1:18-cv-3713

JOHN DOE,                          )
                                   )
          Plaintiff,               )
                                   )
          -vs-                     )
                                   )
TWP-DLP INDIANA UNIVERSITY,        )
                                   )
          Defendant.               )
```

CONFIDENTIAL
TELEPHONIC DEPOSITION OF BARRY MAGEE

The deposition upon oral examination of BARRY MAGEE, a witness produced and sworn telephonically by me, Amy Doman, RPR, CRR, CSR No. 10-R-3022, Notary Public in and for the County of Hamilton, State of Indiana, taken on behalf of the Plaintiff, at the offices of Bingham Greenebaum Doll, LLP, 2700 Market Tower, 10 West Market Street, Indianapolis, Indiana, scheduled to begin at 9:00 a.m., on Friday, December 21, 2018, pursuant to the Federal Rules of Civil Procedure.

---

**Page 2**

A P P E A R A N C E S

FOR THE PLAINTIFF:

    Margaret Christensen
    Jessica Laurin Meek
    BINGHAM GREENEBAUM DOLL, LLP
    2700 Market Tower
    Indianapolis, IN 46204
    317.635.8900
    MChristensen@bgdlegal.com
    JMeek@bgdlegal.com

FOR THE DEFENDANT:

    Melissa A. Macchia
    Aimee Oestreich
    TAFT STETTINIUS & HOLLISTER, LLP
    One Indiana Square
    Suite 3500
    Indianapolis, IN  46204-2023
    317.713.3500
    MMacchia@taftlaw.com
    AOestreich@taftlaw.com

ALSO PRESENT:

    John Doe

---

**Page 3**

INDEX OF EXAM
                                                    Page
DIRECT EXAMINATION............................  4
    Questions by Margaret Christensen

INDEX OF EXHIBITS

    (No new exhibits marked.)

Previously Marked Exhibits:
Exhibit 35    - Office of Student Conduct - ... 17
                IU Bloomington Sexual
                Misconduct Hearing
                Deliberation Worksheet, IU
                0000001 - 8
Exhibit 65    - Affidavit and Résumé of Barry . 9
                Magee

---

**Page 4**

(Time noted:  9:09 a.m.)

THE REPORTER:  Counsel have stipulated that the reporter may swear in the witness over the phone.  So if you will raise your right hand, I will swear you in.

BARRY MAGEE,
having been duly sworn to tell the truth, the whole truth, and nothing but the truth relating to said matter, was examined and testified as follows:

DIRECT EXAMINATION
QUESTIONS BY MARGARET CHRISTENSEN:

Q   Mr. Magee, we met off the off the record, but as a refresher, my name is Meg Christensen.  And with my colleague, Jessie Meek, I represent [John Doe], the plaintiff in this action.

    Have you ever testified in a deposition before?

A   Yes.

Q   What was the context of that deposition?

A   Let's see, the last one was about a car accident that I had seen.

Q   And were there -- have you testified in depositions other than the car accident deposition?

---

**5**

1  A   No, I have never done any depositions.
2  Q   When were you deposed about the car accident?
3  A   Oh, gosh, late '80s, maybe, it's been a long time.
4  Q   So it's been a while. So I'm going to just give
5      you a quick refresher on the rules of a deposition.
6         So I'll ask you a series of questions related
7      to the case. And your obligation is to answer the
8      questions to the best of your ability. You
9      understand that you're under oath just like you
10     would be if you were in a courtroom; is that
11     correct?
12  A   Yes.
13  Q   And I do want you to understand my questions. So
14     if you don't hear me or if you don't understand
15     what I'm asking, would you please let me know?
16  A   Yes. That would be great.
17  Q   And if you answer me, I'll assume that you heard me
18     and that you understand my question. Okay?
19  A   Okay.
20  Q   The court reporter is creating a written record of
21     each question and answer today. This should be
22     easy since we're on the phone, but we do need
23     verbal responses.
24  A   Yes.
25  Q   And utterances like "uh-huh" and "huh-uh" are

**6**

1      difficult to transcribe. So a "yes" or a "no"
2      would be called for in those instances; is that
3      fair?
4  A   Yep. I'm used to that.
5  Q   And then in line with that, in order to keep the
6      record clear, let's both agree not to interrupt
7      each other. It is harder when we're on the phone,
8      but I will try my best. Can you do that as well?
9  A   Yes.
10  Q   Thank you. And if you need a break at any point,
11     let me know and we can take a break and I would
12     just ask that you finish any pending -- answer any
13     pending question before we take that break.
14  A   Okay.
15  Q   Have you taken any medications in the last 24 hours
16     that could affect your ability to testify today?
17  A   No, I have not.
18  Q   Do you have any medical conditions that could
19     affect your ability to testify today?
20  A   No, I do not.
21  Q   And is there any other reason why you wouldn't be
22     able to provide full and complete testimony today?
23  A   Not to my knowledge.
24  Q   Have you ever been convicted of a crime?
25  A   No.

**7**

1  Q   Have you ever been charged, but not convicted of a
2      crime?
3  A   No.
4  Q   Have you ever been arrested, but not charged?
5  A   No.
6  Q   Have you ever been a party to a lawsuit?
7  A   I'm trying to think back in my memory somewhere.
8      Yes.
9  Q   Do you recall the context of that lawsuit?
10  A   One was regarding a car accident in 1980 -- '83.
11     And I believe I was named in another lawsuit by the
12     university, in a case in which the university was
13     involved, but I didn't do a deposition and the
14     university settled the case. So I hadn't had much
15     to do with it. I just knew that they were suing
16     and I was a part of that.
17  Q   Were you named as a defendant in that case?
18  A   I don't believe I was. I just happened to be one
19     that they -- the other party was trying to get some
20     access to space outside there at IU. And by rules,
21     typically outside groups couldn't be there, but I
22     was there with some students, and they took
23     pictures of that and then used that as a reason for
24     asking why we could be there and they couldn't be
25     there. So ultimately they changed the university's

**8**

1      rules.
2  Q   Okay.
3  A   I never had to do a deposition or anything.
4  Q   Okay. That makes sense. Thank you.
5         What did you do to prepare for today's
6      deposition?
7  A   Not much. I'm on vacation. I did -- I was just in
8      my head rethinking some of the things to see if I
9      could remember some of the things that happened
10     during this particular case, having just, you know,
11     heard several cases, I'm just trying to remember in
12     my head as many details as I could for this case
13     particularly.
14  Q   Did you review any documents to prepare for the
15     deposition?
16  A   No, no documents. No. Our normal process, as you
17     likely know, is we get all of the cases notes, we
18     get summaries of the interviews that happened
19     between the various different parties, witness
20     statements. We review those, and then when we come
21     together for the case, and then as we leave the
22     room, we are to leave any and all notes that we've
23     taken, whether that was on a piece of paper on the
24     bars, or the side bars of the information that we
25     were given. So after that, we have no access to



**9**

1    any documents.
2  Q   Do you recall signing your affidavit at some point
3       this week?
4  A   Yes.
5  Q   Attached to that affidavit is a copy of your CV or
6       your résumé.
7  A   Yes.
8  Q   And I know that -- or I believe that Ms. Macchia
9       forwarded you a PDF of your affidavit, including
10      the résumé this morning.  So if you want to access
11      it, we've designated it in this deposition as
12      Exhibit 65.
13         (Deposition Exhibit 65 was previously marked
14      for identification.)
15  Q   My question for you is whether that résumé attached
16      to your affidavit is fully updated or if there's
17      some sort of training or experience that you have
18      relevant to Title IX and sexual misconduct that you
19      can disclose to us.
20  A   Well, I guess I don't normally put on there the
21      training that we're required to do every year.  The
22      person -- the in-person training that we do every
23      year plus any other things that we are required,
24      you know, like lots of other university employees
25      are required to do around Title IX.  And then I've

**10**

1    also attended some webinars about Title IX.  But I
2    haven't normally put those on my résumé just
3    because I see them as my own professional
4    development, as opposed to something that I've held
5    or something I have specifically done other than
6    just listing that I've been a hearing panelist.
7  Q   So you mentioned the mandatory training for
8       panelists.  Is that the twice-a-year day-long
9       training?
10  A   Yes.
11  Q   Okay.
12  A   Well, that's a part of it.  And then there's also
13      some other ones that we do and then there have been
14      a couple of webinars as well that we've done.
15  Q   Do you recall if you attended a training on
16      October 2 of 2018 this year?
17  A   Let me pull up my calendar.
18  Q   The title on the PowerPoint is "Sexual Misconduct
19      Workshop."
20  A   No, I don't believe I attended that workshop
21      because that's not in my calendar.
22  Q   And have you ever attended any Indiana University
23      Statewide Sexual Assault Prevention Conference?
24  A   Yes.
25  Q   Have you attended that conference on more than one

**11**

1    occasion?
2  A   Just once.
3  Q   Do you recall which year that was?
4  A   I want to say it was 2015.  It was at IUPUI.
5  Q   And at that conference, would you have attended any
6       breakout sessions about the state of Title IX or
7       changes in the regulations?
8  A   I do not remember what I attended --
9  Q   When you attend --
10  A   -- what specific sessions I attended.
11  Q   Sorry.  When you attend conferences or training
12      sessions, what's your practice with respect to
13      handouts and notes that you receive and take at
14      those conferences?
15  A   Well, typically the other conferences that I go to
16      on a fairly regular basis, it would just kind of
17      depend on the materials they would give me as to
18      whether I would keep, or whether I'm going to have
19      access to it later, whether I would actually keep
20      the piece of paper or I wouldn't.  I'm the kind of
21      person that normally makes written notes, but then
22      I don't really do anything with them,
23      unfortunately.  But most of the time I have access
24      to the material or otherwise, I would probably have
25      kept that material.

**12**

1  Q   All right.  And are you certified to operate as the
2       chair of a sexual misconduct panel?
3  A   I have not done that yet, no.
4  Q   You say "yet."  Is that something you want to do?
5  A   It just depends, I guess.  I'm not opposed to doing
6       it, but I'm certainly not eager to do it.
7  Q   So you've served on a number of sexual misconduct
8       panels.  About how long have you been doing that?
9  A   Let me figure this out from the documents.  I want
10      to say --
11  Q   To be clear, your affidavit says since 2013; is
12      that accurate?
13  A   Yes, yes.  I had to go back in my head the other
14      day to figure out when Jason was still there.  I
15      started when Jason was still there.
16  Q   And then you indicate you've served on 15 to 18
17      panels?
18  A   Yes.
19  Q   So your experience in serving on sexual misconduct
20      panels, how does that affect the discussion when
21      you are deliberating and debating the outcome with
22      the co-panelists?
23  A   That's a good question.  Typically, it doesn't
24      particularly right at the beginning of the whole
25      thing.  Sometimes at the end, after we've made a



**13**

1  determination of responsibility or not responsible,
2  there might be at that point a conversation just to
3  make sure that we are in a similar bounds of where
4  we were before in terms of, well, if something very
5  similar had happened earlier this year, last year,
6  not typically too much longer back, then we might
7  say, well, we don't want to give, you know, a whole
8  bunch more than that. And we certainly don't want
9  to just, you know, say okay, those three other
10  people, we suspended for a year and now we're only
11  going to suspend this person for two weeks.
12      So we're trying to keep some consistency. And
13  it's only after that we've made a determination
14  about that case, that we would hear from our chair
15  if there were other situations, so if the person
16  was already on probation, that's at the point when
17  we are determining what the sanction is going to
18  be, that we might hear from other of the things
19  that had happened with that particular student.
20  Q   Could you explain to me a little bit more what kind
21      of guidance you rely on as a panelist for
22      determining the appropriate length of a sanction?
23      I take your testimony to mean that you do look back
24      at your knowledge of prior sanctions and similar
25      cases. What else do you look at or consider?

**14**

1  A   Well, yeah, I think it's not just my knowledge, but
2      the chair also gives us some understanding because,
3      you know, it could have been a couple of months,
4      you know, since I've heard something or, I mean, I
5      probably heard things more frequently than that.
6      But the chairs also have knowledge of lots of other
7      cases that I'm not a part of, to be able to give us
8      some guidance on what, you know, is appropriate
9      based upon similar cases.
10      And then we -- you know, we think about other
11      kind of factors. Sometimes it's a factor of
12      thinking about the student -- the kind of
13      situation it was -- what word am I looking for
14      here? -- the level, I think, or if there's, you
15      know, if they've been charged with one or two
16      things and we've found them responsible for two,
17      but perhaps not one, as opposed to just one by
18      itself, or we found them responsible for all three
19      of those, so it's somewhat of -- that really is the
20      thing that takes the longest in the deliberation is
21      trying to establish what is an appropriate amount
22      of time.
23      And then what -- because we also give guidance
24      on when the person -- if they have been suspended,
25      what other things should they have done before they

**15**

1  come back. The deliberation really does take a
2  long time. Even if, in the beginning, we all are,
3  you know, in agreement in terms of our original
4  finding, it's the next part that takes us quite a
5  bit of deliberation in terms of the amount of time;
6  are there other things that the person would need
7  to do before they come back to IU; and then just
8  thinking about how, you know, some logistics of how
9  all this might play out and making sure that we are
10  conscious of both parties in the case or sometimes
11  more than two parties in a case.
12  Q   So in this particular case, and I will refer to
13      [John Doe] as "John Doe" and to the Complainant as
14      "Jane Doe." Is that understandable to you?
15  A   I'll try to keep that in my head, yes.
16  Q   If you use their real names, our court reporter has
17      agreed to help us locate those instances and
18      replace them in the transcript.
19  A   Okay. Great.
20  Q   But I'm just trying to create less work if I can.
21  A   Yes.
22  Q   So in this instance, the charges, when you were
23      deliberating the charges by Jane Doe against John
24      Doe, how long did that deliberation discussion
25      last?

**16**

1  A   After the end of the official testimony part, the
2      hearing ended on a Friday night, we discussed for a
3      little while what some thoughts were. But
4      ultimately, we, as the panelists, decided that we
5      were too tired to make any decisions that evening.
6      So we agreed to come back on Saturday. And it was
7      a good probably two hours, maybe a little bit more,
8      in our discussing: One, you know, what was the
9      level of responsibility; and then two, what would
10      be the outcomes of that in terms of what would be
11      the sanctions.
12      And then some logistical stuff in terms of the
13      way we currently do this was just very different
14      than just a few years ago, but we actually sit
15      there and the chair types and we are really writing
16      up the official letter as we go. So at the end of
17      our time when we all say we are done, there's a
18      really good draft of the decision letter.
19  Q   So when you say there's a draft of the decision
20      letter, was it actually a narrative form, like
21      paragraphs, or was it more bulleted points?
22  A   Yeah. So it is kind of similar in terms of there
23      would be a statement like, we would start out with,
24      you know, something like for the charge of, and we
25      would take that right out of the charge letter, the



**17**

1   panel finds, a sentence or two, and then there
2   might be bullet points that that is kind of kept
3   in. And then it's -- those are kind of reviewed
4   and turned into a little bit more narrative letter.
5 Q   So one of the documents that Ms. Macchia emailed to
6     you this morning, I believe, is our Exhibit 35 in
7     the deposition.
8     (Deposition Exhibit 35 was previously marked
9     for identification.)
10 Q  And it has a Bates label of IU 1 in the lower
11    right-hand corner, and across the top it reads
12    "Sexual Misconduct Hearing Deliberation Worksheet."
13    Is that the document you're referring to that the
14    chair prepared during the panel's discussion on
15    Saturday, October 20th?
16 A  Yes. Sorry. I didn't open the email at all.
17 Q  No, that's fine.
18 A  That's why I'm not a chair.
19 Q  When the chair was typing information into this
20    document, were you able to see the document on her
21    screen or another screen at that time?
22 A  Oh, yeah, it was blown up on a room-sized TV that's
23    there in the hearing room so we can see all the
24    person would be typing. And most of the time, I
25    mean, there might be some wordsmithing or

**18**

1   word-crafting that might go on because we might be
2   thinking about concepts and not about the actual
3   sentence structure or something, so that's why they
4   go back and review the thing.
5     But then we get to see it again afterwards
6   when it's in the shape that we are willing to say,
7   yes, that's what we've come to the conclusion for.
8 Q   So when you were in this deliberation meeting on
9     October 20th, how long did the panel spend
10    discussing and looking at that page IU 1, the
11    question of whether Jane Doe was capable of giving
12    consent?
13 A  During the deliberation on the Saturday morning?
14 Q  Yes.
15 A  Okay. Yes, okay. Well, I think that in this case
16    and probably many others, sometimes -- well,
17    typically, that's one of the first things that we
18    have to determine. And because I have certainly
19    heard cases where it's not -- you know, there's
20    absolutely -- not absolutely -- there's not very
21    much chance for us to believe that the person
22    wasn't capable.
23    And so in that case, then unless there's some
24    other charges that are involved, it's hard to find
25    somebody responsible for something, if indeed, the

**19**

1   person should have been and maybe did give consent.
2   So that is one of the things that we have to first
3   of all determine. So that typically, in my head,
4   is the thing that probably takes the longest.
5   That, then, and then what are the repercussions of
6   whatever happened there. But frequently we don't
7   need to get to that because we've found that the
8   person wasn't responsible or that we don't have
9   enough evidence to determine that the person was
10  responsible.
11 Q  So in this case, do you recall -- so you said you
12    met for about two hours. How long did the panel
13    discuss whether Jane Doe was incapacitated?
14 A  I'm not sure I can remember exactly the amount of
15    time, just focusing on the incapacitation. But I
16    would say a good half or more of that entire time
17    was looking at all of the different circumstances
18    that led to our determination. The writing of the
19    letter, because it is a form letter and we're just
20    filling in what is asked of us there, that doesn't
21    take near as long as it used to when we had to
22    really write the whole letter from scratch.
23 Q  So did you spend more time thinking about the
24    question of whether John Doe knew or should have
25    known that Jane Doe was incapacitated?

**20**

1 A  Did we spend more time than what?
2 Q  Sorry. Than on the question --
3 A  I don't understand the question.
4 Q  Yeah. So did you reach the conclusion that Jane
5    Doe was incapacitated fairly quickly relative to
6    the two-hour meeting?
7 A  No, I don't believe that we did. I mean, we have
8    to consider all of the witnesses, all of the -- all
9    of the investigators' notes, all of each of the
10   person's statements that are in written form for
11   us, as well as stuff that was said there. So I
12   think that that is, you know, a very important part
13   of the case is determining that. And so that's why
14   I'm saying it was probably a fairly substantial
15   amount of time of that two hours where we had to
16   think about that in particular because otherwise,
17   there's, you know, some other questions we can
18   still ask. And there could still be some other
19   responsibility, but if that's what has been
20   discussed in the case, then we really do have to
21   spend a lot of time on that, particularly because
22   we don't -- you know, there's no -- we don't have
23   somebody there that gave anybody a blood test or
24   Breathalyzer or anything else.
25    So we have to put kind of all these various

**21**

1  different pieces, the messages that we get from
2  various different witnesses together, and then any
3  other evidence that we might have, whether those
4  are pictures, text messages, something.
5  Q   Why did you conclude that Jane Doe was
6      incapacitated but that John Doe was not responsible
7      for knowing that she was incapacitated?
8  A   Well, at least from, again, I'm trying to recall.
9      At least from what I am remembering from the case,
10     we could not -- it didn't seem like that there was
11     any kind of relationship there prior.  There was
12     also -- it didn't seem like that even the friends
13     that they might have known, the common friends,
14     that there was any kind of communication there that
15     might have led John to know or not know if Jane's
16     behavior was out of the ordinary, ordinary, this
17     was, you know, her -- yeah, her just being kind of
18     drunk compared to, you know, really drunk or
19     blacked-out drunk.
20        So it just -- we just didn't have enough
21     information to make that determination very
22     specific.  It seemed like, you know, based upon
23     people's actions or reactions, that one might have
24     a determination of whether the other person has the
25     capacity to fully give consent or not.  But in this

**22**

1  particular case, we could not make a very clear
2  determination.  It was certainly discussed about
3  that.  There was some discussion about
4  understanding incapacitation even from the picture
5  and other witnesses, some witnesses talking about
6  her behavior at the party and her normal behavior
7  but we still, at least I don't remember us
8  having -- or I don't have any -- I didn't have any
9  clear understanding that we could definitely say,
10  you should have known this.
11  Q   The panel, then, did find that Jane Doe did not
12      give affirmative consent.  What was the basis for
13      that determination?
14  A   A part of it was testimony, her statements.  A part
15     of it was also just our observation from comments
16     that he made, which seemed very inconsistent about
17     the asking for every little act along the way.  And
18     then when we would come back, then he would just,
19     you know, indicate that he started again, but
20     there -- you know, at that point in time, it wasn't
21     clear that he had asked for consent then or any
22     other time.
23        And then at least a part of what we had to
24     consider too was the picture, her body position and
25     whether she -- she didn't seem like that she was

**23**

1  responding, not in the sexual acts, but responding
2  to the fact that people, two or more, because the
3  testimony was a little confusing, of how many times
4  different people came in.  But there were at least
5  two people who came in, took a picture, and she
6  seems to have no body response to that when
7  somebody barged in the door, she didn't turn her
8  head.  And so based upon that, and some varied
9  inconsistencies in the stories, that's how we came
10  to that determination.
11  Q   So doesn't that analysis go to incapacitation
12      rather than whether Jane Doe actually gave
13      affirmative consent?
14  A   Not necessarily because incapacitation in terms
15     of -- I mean, we weren't making a determination
16     that she didn't get herself there.  And so in
17     thinking about somebody who is incapacitated, there
18     could be other, you know, factors involved, you
19     know, whether that's stumbling everywhere, somebody
20     has to help her along, maybe she told somebody else
21     that, you know, she didn't want to, but then she
22     ended up doing it.  It seemed much more likely that
23     that kind of related to the other, rather than
24     incapacitation.  Which again, the way these are, as
25     you know, is that we have to determine by the

**24**

1  preponderance of the evidence.
2     So is it possible she was incapacitated?
3  Sure.  And maybe she was but we -- because of
4  inconsistencies and other pieces, we could not come
5  to that conclusion at the level that we needed to.
6  Q   You indicated with respect to whether John Doe
7      obtained affirmative consent that you found his
8      statements to be inconsistent?
9  A   Yes.
10  Q   Can you elaborate on those inconsistencies?
11  A   I'm going to try.  Let me try to get all of this in
12     the room here.  So yes.  So there was
13     inconsistencies in determining, one, kind of that
14     whole piece of the story was fairly inconsistent in
15     terms of the going there.  There was inconsistency
16     to why they were going.  There was inconsistency in
17     terms of whether there was any kind of discussion,
18     really, before it happened.  There was
19     inconsistencies in whether the door was locked or
20     not locked, whether -- when he was asked about
21     various different things, penetration, positions,
22     whether they should start again after the
23     interruption of people coming in, and the door
24     being locked but yet people still came in, and
25     there was inconsistencies between John and some of



25

1   the witnesses in terms of -- it seemed like that
2   more than two people came in.  And there were some
3   people who came in who weren't the ones that took
4   the picture.
5       One of the things was somebody had to come in
6   and just got their clothes because it happened to
7   be their room, but wasn't the person taking the
8   picture.  And then just, you know, the locking of
9   the door, and so when you stopped, at that point,
10  when asked, there wasn't an affirmative answer that
11  he asked again, "Do you want to continue?"
12      And then making that a little more
13  inconsistent was, if the door were locked, how did
14  people get in?  I think that's all.
15 Q   Is it IU's policy that if there's a break in the
16      action, so to speak, that there has to be a verbal
17      discussion before the parties would resume
18      penetration, or could consent be communicated
19      through other means?
20 A   Well, each act, so if I'm going to have oral sex
21  with you, I should have asked you, "is it okay?"
22  And then if I decide that I want to digitally
23  penetrate you with my finger or something else,
24  that should be a separate ask.  And then if I want
25  to have, you know, vaginal or anal intercourse with

26

1   you, that should be a different ask.  And if you
2   stop one act and then go back to another one, you
3   really haven't asked for that again, because the
4   consent is given for that specific action at that
5   specific time.  So if I got permission to have
6   vaginal sex with you yesterday, then that doesn't
7   count again.  In this case, there seemed to also be
8   this major interruption of people coming in, taking
9   a picture, of which Jane Doe had no recollection of
10  until later when somebody told her about it.
11      John Doe knew at the time.  I mean, he is
12  looking at the camera.  He is flashing a peace
13  sign, smiling.  And so that happened, it's
14  interrupted because in his testimony he talked
15  about going back and locking the door.  And yet,
16  then, other people came in.
17      And she doesn't really -- as far as I'm
18  remembering in her testimony, she doesn't really
19  ever acknowledge giving permission for those
20  things.
21 Q   So let me ask you, did any panelists ever ask John
22      Doe whether he asked for consent to reengage in
23      penetration after they were initially interrupted?
24 A   I'm not sure I can remember exactly.  I'm not
25  exactly sure what the words were.  I do believe I

27

1   was the one that was asking about some gathering of
2   consent for different actions.  But I don't
3   remember at the moment what the words were or
4   whether I had asked about the going back to that,
5   or how did they get back to that following this
6   interruption, of which he has to get up and there's
7   been a picture taken.  So I don't remember that
8   very clearly so I can't answer that.  I do remember
9   asking some questions about consent, but for the
10  various different actions.
11 Q   And then when you were in the deliberation meeting
12      with the other panelists on October 20, did you or
13      the other panelists replay any portion of the
14      hearing audio to clarify your recollections?
15 A   I do not believe we did in this case.
16 Q   Did you listen --
17 A   I was in a wonderful situation with the other
18  panelists because she's very good at writing down
19  notes.  I'm good at circling and highlighting.  And
20  we kept coming back to that.  And each of us had
21  written down phrases or things that we wanted to
22  remember about that.  Now that I think about it, I
23  think Latosha did play back one thing for us, but I
24  don't remember exactly what it was related to.
25 Q   Did the panel members watch any portion of IUPD's

28

1   interview of Jane Doe or John Doe?
2 A   No.
3 Q   Did you-all listen to --
4 A   Let me --
5 Q   Go ahead.
6 A   The only video that we had watched was one that was
7   taken at the party.
8 Q   The hearing file also included recorded interviews
9      taken by Officer VanLeeuwen from the IUPD.  Did you
10     or the panel members listen to those audio
11     recordings?
12 A   No.
13 Q   And the file also included an interview of John Doe
14     by the Monroe County prosecutor, Josh Radicke, did
15     you or the panel members listen to that interview?
16 A   No, we had the written notes that we used of that
17  interaction between him and the police officer.
18 Q   Just looking through some notes, bear we me for a
19     moment, if you would.
20 A   Okay.
21      MS. MACCHIA:  Is this an okay time for me --
22      MS. CHRISTENSEN:  Hey, Mr. Magee, we'll take a
23  quick break and go off the record.
24      (A recess was taken between 9:51 a.m. and
25  10:03 a.m.)



---

29

1    BY MS. CHRISTENSEN:
2  Q   So we're back on the record and after that break,
3      you understand that you are still under oath,
4      correct?
5  A   I do.
6  Q   So I want to talk to you generally about the
7      training that you've received to serve as a
8      panelist on sexual misconduct hearings.  What sort
9      of training have you received as to evaluating the
10     credibility of witnesses?
11 A   We had several different sessions over the years,
12     looking at credibility, but mostly it comes down --
13     we are not trained, as others, I know, are, looking
14     at how people say things, maybe their eye
15     movements, all those other kind of things.  Though
16     sometimes these are fairly obvious to us somebody
17     is -- you know, we can at least say the person gets
18     very agitated at this point, or something made this
19     person all of a sudden clam up or things.  We are
20     more focusing on consistencies in stories, thinking
21     about the witnesses -- I mean, the Complainants and
22     the Respondents and all of the witnesses'
23     statements for consistencies, and then trying to
24     figure out which ones seem to be consistent and
25     which ones aren't consistent.

30

1          Could you repeat the question one more time?
2  Q   Sure.  I guess really, what tactics or methods are
3      you trained to use to evaluate credibility?
4  A   Well, as I was saying, in terms of the training for
5      credibility is looking at, again, kind of how does
6      all of this lay out.  So if this person is saying
7      something and it's consistent with what they said
8      in other places in the process, is it consistent
9      with what any of the other witnesses have said
10     regardless of who has called the witnesses.  And
11     then some of those things also, then, end up being
12     consistent responses to questions when they are
13     actually in front of the hearing panelists.
14         In terms of other things, you know, there's no
15     blanket rule for everything, so we certainly can't
16     say, this type of person would be more likely than
17     the other person to give us honest answers.  That
18     certainly wouldn't be there.  And again, as I said,
19     even if there had been prior cases involving
20     somebody, we wouldn't know that until after we had
21     determined a finding for the case that we're
22     currently hearing.  I'm not sure if that's getting
23     to what you're wanting to, but if not, you can ask
24     another way and I might get it better.
25 Q   All right.  Thanks.  Are you, as a panelist,

31

1      trained to evaluate a witness's motivation in
2      giving a statement?
3  A   I would say yes, but you're going to ask me for an
4      example and I'm trying to come up with one.
5  Q   While you think about that, could you tell me
6      whether you use -- whether you draw on your
7      personal experience to make credibility
8      determinations?
9  A   No, not really.  I think we hope, what we're
10     trained to do, is to walk in and see each case as
11     its own independent thing with individual people
12     who can each have lots of different kinds of
13     motivations.  The only thing that I would believe
14     would be consistent between all of our folks is
15     that they are at the university for a purpose, to
16     get an education.  But other than that, I don't
17     think that for me, personally, I could walk into a
18     room and already have determined somebody's
19     determinations or why they would say or not say
20     what was then said either through the process or in
21     front of the hearing panel.  It just seems like in
22     these cases there is no -- well, there's some
23     consistency in processes, there's not a lot of
24     consistency in what people are saying, what people
25     are doing.

32

1      I mean, I have heard cases where clearly there
2  have been findings, and other cases there's no
3  finding or not enough evidence to -- for us to come
4  to a conclusion that there was a finding.  And I
5  have also heard cases where it's not -- in male and
6  female, so it could be two men, two women, and so
7  their motivations might also be different or what
8  might come out of their mouth could be different.
9      We do, you know, a part of this is not just my
10 work with training for these hearing panels, but
11 all of my other work in terms of diversity.  We do
12 know that there are some things that are out there
13 in the community that could potentially be playing
14 out in what it is as a panelist I am hearing from
15 somebody.  I don't know.
16     A good example of that was, you know, there's
17 a recent case I had where it was two male students
18 involved.  This is a lot of social pressure when
19 it's two men involved to even come forward.  And
20 that was very evident.  So I didn't have to assume
21 that.  It was just very evident from the comments
22 they were making.
23     So to wrap all that up again, I think that
24 we're trained to just see each individual thing as
25 its very own case and to make a determination from



**33**

1 what it is that we're hearing or the case notes
2 that we are given from the investigators or from
3 other people giving statements.
4 **Q   So in terms of an example about motivation, have**
5 **you had the experience that you've determined a**
6 **witness might lie about whether he or she was**
7 **drinking alcohol because that witness was under**
8 **21 years of age?**
9 A   No, that's not normally been -- I mean, I don't
10 believe anybody has ever told us that they
11 weren't -- avoided talking about alcohol. In my
12 recollection, there's probably only been two cases,
13 my very first case I ever heard, actually, was one
14 where there was no alcohol involved. Everybody
15 agreed there was no alcohol involved. All of the
16 parties, witnesses included.
17    But for the others, I've had, you know, before
18 me a number of students who were under 21. And
19 there is some inconsistency between all students
20 between "I had one drink" and when you get around
21 to asking what "one drink" means, well, one drink
22 could be anything from four ounces to 16 ounces.
23 But I don't believe I recall a time when I felt
24 like somebody wasn't telling me the truth about
25 what they were drinking or how much they were

**34**

1 drinking.
2 **Q   So in this particular case, the panel's decision**
3 **letter referred to John Doe's inconsistency in his**
4 **statements about whether he had been drinking. Did**
5 **the panel discuss his motivations at each point in**
6 **time when he gave those statements and why he might**
7 **be giving inconsistent information about drinking?**
8 A   No, as I recall, he had stated that he knew that he
9 and the other party had both been drinking. His
10 story was, he didn't really go into necessarily how
11 much he felt intoxicated, which, you know, was kind
12 of a little bit different than the case here where
13 Jane and a number of witnesses talked about Jane
14 being kind of functionally blacked out or, you
15 know, kind of -- one of the reasons why I think
16 somebody submitted the video of the party was to --
17 because they felt like that she was as drunk as she
18 has ever been or more so.
19 **Q   You used the term "blacked out." Could you confirm**
20 **what you mean by that?**
21 A   Yeah, that's a good question. When I first started
22 doing this, I thought "blacked out" meant you're on
23 the floor with nothing. But "blacked out,"
24 typically, we refer to you are still able to
25 function, though you really don't have the capacity

**35**

1 to make any decisions, to do -- even what you would
2 normally do, not even related to, you know, any
3 kind of sexual behavior. And that you likely are
4 not going to remember much of that. And it also
5 frequently in a panel setting or in the -- in
6 meeting with the folks who get them to write their
7 statements, they would probably describe what
8 exactly that feels like for them or looks like for
9 them when it happens. A lot of times students say
10 they went out because they wanted to get
11 blacked-out drunk.
12    So it's not drunk as in, I'm no longer moving
13 and I'm just seeing stars. And in her statements,
14 I think, she talked about that most of the time
15 when she is blacked-out drunk, that she has
16 enough -- she can kind of rally and lots of other
17 people don't even know that, even though she may
18 know that about herself. Again, it's one of those
19 words I think that somewhat has to be determined
20 based upon what people are saying about how they
21 are feeling, their actions, how did this particular
22 time compare to other times.
23    So because she could have been blacked out,
24 you know, at the past ten parties and they may have
25 each looked a little bit different. But it is

**36**

1 something that tells us that it's probably more
2 than "I've had a few drinks" or "I've had a buzz"
3 or "I was a little bit tipsy," so on a scale, it's
4 beyond those.
5 **Q   So in your training to serve as a sexual misconduct**
6 **panel officer, have you had the opportunity or been**
7 **asked to in any way review or keep tabs on errors**
8 **made by other universities and colleges or by IU in**
9 **previous cases?**
10 A   In terms of the process or in terms of outcomes?
11 **Q   Either.**
12 A   Well, in our training we are always talking about
13 processes and we do certainly consider other legal
14 matters and we consider what's been given to us
15 from the federal government, in terms of guidelines
16 and what those look like, and to think about how
17 there's differences. We do review the Clery Act to
18 think about, you know, what's involved there in
19 terms of reporting and the process for that
20 reporting to happen and how that's changing, and
21 changed over time.
22    In terms of specifics to a particular case,
23 sometimes there are examples brought up of things
24 where we actually, we might actually -- I know a
25 couple of times we have actually read like a couple



**37**

1    of paragraphs or something. And then we've talked
2    about things that we've noticed there or what
3    responses we might have to it or what kind of
4    questions we might have from that. But I don't
5    ever remember that we've specifically named a case
6    or we came up with, you know -- we certainly didn't
7    put in the names of either one of the parties. So
8    we were, you know, in a way, looking at
9    consistencies and we're looking at kind of best
10   practices in carrying out our responsibilities as
11   well as the processes.
12 Q    So in the past couple of years, say since 2016, has
13      anything stuck out to you as a trend either in the
14      regulation or in case studies?
15 A    Well, I think at least, and I'm not sure if this is
16      true, but for me it's true, I think there have been
17      changes from the Trump administration that
18      certainly change that had come down kind of as
19      directives from Obama and before that, even. And
20      some of those -- I mean, we looked at mostly from a
21      procedural perspective, and also just kind of a
22      double-check on ourselves, to make sure that we are
23      being very consistent with what we're doing and
24      that we are not predetermining somebody's
25      responsibility based on gender or other things.

**38**

1 Q    Mr. Magee, how do you make a determination as to
2      whether a certain piece of information is relevant
3      to the panel's decision-making process?
4 A    Well, sometimes that's not my determination. The
5      office has -- sometimes we don't get some pieces of
6      something just because it's determined that it is
7      not related to the specific charge. It could be
8      good evidence for something, but for the charge
9      that we are looking at, it may not fit there.
10     Sometimes, however, during a hearing, something
11     would be said or something would be in the written
12     record and we have -- we frequently have some
13     discussion about whether that's relative to any of
14     the questions that are involved here.
15       Because, you know, we can only do -- we can
16     only make a determination based upon the charge
17     that's been given us. We can't just come up with
18     our own charge in our own way based upon anything
19     that somebody said. So they may tell us something
20     that could be against some university violation or
21     even some law, but we can't, all of a sudden, come
22     up with a new charge for that. So if it's not
23     relevant to the specific charge that we're hearing
24     for, then we have to make a determination that we
25     have to throw it out.

**39**

1 Q    Mr. Magee, I want to shift to talking more
2      specifically about the hearing in this case. Could
3      you describe how the hearing room was set up?
4 A    Sure. It's almost set up the same way every time.
5      There are two entrances to a kind of oblong-shaped
6      room. One comes from kind of the hallway lobby
7      area, the other one comes from the office areas.
8      One door is facing west and the other one is facing
9      south. You walk in, there's a long conference
10     table in the middle of the room for a setup of a
11     hearing panel, there are three chairs on the north
12     side of the table, and on the right side, there are
13     no chairs at the table. There is some space
14     between the table and the wall and there's two
15     chairs and a small table.
16       And then there is a moveable wall, like a big
17     curtain kind of thing. And then on the other side
18     are two more chairs and a small table. Most of the
19     time, the Complainant sits on the side closest to
20     the door to the lobby, which would be the east
21     side. And then the Respondent sits on the other
22     side by themselves or with whatever adviser that
23     they might bring with them.
24       And then at the east end of the room is a
25     large television. And in the middle of the table

**40**

1    is a telephone that we use. There's a video camera
2    that's a direct connection to IUPD, a panic button
3    under the middle of the table on the side by where
4    the panelists sit. What other details do you want?
5 Q    So is it accurate to state that the hearing
6      panelists sit at a table from which they can see
7      the Complainant and the Respondent?
8 A    Yes.
9 Q    And that the Complainant and Respondent cannot see
10     one another because there is a curtain or divider
11     between them?
12 A    That's true.
13 Q    You mentioned a large television. Can everyone in
14     the room see the television?
15 A    Yes. I mean, I've not sat on the other side, but I
16     believe -- so typically, the person sitting closest
17     to the television would be the Complainant. So the
18     Complainant and the Complainant's adviser have no
19     problem seeing it. The TV is rather large.
20       On the other side, again, I don't know from
21     where, typically the Respondent would sit on the
22     east side of that little table. But I think you
23     would still be able to see the TV from there.
24     Otherwise, if the Respondent had sat on the other
25     side of the table, there would be -- there would be



Barry Magee
December 21, 2018

41 to 44                                                                Confidential

41

1    absolutely no distraction, anything distracting
2    from full view of the television.
3  Q    In this hearing, were any materials portrayed or
4       played on the television?
5  A    No.  The witnesses were either on the phone or in
6       person.  The only time we really, then, used the
7       television was when it was just the panelists in
8       the room.
9  Q    To do your deliberation discussion --
10 A    Yeah.
11 Q    -- on the 20th?
12 A    Yes.  We did, the panelists also reviewed, as I
13      said earlier, the little film clip of the party but
14      we viewed that, actually, on Libby Spotts' computer
15      in her office.
16 Q    When did that happen?
17 A    That was after, at the end, because it was noted in
18      the file that was there, but -- and the other
19      panelists and I asked to see it, but it really
20      didn't show much except a young woman dancing
21      wildly on a floor.
22 Q    What was wild about her dance?
23 A    Well, it didn't always seem like she had good
24      control of her balance.  It just seemed more than
25      just -- I mean, she had her arms raised up over her

42

1    head.  She looked like she was perspiring.  Her
2    head kind of just kept rolling around and looking
3    down a lot.  Other people around her were not quite
4    that excited the piece of music that was
5    playing as she was.  Other people were looking at
6    her seeming to make fun of her.  There are just
7    actions of like two of them, kind of their heads
8    closer to each other, looking at her.  She seemed
9    to be the center of attention.
10 Q    Was she wearing sunglasses in this video?
11 A    Good detail.  I don't know that I have the answer.
12      Sorry.
13 Q    Do you recall if she was holding anything in her
14      hands in the video?
15 A    Yes.  I'm trying to remember if it was both hands
16      or just one hand.  She had a bottle of alcohol, but
17      I don't remember what kind.  Seemed to be clear.
18 Q    So when you watched this video in Ms. Spotts'
19      office, were the other panel members present with
20      you?
21 A    Yes.
22 Q    At that time, did you and the panel members discuss
23      the video?
24 A    No, not really.  We don't normally do any
25      discussion outside of that room.

43

1  Q    When did you watch this video in Ms. Spotts'
2       office?
3  A    I want to say it was when we had taken a break and
4       the Respondent was meeting with his adviser to
5       write questions.  So we were watching it as a part
6       of the evidence that we just didn't get because we
7       get a hard copy of a file.  We don't normally get
8       the videos in advance.
9  Q    So you watched it on October 19 during the course
10      of the hearing at some point?
11 A    Yes.
12 Q    And was Libby Spotts present when the panel members
13      watched the video?
14 A    Yes.
15 Q    Did she make any comments about the video?
16 A    Nope.  She just pulled it up for us, because we
17      obviously hadn't seen it.  And she knew where it
18      was located because it didn't seem to be where it
19      was residing -- where it was supposed to be
20      residing, but she pulled it right up and played it
21      for us.  It's a very short clip, anyway.  So then
22      we just -- I mean, during breaks, typically the
23      panelists, we don't normally even talk to each
24      other but we had asked about it, the chair did not
25      have it to be able to pull up on the large-screened

44

1    TV.  So we went and asked Libby, who was there, if
2    she could pull it up for us.
3  Q    So --
4  A    And not that we thought it was going to show us
5       anything in particular.  It's just that a witness
6       had said something about it and we noted in the
7       file that it had been turned in.
8  Q    Let me ask you a question, then.  I'm going to take
9       you back to the hearing room.  You've explained
10      that it was set up so that the panelists could see
11      both Respondent and Complainant, but Respondent and
12      Complainant could not see one another.  So you were
13      able to observe John Doe throughout the hearing,
14      correct?
15 A    Yes.
16 Q    Can you describe your observations of John Doe
17      during the hearing?
18 A    At least for me, my perceptions of him was he came
19      off, you know, as professional.  Obviously, for all
20      parties involved in these cases, there's got to be
21      some -- a lot of anxiety and emotion going on.  And
22      in his own way, I could tell that he was pretty
23      anxious about this, not in a -- anxious in terms of
24      somebody trying to cover up that they did
25      something.  But just some normal kind of nerves



45

1 about this.  And there is -- sometimes there was a
2 little bit of frustration.  But there was nothing I
3 noticed that told me, you know, for me to be able
4 to make any kind of value judgment about him based
5 upon his interactions.
6     You know, I don't think that a person
7 necessarily -- unlike what you might see on TV,
8 where somebody looks like they are showing remorse
9 or saying something or they should have been crying
10 or should have been doing anything else, every
11 person acts differently and reacts differently.  So
12 I don't ever put too much into that.  But he just
13 seemed like he was calm.  He was organized in kind
14 of what his thinking was, in the questions that he
15 was asking.  Because the questions between the
16 witness and the Complainant are ones that are
17 developed and then the chair reviews those first.
18 But questions that he could have asked any of the
19 witnesses are not necessarily scripted.  He doesn't
20 have to have those go through anybody else.  So
21 there was nothing that I was determining from him
22 that led me to feel like he was responsible or that
23 he wasn't telling the truth.
24 **Q    You mentioned that it appeared that he was anxious**
25 **or had nerves about the situations.  Can you**

46

1 **describe the physical behaviors that led you to**
2 **that conclusion?**
3 A    Some of it was just at various different times when
4 something would be said, he would look down.  There
5 were times when he was kind of sitting on the front
6 of his seat and you could tell that he wanted to
7 kind of jump in and correct or say something when
8 somebody else was talking.  There was one time when
9 I think he was getting a little frustrated and he
10 asked for a break.  There was another time when his
11 adviser had wrote something down, and then it
12 seemed like, at least from my perception, he
13 decided not to go with that.  And he kind of pushed
14 it away and said something different.
15 **Q    You said that at one point --**
16 A    And it's just a -- go ahead.
17 **Q    You said that at one point he appeared frustrated**
18 **and that he asked for a break.  What did you**
19 **observe that leads to your belief that he was**
20 **frustrated?**
21 A    Just his body motion in terms of it became a little
22 bit more jerky.  He sat, as opposed to kind of a
23 leaning forward in a listening mood, he kind of sat
24 back, you know, kind of sat back heavily.  And then
25 said something to his adviser and asked for a

47

1 break.
2 **Q    You were also able to see Jane Doe throughout the**
3 **hearing; is that correct?**
4 A    Yes.
5 **Q    And can you describe your observations of Jane**
6 **Doe's demeanor and behavior during the hearing?**
7 A    Yes.  Her kind of overall demeanor was very
8 reserved.  She mostly kind of slouched in her
9 chair.  You could tell that she was, I guess I
10 would -- let's see.  So I try to pan and not assume
11 what it is, but she -- there were some tears that
12 she was having along the way.  She did gain a
13 little bit of, you know, not having tears as the
14 hearing went on.  It was just when she first got
15 there, I think there was a lot of emotion that
16 welled up in tears.  But she never did really come
17 across as, you know, overly assertive in terms of,
18 you know, saying something that led us or led me to
19 believe that she was, you know, being aggressive
20 towards anybody or -- she was just very subdued.  I
21 think that's the best word I can come up with.
22     Unlike, you know, she wasn't like sitting up
23 in her chair.  She wasn't, you know, kind of bent
24 forward, kind of in a way sometimes people do when
25 they are listening to something.  She seemed very

48

1 kind of just emotionally maybe worn out.
2 **Q    During the hearing, the panel heard statements,**
3 **testimony from witnesses indicating that Jane Doe**
4 **was crying and otherwise emotionally distraught on**
5 **the night of September 4, 2017, at her sorority**
6 **house.**
7 A    Yes.
8 **Q    What was your understanding of the cause of her**
9 **emotional distress?**
10 A    Gosh.  Well, at least in my head, what I'm
11 remembering is that some of her sorority members
12 found her distressed and started talking to her,
13 realizing what had happened.  But that by this
14 point in time, some had already seen the picture as
15 well.  And so put those two-and-two kind of
16 together as to probably that's what was going on.
17 And she -- I don't remember in my recollection
18 whether -- or it just didn't come out whether she
19 fully explained everything that had happened,
20 whether she told her complete story at that point
21 in time, though that wouldn't necessarily be
22 inconsistent with other times, you know, that
23 somebody has felt like somebody has assaulted them.
24 And it could also be determined by her -- she was
25 still, at that point, had had a considerable amount

49

1  of alcohol in her body, if she drank as much as she
2  and her friends said she drank.  So to be able to
3  remember all of the details to tell somebody the
4  very first thing they say, hey, what's wrong,
5  wouldn't be unlikely.  And then it moved fairly
6  quickly, at least in the material we got, to the
7  concern about the picture.
8  Q   If you would look at that deliberation worksheet
9      that was emailed to you this morning.
10 A  Yes.  Whereabouts?
11 Q   On page 1, where the lower right-hand corner is
12     marked IU 1?
13 A  Yes.
14 Q   The second bullet discusses "Nonconsensual Sexual
15     Contact."  And the little empty bullet under that
16     in, "See statement and file" and "During hearing,
17     Complainant stated at Sigma Phi Epsilon house,
18     Respondent would come up to her and kiss her for a
19     few seconds before she moved her head away."
20 A  Uh-huh, yes.
21 Q   What was the discussion that the panelists had
22     regarding the kissing that occurred at the Sigma
23     Phi Epsilon house?
24 A   This was one of the places where there was a little
25     bit of inconsistency between the two parties.

50

1  Ultimately, I think in our recollection -- or my
2  personal recollection of our discussions, we didn't
3  really -- it wasn't an overly determining factor
4  that something had happened here just because her
5  statement was such, his was such, but we couldn't
6  determine for sure that it was an aggravated kind
7  of situation.  And there certainly were
8  inconsistencies between the two regarding this
9  particular thing as were there was, you know, some
10 others in terms of -- sorry, the Complainant, you
11 know, disagreed with his statement in terms of, you
12 know, him kissing or touching her breasts, those
13 things when they were over at the fraternity house,
14 whereas, she didn't remember any of that happening
15 at all.
16 Q   So on this first page of the deliberation
17     worksheet, the panel chair apparently has written
18     Complainant's statement that John Doe had come up
19     to her and kissed her.  But there's no reference to
20     John Doe's contrary testimony that Jane Doe led him
21     around at the party and that she put his back
22     against a wall and kissed him.
23         What's your understanding of why those
24     statements aren't referenced in this analysis?
25         MS. MACCHIA:  I'm going to object, first, that

51

1  it misstates some of the things that are in the
2  document.  But you can go ahead and answer.
3      THE WITNESS:  What was that?  I didn't hear
4  you.  I'm sorry.
5      MS. MACCHIA:  I just made an objection real
6  quick, but you can go ahead and answer.
7  BY MS. CHRISTENSEN:
8  Q   Mr. Magee, the question is why Mr. Doe's testimony
9      about what happened at the party are not in the
10     document.  So I'm not telling you what's in the
11     document.  I'm asking you why Mr. Doe's testimony
12     about being led around and being kissed by Jane Doe
13     with his back against a wall doesn't appear in the
14     document.
15 A  Uh-huh.  Well, I'm not sure why it doesn't appear
16 there.  It's certainly in other places.  I
17 certainly remember hearing about that.  There was
18 some inconsistency with that too.  There were some
19 who said they didn't see that at all, others who
20 agreed that that was what was happening, that they
21 agreed with John in this case about what was going
22 on.  But again, this is one of the inconsistencies
23 in terms of some of these little pieces which made
24 it somewhat difficult for us to, you know, just be,
25 this is 100 percent slam dunk here, because she

52

1  didn't remember some of these things.  He didn't
2  remember some of the things.  And so in this case
3  here, when we were trying to think about and review
4  specific allegations and relevant policy under
5  rationale for the nonconsensual, so what this is
6  all leading to, is to whether she did give or was
7  able to give consent.
8      So as a background story, her leading him
9  around is different than some other kind of
10 physical touching.  So kissing is different than
11 holding your hand.  Unwanted kissing is different
12 than we were kissing.  And so in thinking about
13 some of the possibilities for or the rationale for
14 how we got to the determination of nonconsensual
15 contact, that was just, you know, a part of that in
16 terms of leading one around by their hand is not
17 sexual contact.
18 Q   I believe you just stated in your testimony that
19     there were inconsistent statements about whether
20     Jane Doe kissed John Doe with his back against a
21     wall.  What were the inconsistencies in that
22     testimony?
23 A   Well, just whether that happened.
24 Q   John Doe testified that it happened, correct?
25 A   Yep --



**53**

1  Q   I'm sorry.  Go ahead.
2  A   I was just going to say, we don't really have, at
3     least in my head, I don't recollect that we had any
4     witnesses who stated that same thing, that she had
5     pushed him up or backed him up against a wall and
6     was kissing him.  I do not -- at least right here
7     with no notes in front of me, don't remember any
8     other witnesses saying that they observed that
9     particular event.
10 Q   Does that amount to an inconsistency?
11 A   It could, depending.  In this case, we don't have
12    anything really to compare that to except her
13    story.  So then there's inconsistency because she
14    said it didn't happen.  He said that, you know, it
15    was all her coming on to him.  And again, kind of
16    the leading around, to me those things are not
17    sexual contact in the way kissing might happen.
18    And then it relates a little bit later to the story
19    in terms of when they actually do get to the
20    fraternity house and, you know, his story comes
21    across as there was, you know, some heavy petting,
22    some discussion about what was going to happen.
23    Her story is clothes started coming off right away,
24    but there weren't those other things.
25 Q   Do you recall a witness named [Individual 6]

**54**

1     testifying that he observed Jane Doe's contact with
2     John Doe at the party?
3  A   Contact in -- what is that?  What are you referring
4     to?
5  Q   His, [Individual 6's] testimony that he observed
6     Jane Doe leading John Doe by the hand.
7  A   I don't remember him specifically, but I do believe
8     that I remember somebody else saying that that was
9     the case.  Again, in my head, as a panelist,
10    leading somebody by the hand is not -- that has
11    nothing really to do with sexual contact.
12 Q   Could it be an indication of the Complainant's
13    state of mind leading up to sexual contact?
14 A   It could.  It could mean that she's drunk.  It
15    could mean that she's happy.  But I couldn't
16    determine from one leading somebody around by their
17    hand, that they are drunk or they are not drunk or
18    that that's an invitation to have sex.  I mean,
19    friends sometimes haul each other around the party.
20    It doesn't necessarily have any indication of
21    something.  I mean, I think here in terms of her
22    perception of the kissing, you know, was that she
23    didn't really want to kiss the person at all.
24 Q   Mr. Magee, do you recall witness testimony, that
25    when the students, however many there were, entered

**55**

1     the room while John and Jane Doe were engaged in
2     intercourse, that they didn't observe decisive
3     movements from Jane Doe?
4  A   Yes.  I wasn't the one that asked the question, but
5     I think my fellow panel member asked what was her
6     reaction, what was Jane Doe's reaction, and they
7     said they didn't notice any reaction at all.
8  Q   If you would look on that deliberation worksheet at
9     page 6.  The panel chair apparently typed that,
10    "Witnesses described Complainant's body as pretty
11    still, no decisive movements while Respondent
12    continued penetration."
13 A   Uh-huh.  Where are you on that page?
14 Q   Page 6, the third black bullet point.
15 A   When witnesses were asked -- okay, yeah, got it.
16 Q   What was the panel's discussion about that point?
17 A   About the witnesses' --
18 Q   About the --
19 A   -- statements?
20 Q   The statement that the Complainant was still while
21    penetration continued.
22 A   Well, yeah, that certainly came up.  I think in
23    some way it confirmed what -- helped us to confirm
24    what we were seeing with the photograph in terms of
25    whether there was any body movement.  There was the

**56**

1     face turning away or turning towards the camera or
2     I remembering -- I'm forgetting some of the details
3     in terms of who the person was who came in and said
4     they saw what was going on, but they just got their
5     clothes and got out, and then the people that
6     actually came in and took the picture.  But those
7     statements kind of align with other statements in
8     terms of where she was in her capacity to continue
9     with what was going on, how aware she was of what
10    was going on.
11        So in and of itself, it's just one little
12    piece.  But it certainly aligned with some other
13    things other people were saying, what she was
14    saying, what the picture indicated was happening.
15 Q   From those witnesses, [Individual 1] and
16    [Witness 3], was there any indication that
17    Respondent continued moving in a sexual manner when
18    they were in the room?
19 A   No.
20 Q   Were you aware at the time of the hearing in this
21    matter on October 19 that the individual who took
22    the photo and the individual who disseminated it on
23    social media were both facing charges for those
24    actions?
25 A   No.  It might have come up as a part of a



---

**57**

1  conversation, and Latosha had just indicated that
2  that wasn't the matter we were discussing today.
3  But I didn't really know -- I knew a couple of
4  weeks later, just because the way we get panelists
5  is Libby sends out an email requesting
6  participation. And it's based pretty much on time,
7  you know, the date, the place, how much time she
8  estimates that the hearing might take. And we
9  indicate our availability or not indicate our
10  availability.
11       I indicated my availability to be on a hearing
12  panel. I didn't know anything about the case until
13  I received the file, that related to the other
14  incident, the people who took the picture, that it
15  also involved John Doe in this case. And at that
16  time I asked whether it was appropriate for me to
17  hear the case, since I had already heard the other
18  one. And ultimately the case was then decided in
19  some other fashion because I was told I was not
20  needed.
21  **Q    Looking at your affidavit, it's Exhibit 65, and I**
22  **believe it was emailed back to you this morning.**
23  **Paragraph 3 you indicate that you were the adviser**
24  **for Lambda Pi Phi fraternity.**
25  A   Pi Lambda Phi.

**58**

1  **Q    Oh, sorry. Pi Lambda Phi. Is that a traditional**
2  **Greek fraternity?**
3  A   Yes. It's currently an unhoused fraternity, though
4  they do by groups of 18 or 20, they do live in the
5  same house together, but it's not a university
6  house that's recognized as a fraternity house,
7  though it is through IU properties. It's a --
8  yeah, it's a traditional fraternity founded in the
9  late 1800s at Yale University. I have been
10  involved in fraternity life ever since I was in
11  college. I was a chapter member, chapter
12  president, regional governor, and then I became the
13  national director of Phi Mu Alpha, which I did for
14  nine years. Came to IU. And then I was asked to
15  be an adviser for Pi Lambda Phi, and I'm also their
16  cycling coach.
17  **Q    So is there any conflict if you're a Greek life**
18  **adviser in your service in a sexual misconduct case**
19  **involving students who are also in fraternities and**
20  **sororities?**
21  A   I don't find it. I mean, I could also, you know,
22  belong to some other club. So I don't know that
23  that would have any determination about anything.
24  I mean, what I hope it's saying about me is that I
25  believe that fraternal organizations have a

**59**

1  wonderful opportunity to help young men and women
2  grow as leaders, as professionals, and as human
3  beings.
4       And I believe that for myself and others. I
5  don't think that that biases me towards them or
6  against them.
7  **Q    Paragraph 14 of your affidavit, you mentioned that**
8  **you were not influenced in any way by alleged**
9  **external public pressure to make findings of**
10  **responsibility against male respondents. What was**
11  **your knowledge of the march held during IU's**
12  **Welcome Week in 2018?**
13  A   One second. I'm trying to -- was the -- that's --
14  my statement before, was that in the same email?
15  I'm not finding it.
16  **Q    Oh, your affidavit?**
17  A   Yeah, Jessica sent me something just this morning,
18  but it's just that deliberation sheet.
19       MS. MACCHIA: Do you have an email from me,
20  this is Melissa. Do you have an email from me that
21  would have come a few minutes before that one that
22  has a couple other things attached? If not, I can
23  re-send it.
24  A   Hold on here. Let me look.
25  BY MS. CHRISTENSEN:

**60**

1  **Q    I'm not overly concerned about you looking at**
2  **paragraph 14 unless you just want to. Really, I'm**
3  **just wondering generally, what was your knowledge**
4  **of the march that occurred during IU's Welcome Week**
5  **in 2018.**
6  A   What was my knowledge of it? I knew it happened.
7  **Q    And were you aware of --**
8  A   Go ahead. Sorry.
9  **Q    Were you aware of any other rallies or**
10  **demonstrations in support of sexual assault**
11  **survivors that week?**
12  A   That was the only one that I was really aware of.
13  I mean, I knew of the situation because the young
14  woman had worked in an area of our department. But
15  I don't know too much other than that.
16  **Q    Were you aware that the Complainant who organized**
17  **the march had published documents about individuals**
18  **who work at the OSC in public places online?**
19  A   That's what I knew. I knew that she had been very
20  vocal about, you know, what had happened. And
21  really, my only even understanding of some of those
22  things came during our staff training.
23       Libby Spotts and -- gosh. Well, Andy Kalis
24  was there and Dave O'Quinn, and just didn't talk to
25  us really about the case. They were just mostly

---



**61**

1  talking about kind of what had happened and to just
2  clarify some of the things that were out there that
3  weren't necessarily the truth.
4      I mean, in this case, I didn't know anything
5  about the case before, because I didn't participate
6  in it.  At least from what I heard and what we were
7  told then, I had just some feelings about her --
8  the way she had portrayed things in terms of not
9  feeling like she had been heard and some of the
10  specific kinds of statements.  And as a panelist on
11  other cases, that seemed inconsistent with my
12  experiences in that we have to make, you know, a
13  finding based upon the evidence.  And in the end,
14  that means that while something might have
15  happened, something inappropriate might have
16  happened, if we don't have enough evidence, then we
17  have to have no finding.  And so that's really all
18  I thought about it was just that, again, I think,
19  rethink in my head, consistency and what we are
20  asked to do.  And that is to really focus on what's
21  right in front of us and to not bring other things
22  into the equation.
23      MS. CHRISTENSEN:  Mr. Magee, I don't have any
24  further questions for you.  Your counsel -- IU's
25  counsel might.

**62**

1      MS. MACCHIA:  No questions.
2      MS. CHRISTENSEN:  Thank you so much for
3  getting up early to take care of this with us.
4  Enjoy the rest of your vacation.
5      THE WITNESS:  Okay.  Thank you.
6
7      (Time noted:  11:06 a.m.)
8
9  FURTHER THE DEPONENT SAITH NOT
10
11
12      _____
        BARRY MAGEE
13
14
15
16
17
18
19
20
21
22
23
24
25

**63**

1  STATE OF INDIANA          )
                             )  SS:
2  COUNTY OF HAMILTON        )
3
4      I, Amy Doman, RPR, CRR, CSR No. 10-R-3022,
5  Notary Public in and for the County of Hamilton,
6  State of Indiana, at large, do hereby certify that
7  BARRY MAGEE, the deponent herein, was by me first
8  duly sworn to tell the truth, the whole truth, and
9  nothing but the truth in the aforementioned
10  matter;
11      That the foregoing deposition was taken on
12  behalf of the Plaintiff, at the offices of Bingham
13  Greenbaum Doll, LLP, 2700 Market Tower, 10 West
14  Market Street, Indianapolis, Indiana, on Friday,
15  December 21, 2018, pursuant to the Federal Rules of
16  Civil Procedure;
17      That said deposition was taken down in
18  stenograph notes and afterwards reduced to
19  typewriting under my direction, and that the
20  typewritten transcript is a true record of the
21  testimony given by the said deponent; and that
22  signature was requested by the deponent and all
23  parties present;
24      That the parties were represented by their
25  counsel as aforementioned.

**64**

1      I do further certify that I am a disinterested
2  person in this cause of action, that I am not a
3  relative or attorney of either party or otherwise
4  interested in the event of this action, and that I
5  am not in the employ of the attorneys for any
6  party.
7      IN WITNESS WHEREOF, I have hereunto set my
8  hand and affixed my notarial seal this _____ day
9  of _____, 2018.
10
11
12
13
14      Amy Doman, RPR, CRR, CSR No. 10-R-3022
15      Notary Public
16
17
18  My Commission Expires:
19  September 30, 2025,
20  Residing in Hamilton County, Indiana
21
22
23
24
25



**Exhibits**

M TREFF_35  3:9 17:6,8

M TREFF_65  3:11 9:12,13 57:21

---

**1**

**1**  17:10 18:10 49:11,12 56:15

**100**  51:25

**10:03 a.m**  28:25

**14**  59:7 60:2

**15**  12:16

**16**  33:22

**18**  12:16 58:4

**1800s**  58:9

**19**  43:9 56:21

**1980**  7:10

---

**2**

**2**  10:16

**20**  27:12 58:4

**2013**  12:11

**2015**  11:4

**2016**  37:12

**2017**  48:5

**2018**  10:16 59:12 60:5

**20th**  17:15 18:9 41:11

**21**  33:8,18

**24**  6:15

---

**3**

**3**  56:16 57:23

**35**  17:6,8

---

**4**

**4**  48:5

---

**6**

**6**  53:25 55:9,14

**6's**  54:5

**65**  9:12,13 57:21

---

**8**

**80s**  5:3

**83**  7:10

---

**9**

**9:51 a.m**  28:24

---

**A**

**ability**  5:8 6:16,19

**absolutely**  18:20 41:1

**access**  7:20 8:25 9:10 11:19,23

**accident**  4:22,25 5:2 7:10

**accurate**  12:12 40:5

**acknowledge**  26:19

**act**  22:17 25:20 26:2 36:17

**action**  4:17 25:16 26:4

**actions**  21:23 27:2,10 35:21 42:7 56:24

**acts**  23:1 45:11

**actual**  18:2

**administration**  37:17

**advance**  43:8

**adviser**  39:22 40:18 43:4 46:11,25 57:23 58:15,18

**affect**  6:16,19 12:20

**affidavit**  9:2,5,9,16 12:11 57:21 59:7,16

**affirmative**  22:12 23:13 24:7 25:10

**age**  33:8

**aggravated**  50:6

**aggressive**  47:19

**agitated**  29:18

**agree**  6:6

**agreed**  15:17 16:6 33:15 51:20, 21

**agreement**  15:3

**ahead**  28:5 46:16 51:2,6 53:1 60:8

**alcohol**  33:7,11,14,15 42:16 49:1

**align**  56:7

**aligned**  56:12

**allegations**  52:4

**alleged**  59:8

**Alpha**  58:13

**amount**  14:21 15:5 19:14 20:15 48:25 53:10

**anal**  25:25

**analysis**  23:11 50:24

**Andy**  60:23

**answers**  30:17

**anxiety**  44:21

**anxious**  44:23 45:24

**apparently**  50:17 55:9

**appeared**  45:24 46:17

**area**  39:7 60:14

**areas**  39:7

**arms**  41:25

**arrested**  7:4

**assault**  10:23 60:10

**assaulted**  48:23

**assertive**  47:17

**assume**  5:17 32:20 47:10

**attached**  9:5,15 59:22

**attend**  11:9,11

**attended**  10:1,15,20,22,25 11:5,8,10

**attention**  42:9

**audio**  27:14 28:10

**availability**  57:9,10,11

**avoided**  33:11

**aware**  56:9,20 60:7,9,12,16

---

**B**

**back**  7:7 12:13 13:6,23 15:1,7 16:6 18:4 22:18 26:2,15 27:4,5, 20,23 29:2 44:9 46:24 50:21 51:13 52:20 57:22

**backed**  53:5

**background**  52:8

**balance**  41:24

**barged**  23:7

**bars**  8:24

**based**  14:9 21:22 23:8 35:20

37:25 38:16,18 45:4 57:6 61:13

**basis**  11:16 22:12

**Bates**  17:10

**bear**  28:18

**beginning**  12:24 15:2

**behavior**  21:16 22:6 35:3 47:6

**behaviors**  46:1

**beings**  59:3

**belief**  46:19

**belong**  58:22

**bent**  47:23

**biases**  59:5

**big**  39:16

**bit**  13:20 15:5 16:7 17:4 34:12 35:25 36:3 45:2 46:22 47:13 49:25 53:18

**black**  55:14

**blacked**  34:14,19,22,23 35:23

**blacked-out**  21:19 35:11,15

**blanket**  30:15

**blood**  20:23

**blown**  17:22

**body**  22:24 23:6 46:21 49:1 55:10,25

**bottle**  42:16

**bounds**  13:3

**break**  6:10,11,13 25:15 28:23 29:2 43:16,10,18 47:1

**breakout**  11:6

**breaks**  43:22

**breasts**  50:12

**Breathalyzer**  20:24

**bring**  39:23 61:21

**brought**  36:23

**bullet**  17:2 49:14,15 55:14

**bulleted**  16:21

**bunch**  13:8

**button**  40:2

**buzz**  36:2

---

**C**

**calendar**  10:17,21



**called** 6:2 30:10

**calm** 45:13

**camera** 26:12 40:1 56:1

**capable** 18:11,22

**capacity** 21:25 34:25 56:8

**car** 4:22,25 5:2 7:10

**care** 62:3

**carrying** 37:10

**case** 5:7 7:12,14,17 8:10,12,17, 21 13:14 15:10,11,12 18:15,23 19:11 20:13,20 21:9 22:1 26:7 27:15 30:21 31:10 32:17,25 33:1,13 34:2,12 36:22 37:5,14 39:2 51:21 52:2 53:11 54:9 57:12,15,17,18 58:18 60:25 61:4,5

**cases** 8:11 13:25 14:7,9 18:19 30:19 31:22 32:1,2,5 33:12 36:9 44:20 61:11

**center** 42:9

**certified** 12:1

**chair** 12:2 13:14 14:2 16:15 17:14,18,19 43:24 45:17 47:9, 23 50:17 55:9

**chairs** 14:6 39:11,13,15,18

**chance** 18:21

**change** 37:18

**changed** 7:25 36:21

**changing** 36:20

**chapter** 58:11

**charge** 16:24,25 38:7,8,16,18, 22,23

**charged** 7:1,4 14:15

**charges** 15:22,23 18:24 56:23

**Christensen** 4:15 28:22 29:1 51:7 59:25 61:23 62:2

**circling** 27:19

**circumstances** 19:17

**clam** 29:19

**clarify** 27:14 61:2

**clear** 6:6 12:11 22:1,9,21 42:17

**Clery** 36:17

**clip** 41:13 43:21

**closer** 42:8

**closest** 39:19 40:16

**clothes** 25:6 53:23 56:5

**club** 58:22

**co-panelists** 12:22

**coach** 58:16

**colleague** 4:16

**college** 58:11

**colleges** 36:8

**comments** 22:15 32:21 43:15

**common** 21:13

**communicated** 25:18

**communication** 21:14

**community** 32:13

**compare** 35:22 53:12

**compared** 21:18

**Complainant** 15:13 39:19 40:7,9,17,18 44:11,12 45:16 49:17 50:10 55:20 60:16

**Complainant's** 40:18 50:18 54:12 55:10

**Complainants** 29:21

**complete** 6:22 48:20

**computer** 41:14

**concepts** 18:2

**concern** 49:7

**concerned** 60:1

**conclude** 21:5

**conclusion** 18:7 20:4 24:5 32:4 46:2

**conditions** 6:18

**conference** 10:23,25 11:5 39:9

**conferences** 11:11,14,15

**confirm** 34:19 55:23

**confirmed** 55:23

**conflict** 58:17

**confusing** 23:3

**connection** 40:2

**conscious** 15:10

**consent** 18:12 19:1 21:25 22:12,21 23:13 24:7 25:18 26:4, 22 27:2,9 52:7

**considerable** 48:25

**consistencies** 29:20,23 37:9

**consistency** 13:12 31:23,24 61:19

**consistent** 29:24,25 30:7,8,12

31:14 37:23

**contact** 49:15 52:15,17 53:17 54:1,3,11,13

**context** 4:21 7:9

**continue** 25:11 56:8

**continued** 55:12,21 56:17

**contrary** 50:20

**control** 41:24

**conversation** 13:2 57:1

**convicted** 6:24 7:1

**copy** 9:5 43:7

**corner** 17:11 49:11

**correct** 5:11 29:4 44:14 46:7 47:3 52:24

**counsel** 61:24,25

**count** 26:7

**County** 28:14

**couple** 10:14 14:3 36:25 37:12 57:3 59:22

**court** 5:20 15:16

**courtroom** 5:10

**cover** 44:24

**create** 15:20

**creating** 5:20

**credibility** 29:10,12 30:3,5 31:7

**crime** 6:24 7:2

**crying** 45:9 48:4

**curtain** 39:17 40:10

**CV** 9:5

**cycling** 58:16

---

**D**

**dance** 41:22

**dancing** 41:20

**date** 57:7

**Dave** 60:24

**day** 12:14

**day-long** 10:8

**debating** 12:21

**decide** 25:22

**decided** 16:4 46:13 57:18

**decision** 16:18,19 34:2

**decision-making** 38:3

**decisions** 16:5 35:1

**decisive** 55:2,11

**defendant** 7:17

**deliberating** 12:21 15:23

**deliberation** 14:20 15:1,5,24 17:12 18:8,13 27:11 41:9 49:8 50:16 55:8 59:18

**demeanor** 47:6,7

**demonstrations** 60:10

**department** 60:14

**depend** 11:17

**depending** 53:11

**depends** 12:5

**deposed** 5:2

**deposition** 4:18,21,25 5:5 7:13 8:3,6,15 9:11,13 17:7,8

**depositions** 4:24 5:1

**describe** 35:7 39:3 44:16 46:1 47:5

**designated** 9:11

**detail** 42:11

**details** 8:12 40:4 49:3 56:2

**determination** 13:1,13 19:18 21:21,24 22:2,13 23:10,15 32:25 38:1,4,16,24 52:14 58:23

**determinations** 31:8,19

**determine** 18:18 19:3,9 23:25 50:6 54:16

**determined** 30:21 31:18 33:5 35:19 38:6 48:24

**determining** 13:17,22 20:13 24:13 45:21 50:3

**developed** 45:17

**development** 10:4

**differences** 36:17

**differently** 45:11

**difficult** 6:1 51:24

**digitally** 25:22

**direct** 40:2

**directives** 37:19

**director** 58:13

**disagreed** 50:11

disclose 9:19

discuss 19:13 34:5 42:22

discussed 16:2 20:20 22:2

discusses 49:14

discussing 16:8 18:10 57:2

discussion 12:20 15:24 17:14
22:3 24:17 25:17 38:13 41:9
42:25 49:21 53:22 55:16

discussions 50:2

disseminated 56:22

distracting 41:1

distraction 41:1

distraught 48:4

distress 48:9

distressed 48:12

diversity 32:11

divider 40:10

document 17:13,20 51:2,10,
11,14

documents 8:14,16 9:1 12:9
17:5 60:17

Doe 4:16 15:13,14,23,24 18:11
19:13,24,25 20:5 21:5,6 22:11
23:12 24:6 26:9,11,22 28:1,13
44:13,16 47:2 48:3 50:18,20
51:12 52:20,24 54:2,6 55:1,3
57:15

Doe's 34:3 47:6 50:20 51:8,11
54:1 55:6

door 23:7 24:19,23 25:9,13
26:15 39:8,20

double-check 37:22

draft 16:18,19

drank 49:1,2

draw 31:6

drink 33:20,21

drinking 33:7,25 34:1,4,7,9

drinks 36:2

drunk 21:18,19 34:17 35:11,12,
15 54:14,17

dunk 51:25

---

**E**

eager 12:6

earlier 13:5 41:13

---

early 62:3

east 39:20,24 40:22

easy 5:22

education 31:16

elaborate 24:10

email 17:16 57:5 59:14,19,20

emailed 17:5 49:9 57:22

emotion 44:21 47:15

emotional 48:9

emotionally 48:1,4

employees 9:24

empty 49:15

end 12:25 16:1,16 30:11 39:24
41:17 61:13

ended 16:2 23:22

engaged 55:1

Enjoy 62:4

entered 54:25

entire 19:16

entrances 39:5

Epsilon 49:17,23

errors 36:7

establish 14:21

estimates 57:8

evaluate 30:3 31:1

evaluating 29:9

evening 16:5

event 53:9

evidence 19:9 21:3 24:1 32:3
38:8 43:6 61:13,16

evident 32:20,21

examples 36:23

excited 42:4

Exhibit 9:12,13 17:6,8 57:21

experience 9:17 12:19 31:7
33:5

experiences 61:12

explain 13:20

explained 44:9 48:19

external 59:9

eye 29:14

---

**F**

face 56:1

facing 39:8 56:23

fact 23:2

factor 14:11 50:3

factors 14:11 23:18

fair 6:3

fairly 11:16 20:5,14 24:14 29:16
49:5

fashion 57:19

federal 36:15

feel 45:22

feeling 35:21 61:9

feelings 61:7

feels 35:8

fellow 55:5

felt 33:23 34:11,17 48:23

female 32:6

figure 12:9,14 29:24

file 28:8,13 41:18 43:7 44:7
49:16 57:13

filling 19:20

film 41:13

find 18:24 22:11 58:21

finding 15:4 30:21 32:3,4 59:15
61:13,17

findings 32:2 59:9

finds 17:1

fine 17:17

finger 25:23

finish 6:12

fit 38:9

flashing 26:12

floor 34:23 41:21

focus 61:20

focusing 19:15 29:20

folks 31:14 35:6

forgetting 56:2

form 16:20 19:19 20:10

forward 32:19 46:23 47:24

forwarded 9:9

---

found 14:16,18 19:7 24:7 48:12

founded 58:8

fraternal 58:25

fraternities 58:19

fraternity 50:13 53:20 57:24
58:2,3,6,8,10

frequently 14:5 19:6 35:5
38:12

Friday 16:2

friends 21:12,13 49:2 54:19

front 30:13 31:21 46:5 53:7
61:21

frustrated 46:9,17,20

frustration 45:2

full 6:22 41:2

fully 9:16 21:25 48:19

fun 42:6

function 34:25

functionally 34:14

---

**G**

gain 47:12

gathering 27:1

gave 20:23 23:12 34:6

gender 37:25

generally 29:6 60:3

get all 8:17 24:11

give 5:4 11:17 13:7 14:7,23 19:1
21:25 22:12 30:17 52:6,7

giving 18:11 26:19 31:2 33:3
34:7

good 12:23 16:7,18 19:16
27:18,19 32:16 34:21 38:8
41:23 42:11

gosh 5:3 48:10 60:23

government 36:15

governor 58:12

great 5:16 15:19

Greek 58:2,17

groups 7:21 58:4

grow 59:2

guess 9:20 12:5 30:2 47:9

guidance 13:21 14:8,23

guidelines 36:15



**H**

half 19:16

hallway 39:6

hand 42:16 52:11,16 54:6,10,17

handouts 11:13

hands 42:14,15

happen 36:20 41:16 53:14,17, 22

happened 7:18 8:9,18 13:5,19 19:6 24:18 25:6 26:13 48:13,19 50:4 51:9 52:23,24 60:6,20 61:1,15,16

happening 50:14 51:20 56:14

happy 54:15

hard 18:24 43:7

harder 6:7

haul 54:19

head 8:8,12 12:13 15:15 19:3 23:8 42:1,2 48:10 49:19 53:3 54:9 61:19

heads 42:7

hear 5:14 13:14,18 51:3 57:17

heard 5:17 8:11 14:4,5 18:19 32:1,5 33:13 48:2 57:17 61:6,9

hearing 10:6 16:2 17:12,23 27:14 28:8 30:13,22 31:21 32:10,14 33:1 38:10,23 39:2,3, 11 40:5 41:3 43:10 44:9,13,17 47:3,6,14 48:2 49:16 51:17 56:20 57:8,11

hearings 29:8

heavily 46:24

heavy 53:21

held 10:4 59:11

helped 55:23

hey 28:22 49:4

highlighting 27:19

Hold 59:24

holding 42:13 52:11

honest 30:17

hope 31:9 58:24

hours 6:15 16:7 19:12 20:15

house 48:6 49:17,23 50:13 53:20 58:5,6

huh-uh 5:25

**I**

human 59:2

**I**

identification 9:14 17:9

important 20:12

in-person 9:22

inappropriate 61:15

incapacitated 19:13,25 20:5 21:6,7 23:17 24:2

incapacitation 19:15 22:4 23:11,14,24

incident 57:14

included 28:8,13 33:16

including 9:9

inconsistencies 23:9 24:4,10, 13,19,25 50:8 51:22 52:21

inconsistency 24:15,16 33:19 34:3 49:25 51:18 53:10,13

inconsistent 22:16 24:8,14 25:13 34:7 48:22 52:19 61:11

independent 31:11

Indiana 10:22

indicating 48:3

indication 54:12,20 56:16

individual 31:11 32:24 53:25 54:5 56:15,21,22

individuals 60:17

influenced 59:8

information 8:24 17:19 21:21 34:7 38:2

initially 26:23

instance 15:22

instances 6:2 15:17

interaction 28:17

interactions 45:5

intercourse 25:25 55:2

interrupt 6:6

interrupted 26:14,23

interruption 24:23 26:8 27:6

interview 28:1,13,15

interviews 8:18 28:8

intoxicated 34:11

investigators 33:2

investigators' 20:9

invitation 54:18

involved 7:13 18:24 23:18 32:18,19 33:14,15 36:18 38:14 44:20 57:15 58:10

involving 30:19 58:19

IU 7:20 15:7 17:10 18:10 36:8 49:12 58:7,14

IU's 25:15 59:11 60:4 61:24

IUPD 28:9 40:2

IUPD's 27:25

IUPUI 11:4

IX 9:18,25 10:1 11:6

**J**

Jane 15:14,23 18:11 19:13,25 20:4 21:5 22:11 23:12 26:9 28:1 34:13 47:2,5 48:3 50:20 51:12 52:20 54:1,6 55:1,3,6

Jane's 21:15

Jason 12:14,15

jerky 46:22

Jessica 59:17

Jessie 4:16

John 4:16 15:13,23 19:24 21:6, 15 24:6,25 26:11,21 28:1,13 34:3 44:13,16 50:18,20 51:21 52:20,24 54:2,6 55:1 57:15

Josh 28:14

judgment 45:4

jump 46:7

**K**

Kalis 60:23

kind 11:16,20 13:20 14:11,12 16:22 17:2,3 20:25 21:11,14,17 23:23 24:13,17 29:15 30:5 34:11,14,15 35:3,16 37:3,9,18, 21 39:5,6,17 42:2,7,17 44:25 45:4,13 46:5,7,13,22,23,24 47:7,8,23,24 48:1,15 50:6 52:9 53:15 56:7 61:1

kinds 31:12 61:10

kiss 49:18 54:23

kissed 50:19,22 51:12 52:20

kissing 49:22 50:12 52:10,11, 12 53:6,17 54:22

knew 7:15 19:24 26:11 34:8 43:17 57:3 60:6,13,19

knowing 21:7

knowledge 6:23 13:24 14:1,6 59:11 60:3,6

**L**

label 17:10

Lambda 57:24,25 58:1,15

large 39:25 40:13,19

large-screened 43:25

late 5:3 58:9

Latosha 27:23 57:1

law 38:21

lawsuit 7:6,9,11

lay 30:6

leaders 59:2

leading 52:6,8,16 53:16 54:6, 10,13,16

leads 46:19

leaning 46:23

leave 8:21,22

led 19:18 21:15 45:22 46:1 47:18 50:20 51:12

legal 36:13

length 13:22

letter 16:16,18,20,25 17:4 19:19,22 34:3

level 14:14 16:9 24:5

Libby 41:14 43:12 44:1 57:5 60:23

lie 33:6

life 58:10,17

listen 27:16 28:3,10,15

listening 46:23 47:25

listing 10:6

live 58:4

lobby 39:6,20

locate 15:17

located 43:18

locked 24:19,20,24 25:13

locking 25:8 26:15

logistical 16:12

logistics 15:8

long 5:3 12:8 15:2,24 18:9



19:12,21 39:9

**longer** 13:6 35:12

**longest** 14:20 19:4

**looked** 35:25 37:20 42:1

**lot** 20:21 31:23 32:18 35:9 42:3 44:21 47:15

**lots** 9:24 14:6 31:12 35:16

**lower** 17:10 49:11

**M**

**Macchia** 9:8 17:5 28:21 50:25 51:5 59:19 62:1

**made** 12:25 13:13 22:16 29:18 36:8 51:5,23

**Magee** 4:14 28:22 38:1 39:1 51:8 54:24 61:23

**major** 26:8

**make** 13:3 16:5 21:21 22:1 31:7 32:25 35:1 37:22 38:1,16,24 42:6 43:15 45:4 59:9 61:12

**makes** 8:4 11:21

**making** 15:9 23:15 25:12 32:22

**male** 32:5,17 59:10

**mandatory** 10:7

**manner** 56:17

**march** 59:11 60:4,17

**marked** 9:13 17:8 49:12

**material** 11:24,25 49:6

**materials** 11:17 41:3

**matter** 56:21 57:2

**matters** 36:14

**means** 25:19 33:21 61:14

**meant** 34:22

**media** 56:23

**medical** 6:18

**medications** 6:15

**Meek** 4:16

**meeting** 18:8 20:6 27:11 35:6 43:4

**Meg** 4:15

**Melissa** 59:20

**member** 55:5 58:11

**members** 27:25 28:10,15 42:19,22 43:12 48:11

**memory** 7:7

**men** 32:6,19 59:1

**mentioned** 10:7 40:13 45:24 59:7

**messages** 21:1,4

**met** 4:14 19:12

**methods** 30:2

**middle** 39:10,25 40:3

**mind** 54:13

**minutes** 59:21

**misconduct** 9:18 10:18 12:2,7, 19 17:12 29:8 36:5 58:18

**misstates** 51:1

**moment** 27:3 28:19

**Monroe** 28:14

**months** 14:3

**mood** 46:23

**morning** 9:10 17:6 18:13 49:9 57:22 59:17

**motion** 46:21

**motivation** 31:1 33:4

**motivations** 31:13 32:7 34:5

**mouth** 32:8

**moveable** 39:16

**moved** 49:5,19

**movement** 55:25

**movements** 29:15 55:3,11

**moving** 35:12 56:17

**Mu** 58:13

**music** 42:4

**N**

**named** 7:11,17 37:5 53:25

**names** 15:16 37:7

**narrative** 16:20 17:4

**national** 58:13

**necessarily** 23:14 34:10 45:7, 19 48:21 54:20 61:3

**needed** 24:5 57:20

**nerves** 44:25 45:25

**night** 16:2 48:5

**nonconsensual** 49:14 52:5,14

**normal** 8:16 22:6 44:25

**north** 39:11

**noted** 41:17 44:6

**notes** 8:17,22 11:13,21 20:9 27:19 28:16,18 33:1 53:7

**notice** 55:7

**noticed** 37:2 45:3

**number** 12:7 33:18 34:13

**O**

**O'QUINN** 60:24

**oath** 5:9 29:3

**Obama** 37:19

**object** 50:25

**objection** 51:5

**obligation** 5:7

**oblong-shaped** 39:5

**observation** 22:15

**observations** 44:16 47:5

**observe** 44:13 46:19 55:2

**observed** 53:8 54:1,5

**obtained** 24:7

**obvious** 29:16

**occasion** 11:1

**occurred** 49:22 60:4

**October** 10:16 17:15 18:9 27:12 43:9 56:21

**office** 38:5 39:7 41:15 42:19 43:2

**officer** 28:9,17 36:6

**official** 16:1,16

**online** 60:18

**open** 17:16

**operate** 12:1

**opportunity** 36:6 59:1

**opposed** 10:4 12:5 14:17 46:22

**oral** 25:20

**order** 6:5

**ordinary** 21:16

**organizations** 58:25

**organized** 45:13 60:16

**original** 15:3

**OSC** 60:18

**ounces** 33:22

**outcome** 12:21

**outcomes** 16:10 36:10

**overly** 47:17 50:3 60:1

**P**

**pan** 47:10

**panel** 12:2 17:1 18:9 19:12 22:11 27:25 28:10,15 31:21 34:5 35:5 36:6 39:11 42:19,22 43:12 48:2 50:17 55:5,9 57:12

**panel's** 17:14 34:2 38:3 55:16

**panelist** 10:6 13:21 29:8 30:25 32:14 54:9 61:10

**panelists** 10:8 16:4 26:21 27:12,13,18 30:13 40:4,6 41:7, 12,19 43:23 44:10 49:21 57:4

**panels** 12:8,17,20 32:10

**panic** 40:2

**paper** 8:23 11:20

**paragraph** 57:23 59:7 60:2

**paragraphs** 16:21 37:1

**part** 7:16 10:12 14:7 15:4 16:1 20:12 22:14,23 32:9 43:5 52:15 56:25

**participate** 61:5

**participation** 57:6

**parties** 8:19 15:10,11 25:17 33:16 35:24 37:7 44:20 49:25

**party** 7:6,19 22:6 28:7 34:9,16 41:13 50:21 51:9 54:2,19

**past** 35:24 37:12

**PDF** 9:9

**peace** 26:12

**pending** 6:12,13

**penetrate** 25:23

**penetration** 24:21 25:18 26:23 55:12,21

**people** 13:10 23:2,4,5 24:23,24 25:2,3,14 26:8,16 29:14 31:11, 24 33:3 35:17,20 42:3,5 47:24 56:5,13 57:14

**people's** 21:23

**percent** 51:25

**perception** 46:12 54:22



perceptions 44:18

permission 26:5,19

person 9:22 11:21 13:11,15
  14:24 15:6 17:24 18:21 19:1,8,9
  21:24 25:7 29:17,19 30:6,16,17
  40:16 41:6 45:6,11 54:23 56:3

person's 20:10

personal 31:7 50:2

personally 31:17

perspective 37:21

perspiring 42:1

petting 53:21

Phi 49:17,23 57:24,25 58:1,13,
  15

phone 5:22 6:7 41:5

photo 56:22

photograph 55:24

phrases 27:21

physical 46:1 52:10

Pi 57:24,25 58:1,15

picture 22:4,24 23:5 25:4,8
  26:9 27:7 48:14 49:7 56:6,14
  57:14

pictures 7:23 21:4

piece 8:23 11:20 24:14 38:2
  42:4 56:12

pieces 21:1 24:4 38:5 51:23

place 57:7

places 30:8 49:24 51:16 60:18

plaintiff 4:17

play 15:9 27:23

played 41:4 43:20

playing 32:13 42:5

point 6:10 9:2 13:2,16 22:20
  25:9 29:18 34:5 43:10 46:15,17
  48:14,20,25 55:14,16

points 16:21 17:2

police 28:17

policy 25:15 52:4

portion 27:13,25

portrayed 41:3 61:8

position 22:24

positions 24:21

possibilities 52:13

potentially 32:13

Powerpoint 10:18

practice 11:12

practices 37:10

predetermining 37:24

prepare 8:5,14

prepared 17:14

preponderance 24:1

present 42:19 43:12

president 58:12

pressure 32:18 59:9

pretty 44:22 55:10 57:6

Prevention 10:23

previous 36:9

previously 9:13 17:8

prior 13:24 21:11 30:19

probation 13:16

problem 40:19

procedural 37:21

process 8:16 30:8 31:20 36:10,
  19 38:3

processes 31:23 36:13 37:11

professional 10:3 44:19

professionals 59:2

properties 58:7

prosecutor 28:14

provide 6:22

public 59:9 60:18

published 60:17

pull 10:17 43:25 44:2

pulled 43:16,20

purpose 31:15

pushed 46:13 53:5

put 9:20 10:2 20:25 37:7 45:12
  48:15 50:21

Q

question 5:18,21 6:13 9:15
  12:23 18:11 19:24 20:2,3 30:1
  34:21 44:8 51:8 55:4

questions 5:6,8,13 20:17 27:9
  30:12 37:4 38:14 43:5 45:14,15,
  18 61:24 62:1

quick 5:5 28:23 51:6

quickly 20:5 49:6

R

Radicke 28:14

raised 41:25

rallies 60:9

rally 35:16

rationale 52:5,13

re-send 59:23

reach 20:4

reaction 55:6,7

reactions 21:23

reacts 45:11

read 36:25

reads 17:11

real 15:16 51:5

realizing 48:13

reason 6:21 7:23

reasons 34:15

recall 7:9 9:2 10:15 11:3 19:11
  21:8 33:23 34:8 42:13 53:25
  54:24

receive 11:13

received 29:7,9 57:13

recent 32:17

recess 28:24

recognized 58:6

recollect 53:3

recollection 26:9 33:12 48:17
  50:1,2

recollections 27:14

record 4:14 5:20 6:6 28:23 29:2
  38:12

recorded 28:8

recordings 28:11

reengage 26:22

refer 15:12 34:24

reference 50:19

referenced 50:24

referred 34:3

referring 17:13 54:3

refresher 4:15 5:5

regional 58:12

regular 11:16

regulation 37:14

regulations 11:7

related 5:6 23:23 27:24 35:2
  38:7 57:13

relates 53:18

relationship 21:11

relative 20:5 38:13

relevant 9:18 38:2,23 52:4

rely 13:21

remember 8:9,11 11:8 19:14
  22:7 26:24 27:3,7,8,22,24 35:4
  37:5 42:15,17 48:17 49:3 50:14
  51:17 52:1,2 53:7 54:7,8

remembering 21:9 26:18
  48:11 56:2

remorse 45:8

repeat 30:1

repercussions 19:5

replace 15:18

replay 27:13

reporter 5:20 15:16

reporting 36:19,20

represent 4:16

requesting 57:5

required 9:21,23,25

reserved 47:8

residing 43:19,20

respect 11:12 24:6

Respondent 39:21 40:7,9,21,
  24 43:4 44:11 49:18 55:11
  56:17

respondents 29:22 59:10

responding 23:1

response 23:6

responses 5:23 30:12 37:3

responsibilities 37:10

responsibility 13:1 16:9 20:19
  37:25 59:10

responsible 13:1 14:16,18
  18:25 19:8,10 21:6 45:22

rest 62:4



resume 25:17

rethink 61:19

rethinking 8:8

review 8:14,20 18:4 36:7,17
52:3

reviewed 17:3 41:12

reviews 45:17

right-hand 17:11 49:11

rolling 42:2

room 8:22 17:23 24:12 25:7
31:18 39:3,6,10,24 40:14 41:8
42:25 44:9 55:1 56:18

room-sized 17:22

rule 30:15

rules 5:5 7:20 8:1

résumé 9:6,10,15 10:2

———————

S

sanction 13:17,22

sanctions 13:24 16:11

sat 40:15,24 46:22,23,24

Saturday 16:6 17:15 18:13

scale 36:3

scratch 19:22

screen 17:21

scripted 45:19

seat 46:6

seconds 49:19

sends 57:5

sense 8:4

sentence 17:1 18:3

separate 25:24

September 48:5

series 5:6

serve 29:7 36:5

served 12:7,16

service 58:18

serving 12:19

sessions 11:6,10,12 29:11

set 39:3,4 44:10

setting 35:5

settled 7:14

setup 39:10

sex 25:20 26:6 54:18

sexual 9:18 10:18,23 12:2,7,19
17:12 23:1 29:8 35:3 36:5 49:14
52:17 53:17 54:11,13 56:17
58:18 60:10

shape 18:6

sheet 59:18

shift 39:1

short 43:21

show 41:20 44:4

showing 45:8

side 8:24 39:12,17,19,21,22
40:3,15,20,22,25

Sigma 49:17,22

sign 26:13

signing 9:2

similar 13:3,5,24 14:9 16:22

sit 16:14 40:4,6,21

sits 39:19,21

sitting 40:16 46:5 47:22

situation 14:13 27:17 50:7
60:13

situations 13:15 45:25

slam 51:25

slouched 47:8

small 39:15,18

smiling 26:13

social 32:18 56:23

somebody's 31:18 37:24

sororities 58:20

sorority 48:5,11

sort 9:17 29:8

south 39:9

space 72:20 39:13

speak 25:16

specific 11:10 21:22 26:4,5
38:7,23 52:4 61:10

specifically 10:5 37:5 39:2
54:7

specifics 36:22

spend 18:9 19:23 20:1,21

Spotts 43:12 60:23

Spotts' 41:14 42:18 43:11

staff 60:22

stars 35:13

start 16:23 24:22

started 12:15 22:19 34:21
48:12 53:23

state 11:6 40:5 54:13

stated 34:8 49:17 52:18 53:4

statement 16:23 31:2 49:16
50:5,11,18 55:20 59:14

statements 8:20 20:10 22:14
24:8 29:23 33:3 34:4,6 35:7,13
48:2 50:24 52:19 55:19 56:7
61:10

Statewide 10:23

stop 26:2

stopped 25:9

stories 23:9 29:20

story 24:14 34:10 48:20 52:8
53:13,18,20,23

structure 18:3

stuck 37:13

student 13:19 14:12

students 7:22 32:17 33:18,19
35:9 54:25 58:19

studies 37:14

stuff 16:12 20:11

stumbling 23:19

subdued 47:20

submitted 34:16

substantial 20:14

sudden 29:19 38:21

suing 7:15

summaries 8:18

sunglasses 42:10

support 60:10

supposed 43:19

survivors 60:11

suspend 13:11

suspended 13:10 14:24

———————

T

table 39:10,12,13,14,15,18,25
40:3,6,22,25 61:22

tabs 36:7

tactics 30:2

takes 14:20 15:4 19:4

taking 25:7 26:8

talk 29:6 43:23 60:24

talked 26:14 34:13 35:14 37:1

talking 22:5 33:11 36:12 39:1
46:8 48:12 61:1

tears 47:11,13,16

telephone 40:1

television 39:25 40:13,14,17
41:2,4,7

telling 33:24 45:23 51:10

tells 36:1

ten 35:24

term 34:19

terms 13:4 15:3,5 16:10,12,22
23:14 24:15,17 25:1 30:4,14
32:11 33:4 36:10,15,19,22
44:23 46:21 47:17 50:10,11
51:23 52:16 53:19 54:21 55:24
56:3,8 61:8

test 20:23

testified 4:18,24 52:24

testify 6:16,19

testifying 54:1

testimony 6:22 13:23 16:1
22:14 23:3 26:14,18 48:3 50:20
51:8,11 52:18,22 54:5,24

text 21:4

thing 12:25 14:20 18:4 19:4
27:23 31:11,13 32:24 39:17
49:4 50:9 53:4

things 8:8,9 9:23 13:18 14:5,
16,25 15:6 18:17 19:2 24:21
25:5 26:20 27:21 29:14,15,19
30:11,14 32:12 36:23 37:2,25
50:13 51:1 52:1,2 53:16,24
56:13 59:22 60:22 61:2,8,21

thinking 14:12 15:8 18:2 19:23
23:17 29:20 45:14 52:12

thought 34:22 44:4 61:18

thoughts 16:3

throw 38:25

time 5:3 11:23 14:22 15:2,5
16:17 17:21,24 19:15,16,23
20:1,15,21 22:20,22 26:5,11
28:21 30:1 33:23 34:6 35:14,22
36:21 39:4,19 41:6 42:22 46:8,
10 48:14,21 56:20 57:6,7,16



**times** 23:3 35:9,22 36:25 46:3,5 48:22

**tipsy** 36:3

**tired** 16:5

**title** 9:18,25 10:1,18 11:6

**today** 5:21 6:16,19,22 57:2

**today's** 8:5

**told** 23:20 26:10 33:10 45:3 48:20 57:19 61:7

**top** 17:11

**touching** 50:12 52:10

**traditional** 58:1,8

**trained** 29:13 30:3 31:1,10 32:24

**training** 9:17,21,22 10:7,9,15 11:11 29:7,9 30:4 32:10 36:5,12 60:22

**transcribe** 6:1

**transcript** 15:18

**trend** 37:13

**true** 37:16 40:12

**Trump** 37:17

**truth** 33:24 45:23 61:3

**turn** 23:7

**turned** 17:4 44:7

**turning** 56:1

**TV** 17:22 40:19,23 44:1 45:7

**twice-a-year** 10:8

**two-and-two** 48:15

**two-hour** 20:6

**type** 30:16

**typed** 55:9

**types** 16:15

**typically** 7:21 11:15 12:23 13:6 18:17 19:3 34:24 40:16,21 43:22

**typing** 17:19,24

———————————

**U**

**uh-huh** 5:25 49:20 51:15 55:13

**ultimately** 7:25 16:4 50:1 57:18

**understand** 5:9,13,14,18 20:3 29:3

**understandable** 15:14

**understanding** 14:2 22:4,9 48:8 50:23 60:21

**unhoused** 58:3

**universities** 36:8

**university** 7:12,14 9:24 10:22 31:15 38:20 58:5,9

**university's** 7:25

**unlike** 45:7 47:22

**Unwanted** 52:11

**updated** 9:16

**utterances** 5:25

———————————

**V**

**vacation** 8:7 62:4

**vaginal** 25:25 26:6

**Vanleeuwen** 28:9

**varied** 23:8

**verbal** 5:23 25:16

**video** 28:6 34:16 40:1 42:10,14, 18,23 43:1,13,15

**videos** 43:8

**view** 41:2

**viewed** 41:14

**violation** 38:20

**vocal** 60:20

———————————

**W**

**walk** 31:10,17 39:9

**wall** 39:14,16 50:22 51:13 52:21 53:5

**wanted** 27:21 35:10 46:6

**wanting** 30:23

**watch** 27:25 43:1

**watched** 28:6 42:18 43:9,13

**watching** 43:5

**wearing** 42:10

**webinars** 10:1,14

**week** 9:3 59:12 60:4,11

**weeks** 13:11 57:4

**welled** 47:16

**west** 39:8

**Whereabouts** 49:10

**wild** 41:22

**wildly** 41:21

**witness's** 31:1

**witnesses** 20:8 21:2 22:5 25:1 29:10,21 30:9,10 33:16 34:13 41:5 45:19 48:3 53:4,8 55:10,15 56:15

**witnesses'** 29:22 55:17

**woman** 41:20 60:14

**women** 32:6 59:1

**wonderful** 27:17 59:1

**wondering** 60:3

**word** 14:13 47:21

**word-crafting** 18:1

**words** 26:25 27:3 35:19

**wordsmithing** 17:25

**work** 15:20 32:10,11 60:18

**worked** 60:14

**worksheet** 17:12 49:8 50:17 55:8

**workshop** 10:19,20

**worn** 48:1

**wrap** 32:23

**write** 19:22 35:6 43:5

**writing** 16:15 19:18 27:18

**written** 5:20 11:21 20:10 27:21 28:16 38:11 50:17

**wrong** 49:4

**wrote** 46:11

———————————

**Y**

**Yale** 58:9

**year** 9:21,23 10:16 11:3 13:5,10

**years** 16:14 29:11 33:8 37:12 58:14

**yesterday** 26:6

**you-all** 28:3

**young** 41:20 59:1 60:13

