UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-3713-TWP-MJD |
| | ) | |
| INDIANA UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**PRE-HEARING BRIEF IN SUPPORT OF MOTION PRELIMINARY INJUNCTION**

Plaintiff, John Doe ("John"), by counsel, states the following for his Pre-Hearing Brief in Support of his Verified Motion for Preliminary Injunction.

**INTRODUCTION AND FACTUAL BACKGROUND**

This case arises from Indiana University's (the "University") sexual misconduct investigation of John, resulting in his four year suspension. The University's investigation, charging decision, hearing process, and appeal were arbitrary, capricious and motivated by gender bias, and violated the University's policies, contract with John, and Title IX.

I.    **John's Sexual Encounter with Jane Doe in September, 2017.**

On September 4, 2017, John and Jane Doe engaged in sexual activity. (Ex. 1, Doe Affdvt ¶¶ 9–30). Another student took a photo of John and Jane's sexual intercourse, which was ultimately reported to the Interfraternity Council.  That month, the Office of Student Conduct ("OSC") interviewed John regarding the photo as a **victim** of sexual exploitation. (*See* Ex. 3, IU0001193.) John's fraternity president instructed him to downplay the incident and not create trouble for the fraternity.  (Ex. 2, Doe Dep. 12:1–10; 25:6–13; 112:19– 25.) Thus, John told OSC that the photo did not bother him. (*Id.* 12:13–15). Because Jane told John that she did not care about the photo,

he did not provide her name to protect her privacy. (Ex. 39, IU00000036, 1:44:19–41; Ex. 3 IU0001252-53). No one alleged at that time that the intercourse was non-consensual.

**II.      In May, 2018, Jane Alleges that John Sexually Assaulted Her.**

On June 1, 2018, nine months after his sexual encounter with Jane, IUPD Officer Garth VanLeewuen interviewed John for over an hour, and then advised that Jane alleged that John raped her on September 4, 2017.  (Ex. 1 ¶¶48-52; Ex. 3 IU0001266-67; Ex. 41, John Doe's Recorded Statement to IUPD).

**III.      OSC Investigates and Charges John with Sexual Misconduct on June 8, 2018.**

OSC interviewed some of the students who Jane and John identified.  An IUPD officer first interviewed each male witness who John identified, while only OSC investigators interviewed the female witnesses. (Ex. 3 IU0001268, IU0001239-40, IU0001243, IU0001246, IU00047). OSC summarized the IUPD interviews based on the police reports, but did not listen to the recorded interviews to confirm the summaries' accuracy.  (Ex. 17 36:4-9; 75:8-10.)

**IV.      A Hearing Panel Suspends John for Four Years on October 20, 2018.**

On October 19, 2018, the University conducted a hearing on the charges against John. (Ex. 39.) The panel reconvened on October 20, 2018 (Ex. 26 ¶7) and issued its decision on November 6, 2018. (Ex. 7.)  John appealed the Panel's decision on November 10, 2018.  (Ex. 35.)  An appellate officer, Kurt Zorn, decided on November 26, 2018, to uphold the four-year sanction. (Ex. 36.)

**STANDARD OF REVIEW**

I.      **Legal Standards for Underlying Claims**

a.   **Title IX Standards**

20 § U.S.C. 1681(a) ("Title IX") prohibits gender discrimination in education. To prevail on an erroneous outcome theory under Title IX, the plaintiff must demonstrate: "(1) '[F]acts sufficient to cast **some** articulable doubt on the accuracy of the outcome of the disciplinary proceeding and (2) a 'particularized . . . causal connection between the flawed outcome and gender bias.'" *Doe v. Miami Univ.*, 882 F.3d 579, 592 (6th Cir. 2018) (emphasis added) (quoting *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016) (reversing the district court's dismissal of an erroneous outcome claim brought by a student accused of sexual assault). To prevail on a deliberate indifference theory, the plaintiff "must ultimately show that an official of the institution who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct." *Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 751 (S.D. Ohio 2014).

b.   **Breach of Contract Standard**

A student's and a university's relationship is contractual, and regulations and policies made available to the student form part of the contract. *Amaya v. Brater*, 981 N.E.2d 1235, 1240 (Ind. Ct. App. 2013); *see also Sung Park v. Indiana Univ. Sch. of Dentistry*, 692 F. 3d 828, 830–31 (7th Cir. 2012) (implied contract arising out of Student Handbook and Codes of Conduct). In assessing a breach of contract claim in this context, the Court "determine[s] whether the educational institution acted illegally, arbitrarily, or in bad faith." *Amaya*, 981 N.E.2d at 1240; *see also Doe v. Univ. of Notre Dame*, 2017 WL 1836939, No. 3:17-cv-298-PPS/MGG, at *9 (N.D. Ind. May 8, 2017) (finding more than a "negligible chance of plaintiff prevailing on his contention that

3

disciplinary process . . . was arbitrary and capricious), *vacated by* 2017 WL 7661416, at *1 (N.D. Ind. Dec. 27, 2017) (stipulated dismissal).

## II.   Legal Standard for Granting Preliminary Injunctive Relief

To obtain a preliminary injunction, John must demonstrate that he "is reasonably likely to succeed on the merits, [ ] is suffering irreparable harm that outweighs any harm the nonmoving party will suffer if the injunction is granted, there is no adequate remedy at law, and an injunction would not harm the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). "If the moving party meets this threshold burden, the district court weighs the factors against one another in a sliding scale analysis." *Id.*  The Seventh Circuit has "said repeatedly that the plaintiff's chances of prevailing need only be better than negligible." *Doe v. Notre Dame*, No. 3:17-cv-298-PPS/MGG, *2 (quoting *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016)) ("[E]ven though a plaintiff has less than a 50 percent chance of prevailing on the merits, he may nonetheless be entitled to the injunction if he can demonstrate that the balance of harms would weigh heavily against him if the relief were not granted"). *Id.*

## ARGUMENT

## I.   John Doe Is Likely to Prevail on His Ultimate Claims.

Gender bias tainted all phases of John's case, leading to an erroneous four-year suspension. Further, the University turned a blind eye and engaged in post-hoc justification when challenged. The University's arbitrary and capricious conduct was fundamentally unfair and violated its Sexual Misconduct Policy. (Ex. 38, pp.1, 10, 11, 13, 14.)

### a. The University's Investigation of John Was Substantially Flawed and Biased for Its Lack of Thoroughness and Arbitrary Relevance Determinations Throughout.

The University's handling of John's case was flawed and biased from the start. The Lead Investigator in John's case, Simone Cardosa, investigated Jane Doe's claim and decided whether

4

to charge John with a conduct violation. (Ex. 15, Cardosa Affdvt. ¶5; Ex. 10, Cardosa Dep. 30:20–31:18.)  Despite ample training in sexual assault matters and a law degree (Ex. 15, Cardosa Affdvt ¶2), Cardosa relied on John and Jane to develop leads and evidence, and did not seek corroboration of Jane's statements. (Ex. 17, Cardosa Dep. 16:24–17:1, 17:13-18:21.).

To illustrate, Jane alleged that her incapacitation was obvious because she had worn her clothes into a pool that was at the party, while others wore swimsuits. (Ex. 39, 24:30-25:30, 1:05-1:05:37.) This allegation is inconsistent with photos Jane posted of the party on Facebook. (Ex. 20.)  Moreover, these photos also depict third-party witnesses of Jane's demeanor at the party. But, the University did not look at Jane's public Facebook account because no one mentioned it.[1] (Ex. 17, Cardosa Dep. 17:25-18:10; 19:5-15; Ex. 21, Spotts Dep. 17:12–20.) Relevance apparently turns on whether something is submitted rather than the nature of the evidence. (Ex. 21, Spotts Dep. 17:12–20; *c.f.* Ex. 38, Sexual Misconduct Policy, p.10 (requiring an "adequate, reliable, and impartial investigation.")

In the same vein, Cardosa did not watch the live videos of John's and Jane's statements to IUPD. Instead, she merely summarized IUPD's summaries, (Ex. 10, Cardosa Dep. 36:4–9, 75:8–10), even though she could have asked for recordings. (*C.f.* Ex. 19 IU0001498.) If Cardosa had watched Jane's IUPD statement, she would have learned that Jane prepared her own timeline of September 4, 2017, that she brought to the interview. (*Id.* 35:8–16.) Even worse, Cardosa did not include IUPD male witness statements *that were in her possession* in the Final Investigation Report, which included a statement by Witness 3 that Jane seemed coherent when he inadvertently walked in on John and Jane having sex. (Ex. 3, IU0001268.)

---

[1] John located the Facebook photos, but did not submit them to the University because he located them after the ten day window in which he was allowed to submit evidence before the Final Investigative Report was finalized. (Ex. 1, Doe Affdvt. ¶63).

Moreover, the investigators' arbitrary determinations of relevance prejudiced John and bolstered Jane. The following examples are illustrative. First, in his IUPD statement, Witness 6 stated that the party was at a particular fraternity. But, in his OSC statement, he stated he could not remember where the party was located. (*C.f.* Ex. 3, IU0001206 & IU0001268.) Cardosa did not raise this discrepancy during her meeting with Witness 6 because she did not consider the discrepancy relevant, (Ex. 10, Cardosa Dep. 80:6–81:12), and did not resolve this "irrelevant" discrepancy in the Final Investigation Report, (*id.* 26:4–18). Specifically, Cardosa reasoned that "it's not uncommon for students to not want to tell us what fraternity they were at [ ] in case that they don't want to get the organization in trouble." (*Id.* 81:3–12; *c.f.* Ex. 22, Witness 6 Affdvt ¶19.) In contrast, the Hearing Panel clearly found this discrepancy relevant. (Ex. 39, IU00000036, 26:44–27:37.) Omissions like these are particularly problematic because the Panel relies on the contents of the Final Investigation Report. (*See, e.g.* Ex. 17, Magee Dep. 38:1–7; Ex. 18, Williams Dep. 49:15–21, 50:19–22.)

Second, the University selectively enforced its prohibition against using evidence of prior sexual history against John only, using antiquated assumptions regarding women and virginity. (*C.f.* Ex. 12, Sexual Misconduct Policy, p.1 (promising a "fair and impartial investigation.") The University did not interview two of John's sexual partners after John so requested because "past sexual relationships are not considered relevant in our investigation," (Ex. 10, Cardosa Dep. 58:1–5), and information about the parties' prior sexual history should not be included in the Final Investigation Report (*id.* 17:22–23; *see also* Ex. 14, Treff Dep. 25:25–26:10 (prior sexual history of either party "could potentially bias the case" and "there's really no relevance").

Even though the University ignored John's request to contact witnesses regarding his habit of asking for consent during sexual encounters,[2] Cardosa intentionally included multiple statements regarding Jane's virginity before September 4, 2017, in the Final Investigation Report. (*See*, *e.g.*, Ex. 3, IU0001190 ("Complainant stated she was a virgin and did not plan to lose her virginity to Respondent on a couch."); IU0001207 ("Witness 7 stated, she thinks, Complainant was a virgin before her experience with Respondent"); IU0001208 ("Witness 8 stated she knew that Complainant hadn't had sex before") (emphasis added).)[3] (*C.f.* Ex. 12, Sexual Misconduct Policy (providing that the parties "will have equal opportunities to present information.") *See also Doe v. Univ. of Notre Dame*, 2017 WL 1836939 at *10 (criticizing Notre Dame's limits on hearing testimony and the discrepancy between what the accused and the accuser were allowed to present).

Cardosa reasoned that the repeated references to Jane's virginity were relevant and permissible because "virgin[ity] is more of an identity" rather than an "act" and that it "goes to [ ] state of mind." (Ex. 17, Cardosa Dep. 58:19–22.) This justification is problematic for two reasons. First, virginity is *precisely* about prior sexual history: the lack thereof. Second, characterizing virginity as an "identity" imposes a form of sexual morality upon Jane as a woman—*i.e.*, that not having sex is core to who she is and how she sees herself—rather than being a mere factual description (that she had never had sex before). As a result of the University's distinction is rooted in gender stereotypes,[4] the University allowed the Panel to hear evidence of Jane's prior sexual

---

[2] (*See* Ex. 23, Sealed Witness Aff. ¶12 ("If the University would have contacted me, I would have testified as to the above-stated events that took place in December 2017, including that John asked me for consent every step of the way during our sexual encounter.").)

[3] Jane was also permitted to testify about her prior sexual history during the Hearing, including her first kiss; that she is awkward around men; that a guy ended things with her because she did not want to have sex with him; that she never consented to sex before; and that she never thought her first time would have been like this. (Ex. 39, IU00000033, 14:38–14:54, 15:56–16:03.)

[4] The University also imposed gender stereotypes on John. For example, Kurt Zorn, the appellate officer in John's case, describes the photograph of John and Jane having sex as "*John* Doe's badge

history, but not John's, thus tainting how the Panel heard testimony at the hearing before it even began.  (*C.f.* Ex. 12, Sexual Misconduct Policy, p.10 ("The University will have as a priority all parties involved, in regard to fairness, dignity, . . . and due process.")); *Prasad v. Cornell Univ.*, No. 5:15-CV-322, 2016 WL 3212079, at *17 (N.D.N.Y. Feb. 24, 2016) (finding a plausible causal connection between gender bias and the proceeding's outcome where "the investigators seemingly slanted the Investigative Report against Plaintiff").

Finally, the University purposefully obscured the investigations of Individual 1 and Individual 2 from John's case, purportedly because they are separate cases. This justification is illogical and prejudiced John because the Panel lacked necessary context. To illustrate, John gave a statement as *Complainant* on September 27, 2017, so John had no reason to elaborate on affirmative consent for the sexual act at that point. But the statement summary did not indicate this context. (*Compare* Ex. 3, IU0001193 & IU0001229.) In turn, the University took John's lack of elaboration as an "inconsistency" with later statements that consent was given. (Ex. 7, p.3.) Additionally, the missing context meant that the Panel could not appreciate Individual 1's motivations in giving his statements (*i.e.,* his incentive to testify that John consented to the photo), even though the Panel is trained to consider motivation. (Ex. 17, Cardosa Dep. 76:8–11; *c.f.* Ex. 12, Sexual Misconduct Policy, p.1 (promising a fair investigation and resolution of complaints).)

### b.  The University's Charging Decisions Were Logically Inconsistent and Were Designed to Exacerbate John's Punishment.

The University ultimately found John responsible for "**allowing another individual to photograph**  . . . [him] engaging in sexual intercourse with Jane without her consent." (Ex. 7,

---

of honor," even though no one ever used those words in the investigation or hearing (Ex. 33, Zorn Aff. ¶11 (emphasis added).) To illustrate how gender influenced this phraseology, imagine if the University had described a photo of a woman having sex as "a badge of honor" (or, perhaps, that virginity is a man's "identity").

Panel Decision (emphasis added).) Yet, *after* he was charged with allowing the photograph to be taken, the University charged Individual 1 and Individual 2 with taking and/or disseminating the photograph involving John and Jane "**without either individual's consent**." (Ex. 5, IU0000207 & Ex. 6 , IU0000197.)  By charging and sanctioning John for allowing himself and Jane to be exploited, the University blamed John for not stopping his assailants, which, in itself, suggests gender bias (*i.e.*, the male being the "protector").

The University attempts to justify this incompatibility by stating that John's, Individual 1's, and Individual 2's cases were all separate and were "completely different files." (Ex. 21, Spotts Dep. 62:24–64:15; Ex. 17, Cardosa Dep. 72:7–11.) Yet the University only considers the investigations "separate" when it suits them. Most obviously, the University transplanted John's September 27, 2017, statement taken for the Photo Investigations to his own investigation file. Further, the University admitted that the cases are related. (Ex. 21, Spotts Dep. 67:4–8.) The University could have pursued all three cases together; it even contemplated doing so. (*See* Ex. 24, Email from Cardosa to Spotts, IU0000263 (University employees think "separate hearings are best . . . this is the one we would like to be heard first"); *c.f.* Ex. 25, IU00001483.)

The only commonalities revealed in the investigation files underlying the charges against John and Individuals 1 and 2 is that they are male and that they were fraternity brothers, which is, of course, a badge of maleness. This may explain the University's incongruent charging decisions. A draft of the panel's decision letter stated that the photo was "posted, circulated, and discussed throughout the Greek community at Indiana University." (Ex. 30, IU0001854, p.4 (panelist commenting that this "might be an overstatement").)  Apparently because there was no basis for

extrapolating the dissemination to the entire "Greek community,"[5] the comment was cut from the final draft. Nevertheless, it speaks to the University's motivation.

### c. The Panel's Behavior During the Hearing Process Was Fundamentally Unfair and Biased Against John and Male Witnesses.

Bias and unfairness pervaded John's October 19, 2018, hearing. As the hearing audio demonstrates, there is an appreciable, qualitative difference between the Panel's tone, treatment, and questions posed to male and female witnesses. (*Compare* Ex. 39, IU00000033, 34:02–34:18 (Jane asked whether she could talk to the Panel about how she was "processing" her "thoughts, feelings" when texting John); IU00000034, 20:35–23:07 (asking female Witness 7 about witnessing Jane crying after the incident); and IU00000034, 32:46–33:19 (Treff introducing herself to female Witness 8); *with* IU00000034, 1:06:49–1:07:08 (Treff introducing herself to Individual 1 (male)); IU00000036, 1:08:38–1:10:56 (Williams questioning why John would text Jane asking if she was okay instead of communicating with Individual 1; IU00000036, 42:02–43:15 (questioning John on his perception that Jane was being suggestive and flirtatious); IU00000036, 45:04–46:16 (Williams asking John to explain discrepancies between his and Jane's statement and stating, "so to clarify, very forward, very suggestive behavior on the part of the Complainant, and your response is nothing?"); IU00000034, 1:06:06–1:06:20 (Individual 1 tells Williams, "Nice to meet you" and Williams curtly responds, "okay"); IU00000035, 8:30–15:42 (repeatedly asking male witness to rehash what he remembers); and IU00000036, 32:52–34:07 (Witness 6 (male) telling the Panel that John seemed "very bothered by the photo" and Magee attempting to dismiss this).) *See Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 189 (D.R.I. 2016)

---

[5] John Doe did not get an opportunity to question University employees regarding the drafts. The University had withheld them for being "non-responsive" to a request asking for documents that relate or refer to the Panel's deliberations, and John was not aware of these drafts until they were discussed in the depositions that took place on December 19-21, 2018.

(allegations that university employees treats male students as "guilty, until proven innocent" and that the fact-finding process assumes that it is always the "boy's fault" were related to gender bias).[6]

Relatedly, the panel noticeably did not ask female witnesses important questions, while grilling male witnesses over extraneous details. To illustrate, (1) the panelists relied on Jane's testimony that she was crying after the sexual encounter but did not ask why she was crying.  (Ex. 14, Treff Dep. 62:16-25 Ex. 26, Treff Affdvt. ¶10(g); Ex. 17, Magee Dep. 48:8-49:7.) (2) Jane was asked whether she had gotten on top during the intercourse, and Jane responded that she did not because she did not want to do so.  (Ex. 39, IU00000033, 39:30–40:00.) Jane thus suggested that she had control over her positioning, which contradicted her other testimony indicating that she had no control and the panel does not question her on this. (*Id.* IU00000033, 37:19–37:50.) (3) Magee acknowledged that Jane's position during the photo is "unclear" and asks about statements that she was holding herself up. Jane doesn't actually answer the question, yet the panel moves forward. (*Id.* IU00000033, 40:33–41:14.) (4) Jane stated that her friends told her she was sobbing after the incident, but does not actually remember it herself. (*Id.* IU00000033, 57:37–58:08.) Then, a few minutes later, Jane states that *she remembered* sobbing, but the panel did not question Jane on this contradiction. (*Id.* 1:02:20–39.) *See Doe v. Syracuse Univ.*, 341 F. Supp. 3d 125 (N.D.N.Y. 2018) (an inference of discriminatory intent pled where the university allegedly did not examine blatant contradictions in the female complainant's statements).

_____

[6] Adding to this problem, the panel discounted John's testimony about consent without "watch[ing] or hear[ing] any recorded interviews taken by IUPD of the complainant or respondent."  (Ex. 18, Williams Dep. 14:17-24; Ex. 17, Magee Dep. 28:8-12.)  The panel process makes it impossible for the panelists to judge credibility on any basis other than gut feel and reliance on the second or third-hand narratives.  (Ex. 17, Cardosa Dep., 36:4-9; 75:8-10.)

In contrast, the panel was preoccupied over minor details when questioning males, like whether or not John locked the door during the incident.  (Ex. 39, IU0000036, 1:17:11–1:18:04; 1:21:17–1:22:37).   Witness 3 (male) explained that there was a lock but it was malfunctioning, yet the panel apparently disregarded this testimony. (*Id.* IU0000036, 14:22-15:19.) Likewise, Witness 6 (male) testified as to John and Jane's interactions on September 4, but the panel discounted his testimony because he could not recall where the party had occurred, despite his consistent statements about Jane leading John around by the hand and initiating physical contact. (Ex. 22, Witness 6 Affdvt. ¶17-20; Ex. 3, IU0001268; Ex. 39, IU0000036, 26:43-27:37.)

The stark contrast in the questioning of male and female witnesses likely stems from panelist training, which addresses "confronting" and "challenging" respondent's statements but not complainant's statements.  (*Compare* Ex. 16, IU0000748 & 750.)  Interrogating John and male witnesses regarding every minor detail invites more inconsistencies, which, in turn, affects credibility determinations, as the panelists based credibility on the (in)consistency of prior statements—even though they lacked context of what questions elicited prior responses. (Ex. 14, Treff Dep. 17:12-18:24 ("If it's not discussed in the hearing, it's just in the file, there's nothing for it to be inconsistent with."); Ex. 17, Magee Dep. 29:25-10; Ex. 14, Treff Dep. 13:15-25, 14-15; Ex. 18, Williams Dep. 78:7-14.)  The University's "separation" of the charges against Individual 1 and 2 implicates this issue.  (Ex. 18, Williams Dep. 80:6-11, 83:4-8 97:8-12; Ex. 14, Treff Dep. 36:5-11; Ex. 17, Magee Dep. 56-57:3.)

Additionally, the panel chair excluded information offered by a male witness from the hearing without knowing the information's content. (Ex. 39, IU00000036, 1:44–2:50, 15:42–17:26; *c.f.* Ex. 38, Sexual Misconduct Policy, p.3 (promising fairness and due process).  Had the panel desired to provide all witnesses an equal opportunity to present relevant information, it

should have taken a short break to ask the witness for his intended testimony off-record, as University policy permits.  (Ex. 21, Spotts Dep. 44:11-14.)

Finally, based on the University's reports of sexual assault allegations from July 2017 to the present, 17 out of 33 males were ordered to attend a hearing after being investigated. In contrast, 0 out of 2 females proceeded to a hearing after being investigated. (Ex. 37, IU00000705–707.) This means that a male is 51% more likely to have to defend charges at a hearing after being investigated. Although this is a small sample size, it suggests that the University more vigorously pursues sexual assault allegations against male respondents. *See Doe v. Univ. of Mississippi*, No. 3:16-CV-63-DPJ-FKB, 2018 WL 3570229, at *5 (S.D. Miss. July 24, 2018) (stating that patterns of decision-making may show gender bias); *Prasad*, No. 5:15-CV-322, 2016 WL 3212079, at *17 (holding "that statistical evidence of a disparate impact on gender . . . might support Plaintiff's claim that gender influenced the outcome of his disciplinary proceeding").

### d. The Panel's Deliberation of John's Case Was Inconsistent with the University's Policies and Training and Demonstrates the Panel's Bias Against John.

The panelists' deposition testimony demonstrates a gross lack of understanding of the definition of consent and how to analyze it.  Under University policy, the analysis is three-fold: 1) was the complainant incapacitated, and 2) if so, did the respondent know or should he have known. If yes, the analysis ends.  If not, (3) the panel assesses whether complainant provided affirmative and voluntary consent, which does not require a verbal exchange and can be communicated by actions. (Ex. 18, Williams Dep. 53;31-54:3; Ex. 38, Sexual Misconduct Policy p.3.)

The panel never asked John to recount exactly what was said and how Jane responded to each statement or question, (Ex. 14, Treff Dep. 51, 54:7-9), and ultimately discounted John's testimony based on a flawed assumption that minimal conversation means no consent. (*See*, *e.g*, Ex. 18, Williams Dep. 53, 93:23-95:13; Ex. 14, Treff Dep. 11:1-6; 14:14; 50:6-12; 53:16-19.)  The

decision letter reasons that John's statements in the Investigative Report "indicate little to no verbal communication," while his later statement "indicates that he asked for consent and Complainant said yes," which "contradicts John's earlier statement in the investigative report that describe[s] the activity occurring without verbal communication."[7] (Ex. 7, p.3.)

Another flaw was the panelists' reliance on incapacitation factors to surmise lack of affirmative consent—despite having concluded that John could not have known that Jane was incapacitated. For example, they relied on accounts of Jane's stillness during penetration. (Ex. 17, Magee Dep. 22:11-23:10; 55:5-56:10.) Treff acknowledged in e-mails with other panelists that Jane's stillness was an indication of incapacity, not an indication of consent to activity. (Ex. 30, IU0001854.) Nonetheless, Treff relied on Jane's statement that she felt like a "zombie" in the affirmative consent analysis.[8] (Ex. 26, Treff Aff. ¶10(f).) Williams explained that Jane couldn't have given consent if she "didn't know what was occurring" and because she was so intoxicated, again concluding lack of affirmative consent based on Jane's incapacitation—*despite* concluding that John could not be responsible on that basis. (Ex. 29, Williams Aff. ¶ 15(j); Ex. 18, Williams Dep. 101-102; *see also* Ex. 26, Treff Aff. ¶10(j).) Likewise, Magee reasoned that Jane did not seem to respond to other individuals coming into the room to conclude that there was no affirmative consent, even though he agreed that this could be indicative of Jane's *incapacity*. (Ex. 17, Magee Depo. 22:11–23:5.)

---

[7] John did not describe the activity as occurring "without verbal communication" in any statement included in the Investigation Report. (*See* Ex. 3.)

[8] Treff also relied on Jane's statement that the intercourse was painful to find no affirmative consent (Ex. 26, Treff Aff. ¶ 10(b)), even though Treff could not speak to whether consensual sex can be painful (Ex. 14, Treff Dep. 61:17–23.) *See also* https://www.mayoclinic.org/diseases-conditions/painful-intercourse/symptoms-causes/syc-20375967.

Moreover, the panelists took Jane's story at face value without considering John's contrary statements that the sexual activity was consensual:

*Events at the Party:* In the deliberation worksheet and the decision letter, the panel excluded John's statement that Jane led him around the party by the wrist, despite finding this statement credible. (Ex. 27; Ex. 7; Ex. 14, Treff Dep. 46:12–25.) The panel also excluded John's statement that he and Jane kissed at the party with John's back against the wall. However, the panel included in the deliberation worksheet and the decision letter Jane's contrary statements that John "would come up to her and kiss her for a few seconds before she moved her head away." (Ex. 27.) The panel tried to justify these discrepancies, stating that what happened at the party was unimportant (despite acknowledging that it could be relevant to Jane's state of mind before the sexual contact). (*See, e.g.*, Ex. 14, Treff Dep. 47:2–17; Ex. 17, Magee Dep. 49:14–52:17; 54:12-14.) These post-hoc justifications are incoherent given the panel's deliberate decisions to include Jane's statements about the party in the deliberation worksheet and the decision letter. (*See also* IU0001838 (draft decision letter treating John's version of kissing against a wall as an afterthought, without including that it was *John's* back against a wall).) The panel also credited Jane's uncorroborated statement that John tried to kiss her and she turned her head away, even though the panel supposedly sets aside evidence that is uncorroborated. (Ex. 18, Williams Dep. 78:7–14.)

*Evidence is "inconsistent" if* <u>*Jane*</u> *omits facts; and only John was asked about particular inconsistencies:* Magee referred to "inconsistent" statements about whether Jane kissed John with his back against the wall. When asked what the inconsistencies were, Magee stated, "[w]ell, just whether it happened" and that the panel did not have anything "to compare that to except her story. So then there's inconsistency because **she** said it didn't happen." (Ex. 17, Magee Dep. 52:18–53:14 (emphasis added).) Additionally, Williams asked John during the hearing to address Jane's

statements that he attempted to kiss her (Ex. 39, IU00000036, 45:03–45:57), but did not ask Jane the same question regarding John's statement that she kissed him against a wall. The same is true regarding the removal of clothing at John's fraternity; Williams asked John about how clothes were removed because there were "discrepancies" (*id.* 1:22:52–1:23:22), but did not ask Jane the same question.

*Jane's memory deficiencies:* The deliberation sheet, final decision letter, and drafts do not acknowledge that Jane may have forgotten that John asked for consent or that she exhibited conduct constituting affirmative consent. Yet Jane repeatedly stated at the hearing that she could not remember aspects of September 4, 2017. (*See, e.g.*, Ex., 39 IU00000033, 33:26–33:48 (Jane "just remember[ed] nothing really"); 43:44–44:43 (Jane was "so blacked out that [she couldn't] really remember much of it"); 50:23–51:19 ("time period was no memory at all")). Williams has acknowledged Jane's memory deficiencies, but only in the context of the incapacity analysis rather than the consent analysis. (Ex. 18, Williams Dep. 77:1–78:14; 79:1–16.) *See Syracuse Univ.*, 341 F. Supp. 3d (N.D.N.Y. 2018) (highlighting allegations that the University "chose to believe [the complainant's] description of events in [the accused's] room even though [complainant] indicated that she had very little memory of the incident").

*Concerns regarding inconsistencies:* The Panel gave Jane a pass on her inconsistencies, yet capitalized on John's. Treff viewed Jane's inconsistencies as irrelevant, (Ex. 14, Treff Dep. 40:22–42:24.), yet John's supposed "inconsistencies," no matter how small, were given serious weight. (*See* Ex. 17, Magee Dep. 24:6–25:14.)

*Reactions to the photo:* Both John and Jane initially stated that they were not upset by the photo, but the panel disregarded John's explanation and accepted Jane's. (*See* Ex. 18, Williams Dep. 89:7–21 (excusing Jane's inconsistency because "she said what she needed to say in those

moments [at the hearing]"). And, the panel selectively incorporated John's testimony in its reasoning. The panel did not include in the decision letter or the prior drafts that John said "f*** off" to the people who came into the room; it only included the "oh hey." (Ex. 7.) Nor did the panel include John's statement that the photo upset him or that another witness stated that John was "very bothered by the photo." (Ex. 39, IU00000036, 32:52–34:07, 56:28–59:12.) What is worse, Williams's notes the following as a fact supporting sexual exploitation: "Respondent's statement that he was not upset by photo (in file and in hearing)." This is blatantly incorrect.[9] Instead, the panel capitalized on a witness statement that John seemed "proud"[10] instead of John's actual testimony.

Further, the panel relied on Jane's alleged "non-responsiveness" in the photo and her alleged lack of "decisive movements" while the penetration continued to conclude that the sex was nonconsensual. This is logically unsound. First, when asked what kind of responsiveness she would expect to see in a photo, Williams stated that "you would see their face" and "their head or neck would be upright as opposed to drooping down," and noted that Jane's hair was covering her face. (Ex. 18, Williams Dep. 106:13–18.) This ignores (1) that Jane was facing away from the camera when the photo was taken and (2) the physical mechanics of the sex position in which Jane and John were engaged.  And, critically, **the panel did not ask whether John was also moving when witnesses walked into the room.** (*See* Ex. 17, Magee Dep. 56:15–19; Ex. 18, Williams

---

[9] The panel did not review the audio recording of the hearing to confirm testimony. (Ex. 18, Williams Dep. 13:17–25.)

[10] The panel employed gender stereotypes in characterizing John's position in the photo, apparently jumping from a witness statement that John looked "proud" to describing the peace sign as symbolizing "conquest" in the deliberation worksheet, even though no witness used the word "conquest." (Ex. 27, IU0000002; *see also* Ex. 18, Williams Dep. 92:23–25) (stating that Treff questioned whether John's hand gesture was "a peace sign or is it a victory, as in conquest"). This comports with Zorn's characterization of the photo as John's "badge of honor." (Ex. 33, Zorn Aff. ¶11.)

Dep. 111:1–9.) If John was not moving, either, Jane's lack of movement would have no bearing on consent. The panel heard what it wanted to hear and thus did not ask the pivotal next question.[11]

The panel's reasoning regarding the appropriate sanctions is also problematic. The deliberation worksheet lists "pervasiveness of the sexual exploitation" as an aggravating factor justifying a four-year suspension—even though John had no control over the photo's dissemination. (Ex. 27, IU0000007; *see also* Ex. 31, IU0000001841.) The panel took great liberties with reality[12] to justify holding him responsible for the acts of others: "Taking a picture with a cell phone [ ] is only done for one reason and that's to post it on social media." (Ex. 14, Treff Dep. 55:2–7; Ex. 18, Williams Dep. 96:1–19.)

Finally, the panelists' comments during the process of drafting and editing John's decision letter demonstrates the panelists did not control the decision letter.  First, in response to Spotts's first draft of the letter, Magee wrote an email: "Libby is really done? **Seems like a couple sentences that don't make sense at least to me**." (Ex. 43, IU0001825 (emphasis added); *see also* Ex. 30, IU0001854.) There is no evidence that their concerns were ever addressed.[13] Additionally, the panelists apparently lost access to the relevant documents *before* the letter was finalized, thus hindering their ability to fact-check. (*See id*; Ex. 18, Williams Dep. 15:3-10; Ex. 17, Magee Dep.

---

[11] It is dubious that the lack of movement was probative of the lack of consent, in any event. Treff commented on a draft of the decision letter regarding this point: "This seems like a stretch to connect lack of consent to lack of body movement. I equated that more to her incapacity." (Ex. 30, IU0001854.) The final draft of the letter does not address this concern. (Ex. 7.)

[12] Additionally, Magee's characterization of Jane as depicted in the video dated September 4, 2017, is inaccurate. He describes Jane was dancing "wildly on a floor"; "her head kind of just kept rolling around and looking down a lot"; "[o]ther people were looking at her seeming to make fun of her"; and "[s]he seemed to be the center of attention." (Ex. 17, Magee Dep. 41:16–42:9; *c.f.* Ex 28, Video of Jane Doe at September 4, 2017 Party (Jane is the individual wearing the shirt that reads, "ALWAYS HUNGRY").)

[13] Again, John did not have the opportunity to ask Magee what did "not make sense" because the University had withheld drafts of the decision letter and related communications as "non-responsive."

8:16-9:1.)  Given that the hearing was held on October 19, 2018, yet the decision letter was finalized November 6, 2018, the panelists did not have accurate memory as they finalized the letter without their notes.  (Ex. 7.)  Williams acknowledged that this time gap was problematic. (Ex. 32, IU0001834.)

### e.   The University's Appeals Process Was Nothing More Than a Rubber Stamp.

Zorn wholly disregarded John's concerns raised in his appeal, simply rubber-stamping the panel's decision.  *See Univ. of Notre Dame*, 2017 WL 1836939 at *13 (noting that the Conduct Case Review Board's "conclusory and dismissive denial" of the respondent's appeal may lead to an ultimate finding that the process was arbitrary or capricious).

Zorn's analysis suffers from the same deficiencies as the panelists' analysis.  (Ex. 13, Zorn Dep. 22:9 (referring to affirmative consent as "verbal consent," despite explicit policy provisions allowing non-verbal cues to communicate consent); *id.* 21–23, 82:10–15, 82:20–83:7 (circularly reasoning that Jane's incapacitation precluded affirmative consent); *id* 65:6–9; 65:20–67:6 (justifying the sanction because John "implicitly" authorized sharing of the photo because it was on a phone); *id.* 55:8-12, 56:8-16 (admitting he did not know details of the Photo Investigations); *id.* 20:17-24; 28:6-12; 47:15-18; 51:7-19; 52:18-25 (Zorn only reviewed what the panel received, so he could not assess the investigation's scope or witness credibility).)

## II. The Balance of Harm Favors Enjoining the University From Suspending John While This Litigation Proceeds.

As John's Brief in Support of Preliminary Injunction (Dkt. 5) explains, John will be irreparably injured and left without an adequate remedy at law if the University is permitted to suspend him on based on a biased and unfair process. (*See also* Ex. 1, ¶¶ 102-109.)  The University will not be harmed by allowing John, a high achieving student, to continue attending classes. Moreover, "[t]he public has an interest in fundamentally fair and sound educational discipline that

is not imposed arbitrarily or capriciously." *Doe v. Univ. of Notre Dame*, 2017 WL 1836939 at *13. Finally, there is no cost to the University if an injunction is wrongfully granted and no security bond should be required in order to enjoin the suspension. *See id.*

## CONCLUSION

John respectfully requests that the Court enjoin the University from enforcing its 4-year suspension of John while this litigation is pending.

Respectfully Submitted,

_____
Margaret M. Christensen, # 27061-49
Jessica Laurin Meek, # 34677-53
Bingham Greenebaum Doll LLP
2700 Market Tower
10 West Market Street
Indianapolis, IN 46204-4900
Telephone: (317) 635-8900
Facsimile: (317) 236-9907
mchristensen@bgdlegal.com
jmeek@bgdlegal.com

*Attorneys for Plaintiff John Doe*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on January 4, 2019, the foregoing was filed electronically via the Court's electronic filing system. I further certify that the foregoing was served via ECF.

Michael C. Terrell
Melissa A. Macchia
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204
T: (317) 713-3500
F: (317) 713-3699

/s/ *Margaret M. Christensen*
*An Attorney for John Doe*