**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-3713-TWP-MJD |
| | ) | |
| INDIANA UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S PRE-HEARING BRIEF IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Michael C. Terrell
Melissa A. Macchia
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204
Phone: (317) 713-3500
Email: mterrell@taftlaw.com
          mmacchia@taftlaw.com

*Counsel for Defendant*

## I.     INTRODUCTION

After an exhaustive investigation and hearing before three dedicated and highly trained Title IX hearing panel members, Indiana University ("IU") suspended John Doe ("John") for four years as a result of unanimous findings that he engaged in non-consensual sex with Jane Doe ("Jane"), a female IU student, and allowed several individuals to watch and one individual to photograph the sexual activity without Jane's consent ("Photo"). Although IU followed all of its established policies regarding student sexual misconduct claims, John is now requesting that this Court disregard IU's decision and allow him to return to campus during the pendency of this lawsuit as if nothing had ever happened. John bases his request on the misguided and erroneous belief that he is likely to prevail on two of his claims—breach of contract and Title IX gender discrimination. Nothing could be further from the truth. There is absolutely no evidence that IU (1) breached any of its applicable policies and rendered a decision that was arbitrary, capricious, or in bad faith or (2) discriminated against John based on his gender.

In addition, granting John's request absent any supporting evidence would be an insult to John's sexual assault victim and would chill IU's ability to protect its students from similar conduct in the future. Because John has no likelihood of success on the merits of his claims, and because the balance of harm tips decidedly in favor of John remaining off campus during the pendency of this litigation, his request for preliminary injunction should be denied.

## II.    RELEVANT FACTS

### A.     The Incident and Initial Investigation of the Photo.

During the afternoon of September 4, 2017, John and Jane met at a party at Sigma Phi Epsilon and later left together to go to Sigma Nu—John was a member of Sigma Nu, but did not

live in the fraternity house. [Docket Entry ("DE") 44-18 at 6.] John took Jane to a "chill room"[1] and sexually penetrated her. [*Id.*] While John was having sex with Jane, Individual 1[2] entered the room. [*Id.*] John (while still having sex with Jane) looked toward Individual 1 (who was holding a cell phone), smiled, said "oh hey!," and held up a peace sign. [*Id.*; DE 44-19.] Individual 1 then took the Photo and posted it on SnapChat, which allows a picture to be viewed for a few seconds before disappearing. [DE 44-18 at 24.] During his interview with IU's Office of Student Conduct ("OSC"), Individual 1 explained that he took the Photo as a prank because John was laughing. [*Id.*] He also indicated that John's reaction made it seem that it was okay he was in the room and it was okay to take the Photo. [*Id.* at 24, 26.] Individual 2[3] took a screen shot of the Photo and posted it on a GroupMe chat. [*Id.* at 24.]

On September 12, 2017, OSC was made aware of the Photo. [DE 44-10 at ¶ 6; DE 44-18 at 1.] John was eventually identified as the male student in the Photo. [*Id.*] OSC commenced an investigation ("Photo Investigation") and interviewed John on September 29, 2017. [DE 44-18 at 1.] During his interview, John gave a voluntary statement and explained that Individual 1 had taken the Photo. [DE 44-1 at 11:16-22, 14:12-14; DE 44-18 at 6.] John declined to identify the female student in the Photo (and stated that she was not aware that the Photo was being taken) and declined to file a complaint against Individuals 1 and 2 due to "social pressure" within his fraternity. [DE 44-1 at 15:25-16:13, 24:17-25:13; DE 44-10 at ¶ 6.] John also lied about drinking alcohol that day, falsely claiming that "he doesn't drink." [DE 44-1 at 14:18-15:11.] Because John declined to proceed with a complaint, and because Jane remained unidentified, OSC did not pursue the investigation. [DE 44-10 at ¶ 6.] In his deposition, John admitted that he had no

---

[1] A "chill room" is a living room for the brothers who lived in that suite.
[2] For purposes of privacy, and because such information is protected under the Family Educational Rights and Privacy Act, IU refers to its students as "Individual _" or "Witness _." Individual 1 and Witness 13 are the same person—the individual who took the Photo. A witness key is provided on p. 47 of DE 44-18 (sealed version).
[3] Individual 2 is referred to as Witness 15 in the Investigation Report.

reason to believe that, at the time of this interview, OSC had received any complaint from Jane (or anyone else) that John had sexually assaulted her. [DE 44-1 at 19:17-24.]

### B.     OSC's Investigation of Jane's Sexual Assault Complaint.

On Friday, May 25, 2018, Jane's confidential victim advocate contacted OSC to schedule a complainant information meeting. [DE 44-10 at ¶ 7.] During her meeting with Simone Cardosa,[4] Jane reported that the sexual activity portrayed in the Photo was non-consensual. [*Id.*] Jane also stated that the Photo was taken without her consent. [*Id.*][5] Jane advised Cardosa that she had given a statement earlier that day to the Indiana University Police Department ("IUPD"). [*Id.*] On the following Tuesday (after the Memorial Day holiday weekend), Laura Mals, Associate Director of OSC, spoke to IUPD to obtain Jane's statement. [*Id.* at ¶ 8.] IUPD informed Mals that it planned to conduct its own interviews and requested that OSC delay its investigation until IUPD was able to do so. [*Id.*] In accordance with IU's standard policy, Mals agreed. [*Id.*; DE 44-3 at 13:3-5.][6]

On June 1, 2018, John provided a statement to IUPD.[7] In direct contravention of what he told OSC in September 2017, John told the IUPD detective that he went to the party at Sigma Phi Epsilon and had approximately five to six beers over two hours and "felt drunk." John stated that Jane was flirting with him, was leading him around the party, and eventually began to make out with him. John described both he and Jane as being "drunk."[8] John said that they left the party to go to Sigma Nu and stopped at Jane's sorority house on the way so she could change her clothes.

---

[4] Simone Cardosa was the lead investigator for this case. [DE 44-10 at ¶¶ 2, 5.]

[5] Prior to this meeting, OSC did not know that Jane was the female in the Photo. [DE 44-10 at ¶ 7.]

[6] IU's policy states that it "will cooperate with law enforcement, and if requested by law enforcement, defer its fact gathering for a brief period during the evidence gathering stage of a criminal investigation." [DE 44-16 at 13.]

[7] The summary of John's interview with IUPD is found at DE 44-18, pp. 6-8, 79-80.

[8] This is the first of a series of lies that John made regarding whether he believed Jane was drunk. Indeed, in the affidavit he filed just last week with this Court, John now claims that he does "not believe that [Jane] was drunk." [DE 44-8 at ¶ 16.] John's attempt to explain some of his inconsistencies during his deposition shows that he lied due to feeling "pressure" or discomfort during questioning. [DE 44-1 at 15:25-16:13, 30:4-19, 35:6-36:4.]

He told the IUPD detective that he waited outside Jane's door while she changed. John said that he and Jane then went to one of his friend's rooms at Sigma Nu and sat on the couch and started kissing. He stated that Jane "grabbed his genitals"[9] and that she said it was "okay" for him to rub her breast. John said that he asked Jane if she wanted to have sex, and she said "yes" and that she wanted to "get back at her ex-boyfriend."[10] John said that he "might have digitally penetrated" Jane and then started having sex in the missionary position. John said that they changed positions so that Jane was on her hands and knees and he penetrated her from behind. John indicated they did not communicate "too much." He explained that, while they were having sex, someone came into the room and said, "oops, sorry," then closed the door. John said he did not see who entered the room.[11] At that point, John stated he locked the door. John said that the door opened a second time and Individual 1 and another person entered the room. John looked at them and said, "oh hey," while holding up a peace sign with his hand. He said Individual 1 took the Photo at that moment. John stated that he and Jane stopped having sex, and he walked Jane home.[12]

Also on June 1, 2018, IUPD notified OSC that it could proceed with its investigation. [DE 44-10 at ¶ 9.] Cardosa received Jane's IUPD statement on June 5, 2018 and notified Jane that same day that OSC would begin an investigation into her complaint. [*Id.*] In her statement to IUPD,[13] Jane stated that she had "way too much to drink" at the Sigma Phi Epsilon party and that, at one point, she fell into an inflatable pool. She stated that John tried to kiss her at the party, but that she pulled her head away. She remembered that she and John left Sigma Phi

---

[9] In his deposition, John admitted that this was a lie and that Jane did not grab his genitals. [DE 44-1 at 35:3-36:4.]

[10] This is inconsistent with John's affidavit, which states that Jane made this statement after the sexual activity and "while she was pulling up her pants." [DE 44-8 at ¶ 29.]

[11] This is inconsistent with Witness 3's statements to OSC and IUPD that John saw him enter the room because John looked over his shoulder and smiled at him. [DE 44-18 at 50, 81.] Witness 3 also indicated to OSC that John was "proud" to be seen having sex and did not seem embarrassed. [*Id.* at 50.] Witness 3 lived in the room at Sigma Nu in which John and Jane engaged in sexual activity. [*Id.*]

[12] Although he can be seen staring at the camera, smiling, and flashing the peace sign, and although he saw Individual 1 with his cell phone, John claims that he did not know that Individual 1 took a photo at that time.

[13] The summary of Jane's interview with IUPD is found at DE 44-18, pp. 2-3, 77-78.

Epsilon together around 4:00 p.m. to go to Sigma Nu, and stopped at her sorority house on the way so she could change out of her wet clothing. Jane reported that once they got to Sigma Nu, she thought "they were just going to be hanging out, but [John] started taking off his clothes and then her clothes." She said that there was "zero kissing." The next thing Jane remembers is that John "is just jamming [his penis] into" her. She said that it "wasn't working" so John physically moved her around to "get it to work." She said there was little verbal communication. She said that she did not know what was happening and that John "kind of just went right to it." She explained that she felt pain in her groin and was "shocked" that it was happening. She stated that her body was panicking and she was "clenching up." She reported that John asked her to get on top of him, but she could not because it hurt so badly. She said that she wanted it to all stop, but she did not know how to "make it stop." She said she felt "frozen" and was a "zombie." She told IUPD that she pretended to be asleep so that John would stop. She believes that is what eventually made him stop. Jane learned later that evening once she got back to her sorority that the Photo had been taken.[14]

On the very next day, Cardosa sent John a letter notifying him of Jane's allegations and instructing him to attend a meeting with OSC on June 8, 2018.[15] [DE 44-10 at ¶ 9; DE 44-20.] Cardosa met with John and his chosen advisor (his father) on June 8, 2018. [DE 44-10 at ¶ 10; DE 44-1 at 43:21-44:1, 45:23-46:12.] During the meeting, John signed the standard respondent

---

[14] Jane also told IUPD that when they got to her sorority, John asked her if she was "okay" several times. She thought that was "weird" and said that he must have "realized he fucked up."

[15] In her letter, Cardosa indicated that the purpose of the meeting was "to discuss the process and procedures related to incidents involving sexual misconduct" and to provide John "the opportunity to share information related to the incident and any possible witnesses related to the incident for future contact." [DE 44-20.] The letter also provided a website to access for "[p]ertinent information about the sexual misconduct proceedings," informed John that he could "have an advisor with [him] at this meeting," and identified two offices that could assist him in preparing for the hearing process. [Id.]

information form. [DE 44-10 at ¶ 10; DE 44-18 at 41; DE 44-1 at 46:13-47:3.][16] John then provided a voluntary statement regarding the incident. [DE 44-10 at ¶ 10; DE 44-1 at 47:12-48:6.] During this statement, John directly contradicted several prior statements he made to OSC and IUPD.[17] For example, John explained that while at Jane's sorority, he may have gone inside her room after she changed.[18] He also claimed that as he and Jane had sex, he asked Jane "if it was ok 'every step of the way'" and that he asked for consent for "every act, every next step." This specific detail regarding consent is nowhere to be found in his IUPD statement. In yet another inconsistency, instead of saying that he "might have" digitally penetrated Jane, he now indicated that he "asked [Jane] for permission to 'finger her,' and that [Jane] said 'yes.'"[19] He also identified the names of an ex-girlfriend and another friend with whom he had engaged in sexual acts in the past as being able to speak to his practice of asking for consent. [DE 44-10 at ¶ 11; DE 44-1 at 53:23-55:15.] Cardosa declined to interview those two individuals consistent with IU's policy that prior sexual history of either the complainant or respondent is not relevant. [DE 44-10 at ¶ 11; DE 44-3 at 44:17-45:4, 57:24-59:6; DE 44-16 at 15.]

On June 12, 2018, OSC met with Jane for further information.[20] Jane gave the same story to OSC as she did to IUPD and elaborated on details. For instance, Jane explained that she agreed to go to Sigma Nu with John because she was close with a lot of people in that fraternity and she thought they were going to hang out with other people. She also provided additional details about the sexual activity that occurred between her and John. Jane further explained that

---

[16] Cardosa also gave John the opportunity to ask any questions about the investigation process, went over a flowchart outlining that process, and gave him a section of the Code of Student Rights, Responsibilities, & Conduct ("Student Code") that includes information for respondents. [DE 44-10 at ¶ 10; DE 44-17 at 4-7.]

[17] The summary of John's interview with OSC on June 8, 2018 is found at DE 44-18, pp. 8-10.

[18] John's story regarding what happened at the sorority keeps changing. After this interview, he told the Monroe County Prosecutor that he went into Jane's room and they talked. [DE 44-18 at 10.] In the affidavit he filed with this Court, he now claims that he went into her room and they "kissed more." [DE 44-8 at ¶ 18.]

[19] He also said that there were maybe one or two other people with Individual 1 when he entered the room and took the Photo. [DE 44-18 at 9.] John stated that he saw Individual 1 holding a phone when he entered the room. [Id.]

[20] The summary of Jane's interview with OSC on June 12, 2018 is found at DE 44-18, pp. 3-6.

after the sexual encounter John was texting her to ask if she was "okay" and whether she was on birth control. She responded that she was fine so that John "would leave her alone."

Throughout the course of OSC's investigation from June 2018 through August 2018, Cardosa interviewed John, Jane, and 12 different witnesses. [DE 44-10 at ¶ 12; DE 44-3 at 12:13-13:2, 87:11-89:2.] She also included in the investigation file OSC interviews with John, Witness 1, and Witness 2 that were conducted as part of the Photo Investigation,[21] as well as John's voluntary statements to IUPD and the Monroe County Prosecutor.[22] [DE 44-10 at ¶ 12; DE 44-18 at 6-8, 10-16.] Cardosa also attempted to schedule an interview with Individual 2 by calling and emailing him several times and leaving messages with his parents. Individual 2, however, declined to provide a statement.[23] [DE 44-10 at ¶ 12; DE 44-18 at 30, 64.] Several witnesses also gave statements providing additional details about seeing John and/or Jane at the Sigma Phi Epsilon party, some gave statements about the Photo and John and Jane's actions (or lack thereof) when the Photo was taken, and some gave statements including details about Jane's conduct immediately after the incident.[24]

On September 5, 2018, Cardosa completed the preliminary investigation report and emailed John and Jane notifying them that the report and case file were available for review at

---

[21] Although the Photo Investigation was ongoing at this time, Cardosa kept it separate and redacted from the investigation report references to John's decision not to pursue the Photo Investigation. [DE 44-10 at ¶ 16; DE 44-3 at 29:13-30:19.] Cardosa did, however, keep the substance of John's September 2017 statement to OSC in the report and file because that statement described the same September 4, 2017 incident. [DE 44-9 at ¶ 23.]

[22] John gave a statement to the Monroe County Prosecutor on July 13, 2018, during which John's lawyer at that time was present. [DE 44-1 at 56:2-7; DE 44-18 at 10.] John reiterated what happened on September 4, 2017, but this time he was yet again inconsistent on several key details, including (1) he made no mention of asking Jane for consent "every step of the way," (2) he stated that he went into Jane's room for a couple of minutes after she changed and that "they talked," (3) for the first and only time he said he told Individual 1 and the others at the door to "fuck off" and "get out," (4) he said that five people saw him and Jane engaging in sexual activity, and (5) he claimed he was upset about the Photo being taken. [DE 44-18 at 10-15.]

[23] John admitted during his deposition that he did not attempt to locate Individual 2 and that he does not know what Individual 2 would have said had he given a statement. [DE 44-1 at 73:24-74:24.]

[24] For example, Witness 5 stated that she saw Jane at their sorority house later in the evening on September 4, 2017 and that Jane was crying and very upset and told her that John sexually assaulted her at Sigma Nu. [DE 44-18 at 52.] Two of Jane's roommates also indicated that Jane was very upset and crying that evening and that Jane told them she did not want to engage in sexual intercourse with John. [Id. at 55-56.]

OSC and that an electronic version of the report (but not the entire case file) would be uploaded to Box. [DE 44-10 at ¶ 13.] Cardosa also notified them that they would have ten calendar days to provide new or additional information for the investigation. [*Id.*] The Student Code provides that "this period of 10 days will be the final opportunity for parties to submit any additional information to the Investigator." [DE 44-17 at 5.] John did not provide any additional information or make any corrections during that ten-day time period. [DE 44-1 at 64:18-67:3.]²⁵

On October 5, 2018, Elizabeth Spotts, IU's Deputy Title IX Coordinator, sent a letter to John indicating that OSC was charging him with three violations of the Student Code, including sexual harassment, sexual assault (including non-consensual sexual penetration and non-consensual sexual contact), and sexual exploitation. [DE 44-22 at 1.] The letter identified the alleged behaviors as "penetrating [Jane's] vagina with [his] penis by force, without her consent, and/or while she was incapacitated and allowing another individual to photograph or take a video of [John] engaging in sexual intercourse with [Jane] without her consent." [*Id.*; *see also* DE 44-10 at ¶ 17.] Spotts stated that John's sexual misconduct hearing had been scheduled for October 19, 2018 and provided a brief description of the hearing process. [DE 44-22 at 1.] In addition, Spotts advised John that he could meet with her to discuss the hearing process. [*Id.* at 1-2.]²⁶

On October 8, 2018, Cardosa completed the final investigation report and emailed John and Jane notifying them that the report and case file were available for review at OSC and that an electronic version of the report (but not the entire case file) would be uploaded to Box. [DE 44-

---

²⁵ John testified that he later looked at Jane's Facebook page and saw photos she posted of her at the Sigma Phi Epsilon party on September 4, 2017. [DE 44-1 at 67:4-68:4.] John did not attempt to submit these photos during or after the ten-day period, or at the hearing. [*Id.*; *see* DE 44-2 at 85:20-86:9.] In addition, OSC will not on its own look at a complainant's or a respondent's social media pages unless such information is submitted during an investigation by the parties or witnesses. [DE 44-3 at 17:7-19:15.]

²⁶ She also provided him the same website and office information that was provided in Cardosa's June 6, 2018 letter. [DE 44-22 at 2.] Despite having these available resources, John chose not to set up a meeting with Spotts, access the website to obtain further information, or contact either of the two offices for assistance with hearing preparations. [DE 44-1 at 68:18-70:2.]

10 at ¶ 14; DE 44-23; DE 44-24.] The case file included OSC's notes taken during John's, Jane's, and the witnesses' interviews. [DE 44-10 at ¶ 14; DE 44-3 at 26:4-27:12, 28:22-30:3.]

**C.      The October 19, 2018 Sexual Misconduct Hearing.**

The sexual misconduct hearing took place on October 19, 2018 from approximately 1:00 p.m. to 9:00 p.m. [DE 44-9 at ¶ 14; DE 44-4 at 75:20-76:15.] Latosha Williams served as the chair of the hearing panel, and Marjorie Treff and Barry Magee served as the other two members ("Panel").[27] [DE 44-9 at ¶ 11; DE 44-11 at ¶ 6.] Spotts served as the hearing coordinator and was responsible for answering questions regarding whether a particular piece of evidence, testimony, or question was permissible. [DE 44-9 at ¶ 14.] The Panel received a packet of information approximately one week prior to the hearing, and each panel member thoroughly reviewed the information. [*Id.* at ¶ 13; DE 44-11 at ¶ 7; DE 44-12 at ¶ 9; DE 44-13 at ¶ 6.]

During the hearing, Ms. Williams read from a script to explain the process, dictate the order of statements and questioning, and ensure that IU's hearing procedures were properly followed. [DE 44-4 at 42:23-43:16; DE 44-11 at ¶¶ 8-10, pp. 12-20.] The progression of the hearing was as follows: (1) opening statements from Jane and John, (2) the Panel questioned Jane and gave John the opportunity to submit written questions for Jane, (3) the Panel called witnesses (either in person or by telephone)[28] and allowed both John and Jane the opportunity to ask all witnesses any questions, (4) the Panel allowed John to provide remarks, questioned John, and provided Jane the opportunity to submit written questions for John, and (5) the Panel provided John and Jane the ability to question Cardosa as the lead investigator on the case.[29] [DE

---

[27] Williams, Magee, and Treff all have experience as panel members and have completed the required training. [DE 44-11 at ¶¶ 2-5; DE 44-12 at ¶¶ 2-7; DE 44-13 at ¶¶ 2-4.]
[28] It is standard procedure for the hearing panel to call witnesses by phone. [DE 44-9 at ¶ 15.] In addition, when questioning the parties and witnesses, the hearing panel does not typically ask questions that are already represented in the case file. [DE 44-9 at ¶ 26; DE 44-11 at ¶ 10.]
[29] Jane and John both agreed to forego the opportunity to ask Cardosa any questions. [DE 44-8 at ¶ 86.]

44-11 at ¶¶ 10, 12; DE 44-1 at 75:13-78:4.] Before adjourning the hearing, Williams asked Jane

and John whether they had any last questions and allowed each of them to make closing remarks.

[DE 44-11 at ¶ 12; DE 44-1 at 78:5-11.] John admitted that he was not prevented from making

any statements during the hearing or asking questions of the witnesses. [DE 44-1 at 75:20-

78:11.] In addition, John admitted that "[a]s far as [he] know[s]," the hearing was conducted in

the same manner that IU normally conducts its misconduct hearings. [*Id.* at 105:2-8.]

### D.   The Panel's Decision and John's Appeal.

On November 6, 2018, the Panel issued the following unanimous decision:

> The hearing panel has determined by the preponderance of the evidence, that
> [John was] responsible for violating [the Student Code]; specifically, the panel
> determined more likely than not that [John was] responsible for penetrating IU
> student [Jane's] vagina with [his] penis without her consent and allowing another
> individual to photograph or take a video of [John] engaging in sexual intercourse
> with [Jane] without her consent.

[DE 44-26 at 1-2; *see* DE 44-4 at 46:14-19, DE 44-11 at ¶¶ 13-15, 19-23; DE 44-12 at ¶¶ 10-15;

DE 44-13 at ¶¶ 9-10, 13-17; *see generally* DE 44-25.] In addition, the Panel decided that, while

Jane was found to be incapacitated, John did not know and had no reason to know that Jane was

incapacitated. As a result of this finding, the Panel then moved on to a consent analysis. [DE 44-

26 at 2-3; *see* DE 44-5 at 21:5-22:10.][30] The Panel determined that John "did not have consent

through voluntary words or actions that were mutually understandable for both parties for

[digital and penile] penetration" and based its decision on, among other factors, "the absence of

movement described [of Jane], [Jane's] statements, and the inconsistencies in [John's] statements

---

[30] The determinations on capacity and consent with respect to the sexual assault charge are based on separate
analyses. [DE 44-9 at ¶ 24.] The Panel first evaluated whether Jane was incapacitated and also whether John knew
or should have known Jane was incapacitated. [*Id.*] In the event the Panel had found that John *did* know that Jane
was incapacitated, then the analysis ends there, and the Panel would not have moved on to the question of consent.
[*Id.*; *see* DE 44-16 at 5 ("Consent does not exist when the individual initiating sexual activity *knew or should have
known* of the other person's incapacitation.").] Because the Panel found that John did not know or should not have
known that Jane was incapacitated, the Panel evaluated whether John received affirmative consent from Jane as
defined by IU's Policy to engage in all sexual activity. [DE 44-9 at ¶ 25; *see also* DE 44-11 at ¶¶ 16-18.]

regarding consent[.]" [DE 44-26 at 3; DE 44-4 at 93:17-95:25; DE 44-5 at 22:11-23:10, 24:10-25:14.] The Panel also determined that John was responsible for sexual exploitation by finding that "it is more likely than not that [John] knew multiple people were watching the sexual activity, that [John] encouraged the photo with his own actions of laughing and holding up a peace sign, and [John] knew that a photo was being taken while [Jane] was unaware and had not given consent for this photo." [DE 44-26 at 4; DE 44-6 at 55:18-24.] Significantly, John testified at his deposition that he does not have any facts, information, or evidence that any one of the Panel members did not genuinely believe each of the Panel's determinations to be true. [DE 44-1 at 84:17-86:15, 87:5-88:11.] John also testified at his deposition that he agreed that someone looking at the Photo "could reasonably conclude" that he was "posing" for the camera and "allowing" his fraternity brothers to take the Photo. [DE 44-1 at 60:11-61:7.] Based on John's responsibility for multiple Student Code violations, the Panel issued several sanctions, including a four-year suspension. [DE 44-26 at 5-6.]

On Saturday, November 10, 2018, John submitted (with the assistance of counsel) a Notice of Appeal to OSC, claiming that there were procedural errors and that the four-year suspension was a disproportionate sanction. [DE 44-1 at 88:23-89:12; DE 44-27.] OSC submitted John's appeal, the case file, and the audio recording of the hearing to C. Kurt Zorn, the Associate Vice Provost for Undergraduate Education, for his review on November 13, 2018. [DE 44-7 at 48:20-50:17; DE 44-9 at ¶ 20; DE 44-14 at ¶ 7.] Zorn rendered his decision affirming the Panel's decisions on November 26, 2018. [DE 44-14 at ¶ 7; DE 44-28.][31] Zorn determined that "no procedural errors occurred" and found "the hearing panel's action plan associated with the violation(s)…to be commensurate." [DE 44-28 at 1; DE 44-7 at 61:19-65:14; DE 44-14 at ¶¶ 9-

_____

[31] Because the Student Code excludes Thanksgiving break from "calendar days," Zorn rendered his decision within the ten-day time period after receiving the appeal on November 13, 2018. [DE 44-9 at ¶ 21; DE 44-17 at 9.]

12.] In his affidavit, Zorn indicated that the Photo was a critical factor in his decision that the Panel issued appropriate sanctions and that John's attitude in the Photo was the "most egregious conduct" that he had seen in his many years as a panel member and appellate officer. [DE 44-14 at ¶ 11.] In his deposition, John conceded that he had no basis to question whether Zorn "genuinely believe[d] that his decision on the appeal was the correct one." [DE 44-1 at 106:5-9.]

## III.   ARGUMENT

A party seeking a preliminary injunction must satisfy three requirements: (1) likelihood of success on the merits, (2) a showing of irreparable harm, and (3) inadequacy of traditional legal remedies. *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1058 (7th Cir. 2016).[32] If the plaintiff establishes all three requirements, then the court will assess whether the balance of harm favors an injunction. *Jones*, 842 F.3d at 1058. Here, John is seeking a preliminary injunction based on two of his claims: (1) breach of contract and (2) Title IX discrimination. Because he cannot establish that he is likely to prevail on the merits of either claim, John's request for a preliminary injunction must be denied.

### A.   John Cannot Establish a Likelihood of Success on the Merits of His Breach of Contract Claim.

In addressing breach of contract claims between students and universities, "the sole function of courts is to determine whether the educational institution acted illegally, arbitrarily, capriciously, or in bad faith." *Amaya v. Brater*, 981 N.E.2d 1235, 1240 (Ind. Ct. App. 2013). In so doing, the court should look at "whether there is some evidence to support the decision of the school or college disciplinary board" and whether the university "substantially followed" its

---

[32] "[A] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (quotation and citation omitted). Indeed, the United States Supreme Court has noted that a preliminary injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (original emphasis).

procedures. *See Holert v. Univ. of Chi.*, 751 F. Supp. 1294, 1301 (N.D. Ill. 1990) (no breach where university "conducted its proceedings in substantial compliance with university standards"); *Reilly v. Daly*, 666 N.E.2d 439, 446 (Ind. Ct. App. 1996) (affirming denial of preliminary injunction in light of "some" evidence supporting the school's decision).

As explained above, IU complied fully with its Student Code and Sexual Misconduct Policy throughout the investigation and hearing and there is substantially more than "some" evidence supporting its decisions.[33] Accordingly, IU did not act illegally, arbitrarily, capriciously, or in bad faith. IU, however, anticipates that John will allege the following procedural errors in his brief and at the hearing:[34]

1.  IU did not secure a statement from Individual 2 and the Panel did not ask necessary questions of the witnesses and the parties during the hearing.

There are no requirements in any of IU's policies, including the Sexual Misconduct Policy, that IU secure witness statements from every potential witness. While Individual 2 did report to OSC for his required respondent meeting, he chose not to provide a statement—IU does not have subpoena power and cannot force a witness to make a statement.[35] [DE 44-10 at ¶ 12; DE 44-3 at 15:6-16:14, 92:18-93:5.] In addition, there are no IU policies that dictate the type of questions the Panel must ask during a hearing. Rather, it is common practice for the Panel to question witnesses for information beyond what is readily found in the hearing materials. [DE 44-11 at ¶ 10.] It is also undisputed that John had the ability to ask any questions of any of the witnesses. [*Id.*; DE 44-1 at 76:24-77:4.]

---

[33] To the extent John is requesting that this Court reweigh the evidence, such a request is not permissible. *See, e.g., Ha v. Northwestern Univ.*, No. 14 C 895, 2014 WL 5893292, *2 (N.D. Ill. Nov. 13, 2014) ("…courts should refrain from second-guessing the disciplinary decisions made by school administrators.").

[34] In the event John raises additional procedural issues, IU will respond at the hearing on January 7, 2018.

[35] John admits that, had Individual 2 provided a statement prior to or during the hearing, he does not know what Individual 2 would have said that might have changed the outcome. [DE 44-1 at 97:6-17.]

2. <u>IU shifted John from a complainant to a respondent, improperly used his September 29, 2017 statement in the investigation, and placed inconsistent charges on John and Individual 1</u>.

Again, there are no IU policies related to these allegations. As described herein, at the time OSC interviewed John in September 2017, Jane had not made her complaint. As a result, there was no way for IU to put John on notice that he may be a respondent in a later investigation. The charges placed on John and Individual 1 are also not inconsistent. The charge against Individual 1—that he took the Photo without the consent of Jane or John—was based on John's statement that he did not consent to the Photo and Jane's statement that she did not consent. [DE 44-3 at 71:15-74:1; DE 44-9 at ¶ 28; DE 44-29.] Individual 1's violation would have been the same regardless of whether *both* Jane and John consented—all it takes for a violation is that *one* party depicted in the Photo not to consent. [*Id.*; *see also* DE 44-2 at 65:1-66:5.] Accordingly, it is not inconsistent to find that, on one hand, Individual 1 was responsible for sexual exploitation by taking a Photo without *Jane's consent*, while on the other hand, finding that John was responsible for allowing the Photo to be taken.

3. <u>The investigation went beyond 60 days, John was not provided a complete copy of the case file electronically prior to the hearing, and he was provided less than two weeks to review the final investigation report</u>.

The Student Code provides that the "investigation and determination of responsibility will *generally* be concluded within 60 days of the report, absent special circumstances." [DE 44-17 at 4 (emphasis added). It does not, however, guarantee a conclusion within 60 days.[36] Here, the investigation was conducted as quickly as possible. [DE 44-10 at 12; *see* DE 44-21 (providing John a status update).] Second, while there are no written policies regarding specific

---

[36] *See Pierre v. Univ. of Dayton*, No. 3:15-cv-362, 2015 WL 8567693, *3 (S.D. Ohio Dec. 11, 2015) (holding that plaintiff was unlikely to prevail on his breach of contract claim based on the university's failure to complete the investigation and decision within 60 days where the university had ongoing correspondence with plaintiff about the investigation process and the provision in the university's policy was "couched in so many qualifiers that it is not likely the amount of time taken to resolve this case could be said to be a contractual violation").

14

access to investigation reports, it is IU's standard practice to grant electronic access to both the preliminary and final investigation reports, but not the entire case file. [DE 44-10 at ¶¶ 13-14.] Parties (including John and Jane) have the opportunity to review the entire case file at OSC. [*Id.*] This ensures that private student information is kept confidential. In addition, it is standard practice to distribute the final investigation report to both parties one week prior to the hearing. [*Id.* at ¶ 15.] Here, John and Jane were provided more than one week to review the report and case file. [*Id.*]

       4.       <u>IU did not adequately inform John of the procedures for the hearing</u>.

As described above, it is undisputed that John was notified in writing and in person several times about these procedures, was provided a website and additional resources for further information, and was given the opportunity to request a meeting to discuss questions about the applicable procedures. John, however, failed to do so and cannot now feign ignorance alleging that IU did not properly notify him of the applicable procedures. [DE 44-1 at 68:12-70:2.]

       5.       <u>The Panel disregarded pieces of evidence related to Jane's credibility and regarding Jane being flirtatious with John prior to the incident</u>.

John contends that because Jane's actions showed consent to some intimate contact—for instance, by flirting with him earlier in the day and holding hands—this showed she consented to *all* sexual activity. This contention completely ignores IU's definition of consent, which requires affirmative consent for *each separate act*. [DE 44-11 at ¶ 17; DE 44-16 at 5; *see also* DE 44-5 at 25:15-26:20, 51:8-54:23.] In addition, it is undisputed that the Panel did take into consideration the fact that Jane could not remember pieces of the day and, rather than simply relying on Jane's testimony, looked at witness statements to corroborate the statements made by Jane and John. [*See, e.g.,* DE 44-4 at 77:1-78:14, 85:18-87:5; DE 44-25.] The fact that the Panel found statements made by Jane, as well as other witnesses, more credible than statements made by John

does not demonstrate a flawed outcome. Rather, in light of John's inconsistent statements and admitted lies, the Panel's credibility determinations were more than reasonable.

   6.     The parties did not have equal opportunities to present information because IU did not interview two of John's witnesses and cut-off testimony from a witness.

John takes issue with the fact that Cardosa did not interview two individuals with whom he had previously engaged in sexual activity and who would have corroborated his alleged practice of asking for consent prior to sex. [DE 44-1 at 53:23-54:6, 55:5-15.] IU's Sexual Misconduct Policy, however, states that "[i]nformation related to prior sexual history of the parties will be prohibited…." [DE 44-10 at ¶ 11; DE 44-16 at 15; *see also* DE 44-1 at 82:15-24.] Accordingly, it was proper for IU not to interview these individuals.[37] In addition, John admits that Witness 3 was going to testify as to a conversation Witness 3 had with Jane months after the incident that would shed light on Jane's attitude toward sex. [DE 44-1 at 80:12-81:12, 95:20-96:25.] Such testimony is irrelevant to the question of whether Jane consented to sexual activity on September 4, 2018, and therefore, was properly excluded. [DE 44-9 at ¶ 27; DE 44-11 at ¶ 11; DE 44-4 at 81:8-83:14.][38] Regardless, John had the opportunity to question Witness 3—as he did with all witnesses at the hearing—and chose not to explore that testimony in further detail.

A false assumption that permeates John's entire breach of contract claim is that he was entitled to procedures *he subjectively views as proper*. John, however, was at most entitled to only the procedures set forth in IU's policies—that is exactly what he was provided, and there is no evidence that IU departed from those policies during the investigation, hearing, or appeal. *See, e.g., Tsuruta v. Augustana Univ.*, No. 4:15-CV-04150-KES, 2015 WL 5838602, *6 (D.S.D.

---

[37] This is in contrast to Jane's statements, as well as statements made by other witnesses, that Jane was a virgin prior to the incident on September 4, 2017. Statements regarding Jane's virginity show Jane's "identity" rather than prior sexual history and could assist the Panel in understanding what she understood was happening. [DE 44-3 at 57:24-59:6.] More importantly, there is no indication that the Panel relied upon the fact Jane was a virgin to make any of its determinations.

[38] As the chair of the hearing panel, Williams was tasked with ensuring that the testimony was within the scope of what was relevant to the incident at hand. [DE 44-4 at 56:21-57:17; DE 44-11 at ¶ 11.]

Oct. 7, 2015) (finding that plaintiff was not likely to succeed on merits of a breach of contract claim where "[a]lthough [plaintiff] may wish that Augustana's investigations are more thorough than they are, the court cannot agree that the investigation was completed in a less-thorough or less-impartial manner than is required by the handbook."). Accordingly, because IU more than "substantially complied" with its policies and there is significantly more than "some" evidence to support the Panel's findings, the Panel's decision was not arbitrary or capricious manner, or made in bad faith.[39]  Thus, John has no likelihood of success on his breach of contract claim.[40]

**B.**     **John Has No Likelihood of Success on the Merits of His Title IX Claim.**

To prevail on his Title IX claim, John must establish that IU discriminated against him *because of* his gender. 20 U.S.C. § 1681(a). The Seventh Circuit has adopted the Second Circuit's framework set forth in *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994), identifying "erroneous outcome" and "selective enforcement" as two applicable categories of Title IX claims when a plaintiff attacks a university's disciplinary proceedings. *See Doe v. Purdue Univ.*, 281 F. Supp. 3d 754, 774-75 (N.D. Ind. 2017).

John asserts an "erroneous outcome" claim under Title IX. [DE 1 at 15-16.] A plaintiff bringing an erroneous outcome claim must first allege particular facts sufficient to cast doubt on the accuracy of the outcome of the proceedings and then also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding. *Purdue Univ.*, 281 F. Supp. 3d at 774 (citing *Yusuf*, 35 F.3d at 715). As discussed above, there is no evidence that would cast doubt on the accuracy of the outcome of IU's proceedings. Even if there was

---

[39] *See Amaya*, 981 N.E.2d at 1241-42 (holding that IUSM substantially followed its published procedures for dismissal and that IUSM's conclusion was a rational determination arrived at after deliberation and after Amaya had numerous opportunities to be heard); *Chang v. Purdue Univ.*, 985 N.E.2d 35, 48 (Ind. Ct. App. 2013) (holding that disciplinary decision "was a rational determination" arrived at after plaintiff had several opportunities to be heard).
[40] John's breach of contract claim is also barred by the Eleventh Amendment. *See Bull v. Bd. of Trs. of Ball State Univ.*, No. 1:10-cv-00878-JMS-TAB, 2011 WL 6740549, *4 (S.D. Ind. Dec. 22, 2011) (citing *Raygor v. Regents of the Univ. of Minn.*, 534 U.S. 533, 542 (2002)).

(which there is not), there is absolutely no evidence to suggest that gender bias was a motivating factor behind the decision. Rather, the evidence shows that, throughout the investigation, hearing, and appeal, IU followed its applicable policies and applied them equally to both John and Jane. Moreover, John conceded during his deposition that he is "not alleging that any one of [the] three panel members made his or her decision because he is a man." [DE 44-1 at 105:9-106:4.][41] Nevertheless, John raises two arguments in support of his Title IX claim.

First, John argues that IU "shifted the burden to John to disprove Jane's allegations." [DE 44-15 at No. 4, p. 14; DE 44-1 at 82:25-83:14, 118:12-119:13.] Setting aside that IU does not place any burden on a respondent [DE 44-2 at 37:19-39:8; DE 44-9 at ¶ 17], the Northern District of Indiana has stated:

> To plead facts sufficient to show an erroneous outcome attributable to intentional sex discrimination, Plaintiff must allege more than disagreement with how accurately [the Dean] weighed the evidence. Unbiased persons can weigh the same evidence differently. Plaintiff's allegation that he was presumed to be guilty is nothing more than a bare-bones allegation with no factual support. Again, these facts may be victim-biased, but there is nothing that is specifically gender-biased.

*Doe*, 281 F. Supp. 3d at 778. John's argument, therefore, amounts to little more than a potential bias against *respondents* (as opposed to a gender bias) which, even if true, is insufficient to establish an erroneous outcome claim. *See Doe v. Columbia Coll.*, 299 F. Supp. 3d 939, 955 (N.D. Ill. 2017) (holding that plaintiff's allegations "are indicative, at best, of a bias in favor of

---

[41] Significantly, "Title IX does not create a private right of action for disparate impact cases." *Ludlow v. Northwestern Univ.*, 125 F. Supp. 3d 783, 793 (N.D. Ill. 2015). Rather, a plaintiff must establish "intentional discrimination because of his sex." *Id.* In addition, there is no evidence that IU engages in a pattern of discriminatory decisions toward men. From July 1, 2017 through December 10, 2018, IU conducted approximately 32 investigations into allegations of sexual harassment, sexual assault, and/or sexual exploitation. [*See generally* DE 44-30.] Of the 32 investigations, only two involved a male complainant making allegations against a female respondent, and two involved a male complainant and respondent. In addition, 15 of the 32 investigations resulted in a hearing, while the others concluded by alternative resolution or an acceptance of responsibility, or are still ongoing. Of the 15 hearings (all involving male respondents), four resulted in a "no finding" of responsibility, eight resulted in a finding of responsibility for a policy violation(s), one resulted in a no finding on one alleged incident and a finding of responsibility on a second alleged incident, and two are still pending.

sexual assault complainants and against those accused of sexual assault, regardless of gender").[42]

Second, John claims that "there was a strong probability that the climate at [IU]"—i.e., a Twitter

campaign by another IU student criticizing IU's handling of sexual assault claims and a march

during August 2017 led by that student—impacted the way IU handled Jane's allegations against

John. [DE 44-15 at No. 13, p. 19.] Despite the absence of any evidence that this "climate"

affected the investigation or the Panel's decision in any way, the presence of public campaigns

criticizing a university's response to sexual misconduct allegations is insufficient to show gender

bias. *See, e.g., Doe v. George Washington Univ.*, 305 F. Supp. 3d 126, 133-34 (D.D.C. 2018).

Finally, John alleges a deliberate indifference theory of liability under Title IX. [DE 1 at

17.] This theory traditionally requires a plaintiff to "produce evidence that [the defendant] was

deliberately indifferent to sexual harassment[.]" *Hendrichsen v. Ball State Univ.*, 107 Fed. Appx.

680, 684 (7th Cir. 2004) (citation omitted). Here, John's Title IX claim is not tethered to a claim

that he was sexually harassed, but rather, is based solely on alleged errors throughout the

disciplinary process. As a result, John's deliberate-indifference claim cannot prevail. *See, e.g.,*

*Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 757-58 (E.D. Tenn. 2009). Even if this claim

could be premised on alleged procedural errors, John cannot prevail because, as indicated above,

there is no evidence that IU was motivated by gender bias.

Simply put, there is no evidence that IU found John responsible for sexual misconduct

and ultimately suspended because he is male. As a result, John cannot establish that he is likely

to prevail on the merits of his Title IX claim.

---

[42] *See also Doe v. Cummins*, 662 Fed. Appx. 437, 453 (6th Cir. 2016) (holding that plaintiff's allegations related to a limited right to cross-examination, limited access to an advisor, and the improper allocation of the burden of proof "at most show a disciplinary system that is biased in favor of alleged victims and against those accused of misconduct" and do "not equate to gender bias because sexual-assault victims can be both male and female."); *Ludlow*, 125 F. Supp. 3d at 792-93 ("Ludlow's allegation that Northwestern 'needed to believe the victim' similarly points to a victim-focused procedure by Northwestern, not a procedure that took the gender of the victim and the accused into account.").

C.   **John Cannot Establish Irreparable Harm and the Balance of Harms Favors IU and the Public.**

John complains that his suspension deprives him "of the opportunity to continue and complete his education" [DE 1 at ¶ 6], but admits that he has not even attempted to transfer to a different institution to complete his degree and that he still has his summer internship at Deloitte [DE 44-1 at 109:1-21]—this is not irreparable harm. *See Medlock v. Trs. of Ind. Univ.*, No. 1:11-cv-00977-TWP-DKL, 2011 WL 4068453, *9 (S.D. Ind. Sept. 13, 2011) (holding that a suspension was not an irreparable harm where plaintiff could resume his education at another school). In addition, "a plaintiff cannot obtain a preliminary injunction by speculating about hypothetical future injuries." *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 705-06 (7th Cir. 2005). Here, John speculates that he would not be able to transfer to another school, that he will lose his summer internship, and that his future career will be derailed, but provides no basis for those allegations. [DE 44-8 at ¶¶ 104-09.] As a result, John's alleged injuries are nothing more than mere speculation.

In addition, the balance of harms tips unmistakably in favor of IU as it (and the public) has a strong interest in IU's ability to enforce its policies, protect its students from harmful conduct, and maintain order on campus. *See Knoch v. Univ. of Pitt.*, No. 2:16-CV-00970-CRE, 2016 WL 4570755, *9 (W.D. Pa. Aug. 31, 2016); *Marshall v. Ohio Univ.*, 2015 WL 1179955, *10 (S.D. Ohio Mar. 13, 2015).

IV.   **CONCLUSION**

For all of these reasons, and those that will be set forth during oral argument on January 7, 2018, the Court should deny John's request for a preliminary injunction.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 4, 2019, a copy of the foregoing was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Michael C. Terrell*
Michael C. Terrell

24110924.1