| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-03713-TWP-MJD |
| | ) | |
| INDIANA UNIVERSITY - BLOOMINGTON, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

This matter is before the Court on a Motion for Preliminary Injunction filed pursuant to Federal Rule of Civil Procedure 65 by Plaintiff John Doe (Filing No. 4). John Doe filed this action against Defendant Indiana University – Bloomington ("IU") after IU held sexual misconduct disciplinary proceedings and sanctioned him by suspending him for four years. John Doe seeks a preliminary injunction to prevent IU "from suspending him as a sanction resulting from a fundamentally unfair disciplinary process." *Id.* at 1. For the following reasons, the Motion for Preliminary Injunction is **denied**.

## I. LEGAL STANDARD

A preliminary injunction is an extraordinary remedy never awarded as a right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

> To obtain a preliminary injunction, a party must establish [1] that it is likely to succeed on the merits, [2] that it is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that issuing an injunction is in the public interest.

*Grace Schools v. Burwell*, 801 F.3d 788, 795 (7th Cir. 2015); *Winter*, 555 U.S. at 20. "The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 678 (7th Cir. 2012) (citation and internal quotation marks omitted). "Stated another way, the district court 'sit[s] as would a chancellor in equity' and weighs all the factors, 'seeking at all times to minimize the costs of being mistaken.'" *Id.* (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)).

## II. BACKGROUND

IU is a university of the State of Indiana with its main campus located in Bloomington, Indiana. John Doe enrolled at IU in the fall of 2016 and has been continuously enrolled as an undergraduate student through the fall 2018 semester. He began his undergraduate studies in the Kelley School of Business and has completed six semesters at IU because he has taken classes during the summer (Filing No. 46-1 at 1).

On September 4, 2017, John Doe attended a "day party" at one of the fraternity houses on IU's campus. While at the party, he encountered Jane Doe. He and Jane Doe had not met before. They interacted and eventually left the party together and went to the fraternity house of which John Doe was a member. John Doe did not live in his fraternity's house and entered a room that belonged to one his friends. The room was a private living room, not a bedroom. They undressed, and John Doe touched Jane Doe's breast and vagina. Then they proceeded to engage in sexual

intercourse. While they were engaging in sexual intercourse, an individual walked into the room and saw that they were having sex. That individual left the room. Moments later, other individuals entered the room and saw John Doe and Jane Doe engaging in sexual intercourse. One of the individuals held up their cell phone and took a photograph of John Doe and Jane Doe having sex. In the photograph, John Doe is looking at the person taking the picture with the cell phone, smiling, and giving the "peace sign" hand gesture. The individuals left the room, and John Doe and Jane Doe stopped engaging in sexual intercourse. They got dressed, and John Doe walked Jane Doe back to her sorority house. *Id.* at 2–4.

Soon thereafter, John Doe learned that one of the individuals who had entered the room while he was having sex with Jane Doe had taken a photograph of them engaging in sexual intercourse. He also learned that the photograph was shared via SnapChat, an internet messaging application. Someone captured a screen shot of the photograph on SnapChat and sent it to a "GroupMe" chat amongst John Doe's fraternity brothers. Upon learning this, John Doe immediately went to the fraternity president to ask that the photograph be removed from the GroupMe chat. However, the photograph had already been removed by the time John Doe reached the fraternity president. *Id.* at 4–5.

John Doe sent Jane Doe a text message to ask how she was doing and to explain that he felt that they "should talk about what just happened." (Filing No. 1-1 at 1.) She replied that she was fine and texted "#yolo," understood by John Doe to mean, "you only live once." *Id.* at 2. John Doe sent a text asking her if she knew that someone had taken a photograph of them having sex, and she responded, "Yea but like Idgaf bc u can't see me," and "It is just life." *Id.* John Doe understood "Idgaf" to mean, "I don't give a fuck" about the photograph because she was not visible

in it. *Id.* John Doe replied and texted, "Are you on birth control lol," to which Jane Doe responded that she was on birth control. *Id.* at 2–3. Lol is understood to mean "laughing out loud".

Approximately one week later, on September 12, 2017, IU's Office of Student Conduct ("OSC") learned of the photograph incident and began an investigation. OSC learned that John Doe was the male student in the photograph. John Doe was interviewed by an OSC investigator on September 29, 2017. During the interview, John Doe gave a verbal statement; however, he declined to identify the female student in the photograph. He explained that the female student in the photograph was not aware that the photograph was being taken. When asked had he consumed alcohol that night, John Doe responded "no" and stated that he does not drink alcohol because it does not make him feel good. He identified one of his fraternity brothers as the individual who took the photograph. Because of social pressure within his fraternity, John Doe declined to file a complaint against the individual who took the photograph and the individual who copied the photograph and posted it on the GroupMe chat ([Filing No. 44-10 at 1](#)–2; [Filing No. 44-18 at 1](#), 6; [Filing No. 44-1 at 4](#)–5). OSC did not further pursue the investigation of the photograph incident at that time because John Doe declined to file a complaint and because he did not disclose Jane Doe's identity ([Filing No. 44-10 at 2](#)). At the time of his interview with OSC, John Doe had no reason to believe that OSC had received a complaint from Jane Doe alleging that he had sexually assaulted her ([Filing No. 44-1 at 6](#)).

John Doe later acknowledged that he lied during his interview with OSC. While he stated in the interview that he did not care that the photograph had been taken, he actually did care. He also lied about drinking alcohol, later acknowledging that he does drink alcohol. *Id.* at 4–5. During an interview with OSC, the individual who took the photograph of John Doe and Jane Doe stated that he took the photograph as a prank because John Doe was laughing. He also indicated that

John Doe's reaction made it seem like it was okay he was in the room and it was okay to take the photograph (Filing No. 44-18 at 24, 26).

Approximately eight months later, on May 25, 2018, a confidential victim advocate for Jane Doe contacted OSC to schedule a complainant information meeting for Jane Doe. During her meeting with OSC's investigator, Jane Doe reported that the sexual activity portrayed in the photograph was non-consensual, and the photograph was taken without her consent. She informed OSC's investigator that she had given a statement earlier that day to the Indiana University Police Department ("IUPD"). She asked that OSC use her statement to IUPD as her complaint against John Doe for non-consensual sex and against the individuals who took and shared the photograph (Filing No. 44-10 at 2; Filing No. 46-2 at 77–78).

In her May 25, 2018 statement to IUPD, Jane Doe reported that she had consumed far too much alcohol at the fraternity party in September 2017 and at one point, she fell while in an inflatable pool with her shoes and clothes on. She reported that John Doe tried to kiss her at the party, but she pulled her head away from him. She remembered leaving the party with John Doe, and when they arrived at the other fraternity house, she thought they would only be hanging out; however, John Doe took off his clothes and then her clothes and then immediately started having sex with her. There was little verbal communication, and she did not know what was happening. John Doe "kind of just went right to it." She felt pain in her groin and was "shocked" at what was happening. She explained that her body panicked, and she was "clenching up." She wanted it to stop, but she did not know how to "make it stop." She felt "frozen" and like a "zombie" and she pretended to be asleep so that John Doe would stop. She believed that this is what eventually made him stop. Jane Doe recounted that after John Doe walked her home, he asked her several times if

she was okay.  She told him she was fine because she wanted him to leave her alone (Filing No. 44-18 at 77–78).

Four days later, following the Memorial Day holiday weekend, an OSC official contacted IUPD to obtain Jane Doe's statement.  The OSC official was informed that IUPD was going to conduct its own investigation and was asked to delay OSC's investigation until after IUPD completed its investigation.  Pursuant to IU's standard policy, OSC agreed to wait on gathering facts while the criminal investigation was conducted (Filing No. 44-10 at 2; Filing No. 44-16 at 13).

On June 1, 2018, approximately a week after Jane Doe talked to IUPD and almost nine months after the sexual activity, John Doe agreed to meet with an IUPD officer to be interviewed. The interview lasted approximately an hour, and at the end of the meeting, John Doe was informed that he was being investigated for rape (Filing No. 46-1 at 6–7; Filing No. 46-2 at 79–80).

During his interview with IUPD, John Doe admitted that he had consumed five or six beers in a two-hour period at the party and felt drunk (Filing No. 44-18 at 79).  This contradicted his statement made during the OSC interview when he stated that he does not drink alcohol because it does not make him feel good. *Id.* at 6. During the IUPD interview, John Doe reported that Jane Doe was flirting with him at the party, led him around the party, and eventually began "making out" with him at the party. He stated that both he and Jane Doe were drunk. *Id.* at 79.  Yet John Doe later asserted in another OSC interview that there was no indication of intoxication, *id.* at 8, and he subsequently attested, "I did not witness Jane consuming any alcohol during the party. I assumed she had consumed alcohol because we were at a party, but I did not believe that she was drunk." (Filing No. 46-1 at 2.)

John Doe also told the IUPD officer that he and Jane Doe left the party together and stopped at her sorority house so that she could change her wet clothes. He stated that he waited outside Jane Doe's bedroom while she changed her clothes, and then they went to his fraternity house (Filing No. 44-18 at 79). A month after the IUPD interview, John Doe told the county prosecutor that after Jane Doe changed her clothes, he went into her room and they talked. *Id.* at 10. However, John Doe later attested that he waited outside her bedroom while she changed her pants, and then "Jane invited me into her room and we kissed more." (Filing No. 46-1 at 3.)

During his IUPD interview, John Doe stated the following: After he and Jane Doe got to the fraternity house, they sat on a couch and started kissing. He asked Jane Doe if he could rub her breasts, to which she consented, and Jane Doe "grabbed at his genitals." (Filing No. 44-18 at 79.) He asked Jane Doe if she wanted to have sex, to which she consented, and "he might have digitally penetrated her" before beginning sexual intercourse (Filing No. 44-18 at 79). He reported to the IUPD officer that once they began sexual intercourse, someone came into the room, saw them having sex, and apologized and walked out. He stopped having sex, walked over and locked the door, and then began having sex again. The door opened again, two individuals came into the room, and one of them took a picture of John Doe and Jane Doe. After this happened, John Doe felt bad for himself and Jane Doe, so they stopped having sex, they got dressed, and he walked Jane Doe home. *Id.* at 79–80.

John Doe later admitted that Jane Doe did not grab at his genitals (Filing No. 44-1 at 10). During a subsequent interview with OSC, John Doe asserted that he asked for Jane Doe's consent "every step of the way" and for "every act, every next step," including asking if he could "finger her," meaning digitally penetrate her. He reported that Jane Doe gave her consent and then he digitally penetrated her. *Id.* at 9.

On June 1, 2018, the same day that John Doe was interviewed by IUPD, OSC was notified by IUPD that it could proceed with its own investigation once IUPD sent Jane Doe's statement to OSC. Her statement was received by OSC on June 5, 2018, and OSC immediately began its investigation. That same day, OSC notified Jane Doe that it was pursuing an investigation of her complaint (Filing No. 44-10 at 2).

On June 6, 2018, OSC sent a charge letter to John Doe informing him of the allegations against him and directing him to meet with OSC on June 8, 2018 (Filing No. 44-10 at 2; Filing No. 44-20). The letter explained that the purpose of the meeting was "to discuss the process and procedures related to incidents involving sexual misconduct" and to provide John Doe "the opportunity to share information related to the incident and any possible witnesses related to the incident for future contact." (Filing No. 44-20.) The letter also informed him that he could have an advisor with him at the meeting. It also provided a website for more information about the sexual misconduct proceedings and identified two offices that could provide assistance with preparing for the hearing process. *Id.*

On June 8, 2018, John Doe, with his father present and serving as his advisor, met with OSC and discussed the events leading up to his sexual activity with Jane Doe as well as the photograph incident and what occurred immediately thereafter. He voluntarily offered this information after being told that he did not need to make a statement. John Doe was informed of the investigation process and procedures. He identified two individuals with whom he had previously engaged in sexual activity, and he asserted that these individuals could speak to his practice of asking for consent before engaging in sexual activity. Pursuant to IU's policies and procedures, OSC did not interview these individuals because they had knowledge of John Doe's sexual history only, not knowledge of the sexual activity pertinent to the investigation. He also

provided names of other individuals who could provide additional information for the investigation ([Filing No. 44-10 at 2](#)–3; [Filing No. 44-18 at 8](#)–10; [Filing No. 46-2 at 44](#)–46).

OSC had a follow-up meeting with Jane Doe on June 12, 2018, to gain more information following its review of her statement to IUPD.  Jane Doe discussed her alcohol consumption on the day of the fraternity party and the sexual activity with John Doe.  She told the officer that she had never had sex before this incident, and she did not know what was going on during her encounter with John Doe.  Jane Doe reported that she was very drunk, and during sexual intercourse, she tried to fall asleep in hopes that John Doe would stop having sex with her.  She also explained that, when John Doe texted her after the sexual activity, she told him she was fine because she wanted him to leave her alone.  She also provided names of individuals who could provide additional information for the investigation ([Filing No. 46-2 at 37](#)–39).

During the next couple of months, OSC conducted interviews with twelve witnesses.  Some of these witnesses were identified by John Doe and Jane Doe. The witnesses consisted of both male and female individuals. The witnesses provided statements to OSC, and one additional witness who was identified did not provide a statement ([Filing No. 46-2 at 47](#)–64).  OSC received several recorded interviews that had been conducted with John Doe, Jane Doe, and a few witnesses. Notes were taken on the recorded interviews, and those notes were included in the OSC investigation file ([Filing No. 44-10 at 3](#)).  On July 26, 2018, OSC contacted John Doe to let him know that witness interviews were wrapping up and the preliminary report would be drafted.  OSC asked him if he had any additional information or witnesses that he would like to add to the investigation ([Filing No. 44-21](#)). John Doe did not submit any additional information.

OSC's preliminary investigation report was completed on September 5, 2018. John Doe and Jane Doe were notified that the preliminary report was available for their review.  They were

notified that the entire case file could be reviewed in OSC's office and informed that they had ten days to provide new or additional information for the investigation. This ten-day window was provided pursuant to IU's policies. John Doe did not make any corrections to the preliminary report or provide additional information during the ten-day window (Filing No. 44-10 at 3; Filing No. 44-1 at 17–18). He found photographs that Jane Doe had posted to her Facebook account of the fraternity party; however, he did not try to submit the photographs during or after the ten-day window or at the disciplinary hearing (Filing No. 44-1 at 18).

On October 3, 2018, OSC proposed dates for a disciplinary hearing for John Doe to be held on October 12 or October 19 (Filing No. 46-1 at 8). John Doe requested that the hearing be held on October 19, 2018 (Filing No. 1-10). On October 5, 2018, IU's deputy Title IX coordinator sent a letter to John Doe informing him that the disciplinary hearing would be held on October 19, 2018 and notifying him of the specific university code violations and allegations against him. The letter also informed John Doe that the final investigation report and supporting documentation would be available for his review the following week. The letter provided a website for more information about the hearing process and identified two offices that could provide assistance with preparing for the hearing. The letter also offered John Doe the opportunity to meet with the deputy Title IX coordinator to discuss the hearing process ahead of time (Filing No. 44-22). John Doe did not meet with the deputy Title IX coordinator, access the website to obtain more information about the hearing, or contact the two offices for assistance with hearing preparations (Filing No. 44-1 at 18–19).

OSC's final investigation report was completed on October 8, 2018. John Doe and Jane Doe were notified that the final report and the entire case file were available for their review in OSC's office. They were also given access to the final report online (Filing No. 44-10 at 3–4).

John Doe's disciplinary hearing was held on October 19, 2018. It began at approximately 1:00 p.m. and ended at 8:55 p.m., lasting approximately eight hours. Latosha Williams ("Ms. Williams") served as the chair of the hearing panel, and Marjorie Treff and Barry Magee served as the other two panel members (Filing No. 44-9 at 3). All three panel members had prior experience as disciplinary hearing panel members and received required training to serve on the panel (Filing No. 44-11 at 1–2; Filing No. 44-12 at 1–2; Filing No. 44-13 at 1). IU's deputy Title IX coordinator served as the hearing coordinator and was responsible for answering questions regarding whether a particular piece of evidence, testimony, or question was permissible. The members of the hearing panel received a packet of information approximately one week before the hearing, and they thoroughly reviewed the information.  John Doe and Jane Doe also were provided with the hearing packet at the beginning of the hearing (Filing No. 44-9 at 3; Filing No. 44-11 at 2; Filing No. 44-12 at 2; Filing No. 44-13 at 2).

Throughout the course of the disciplinary hearing Ms. Williams read from a script provided by IU to explain the process and procedures, to explain the order of statements and questioning, and to ensure that IU's hearing procedures were properly followed. The disciplinary hearing consisted of opening statements from Jane Doe and John Doe; the panelists questioning Jane Doe and giving John Doe the opportunity to submit written questions for Jane Doe; the panelists calling witnesses and allowing both John Doe and Jane Doe the opportunity to ask questions of the witnesses; the panelists allowing John Doe to provide remarks, questioning him, and providing Jane Doe the opportunity to submit written questions for him; and the panelists providing John Doe and Jane Doe the opportunity to question OSC's lead investigator on the case (Filing No. 44-11 at 2–3).  The lengthy hearing was exhausting and both John Doe and Jane Doe agreed to forego

the opportunity to ask questions of the lead investigator.  (Filing No. 46-1 at 11; Filing No. 44-11 at 3).

Before the conclusion of the disciplinary hearing, Jane Doe and John Doe were asked whether they had any last questions.  After two more questions from John Doe, both John Doe and Jane Doe were allowed the opportunity to make closing remarks and both made brief closing remarks.  (Filing No. 44-11 at 3).  Because the hearing concluded at a late hour, the panel reconvened the next day, Saturday, October 20, 2018, for its deliberations and decision.  *Id.*

When asked about the hearing in his deposition, John Doe acknowledged that he was not prevented from making any statements during the hearing or asking questions of the witnesses. He admitted that, to his knowledge, the hearing was conducted in the same manner that IU normally conducts its sexual misconduct hearings.  He acknowledged that he did not have any information that would indicate Jane Doe had greater access to information and reports prior to the hearing.  John Doe further acknowledged that he was not aware of other parties in other cases being given greater access to information than he was in his case (Filing No. 44-1 at 18–22, 28).

On November 6, 2018, the panel's decision was sent to John Doe. The letter explained that the panel considered the final investigation report and the information obtained at the hearing in reaching the decision. The panel unanimously determined by the preponderance of the evidence, that John Doe was responsible for sexual assault, sexual harassment, and sexual exploitation. The letter discussed some of the evidence that supported the panel's decision. The panel imposed a sanction of a four-year suspension from IU. The letter informed John Doe of his right to appeal the panel's decision and the sanction, and it provided information about the appeals process (Filing No. 44-26).

With the assistance of counsel, John Doe submitted a notice of appeal to OSC on November 10, 2018. His appeal alleged that procedural errors occurred during the investigation and hearing and the outcome of the case and the four-year suspension was a disproportionate sanction (Filing No. 44-27; Filing No. 44-1 at 24). On November 13, 2018, OSC submitted the appeal, the case file, and the audio recording of the disciplinary hearing to C. Kurt Zorn ("Mr. Zorn"), the Associate Vice Provost for Undergraduate Education, for his review. Mr. Zorn issued a decision affirming the panel's decision on November 26, 2018. Mr. Zorn determined that no procedural errors had occurred and found that the sanction imposed by the panel was not disproportionate to John Doe's offenses. Mr. Zorn also noted that John Doe's conduct was the most egregious conduct he had seen in his many years as a panel member and appellate officer (Filing No. 44-14 at 2–4; Filing No. 44-28).

On November 27, 2018, John Doe initiated this lawsuit, seeking injunctive relief and damages for his suspension from IU. In his Complaint, John Doe asserted claims for violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88 ("Title IX"), breach of contract, and other state law claims (Filing No. 1). He also filed the instant Motion for Preliminary Injunction. (Filing No. 4.)

### III.    DISCUSSION

John Doe seeks a preliminary injunction on his Title IX claim and breach of contract claim to prevent IU "from suspending him as a sanction resulting from a fundamentally unfair disciplinary process." The Court will first address the breach of contract claim.

### A.    Breach of Contract Claim

IU offers two reasons why John Doe has no likelihood of success on the merits of his breach of contract claim. IU first contends that it complied fully with its Student Code and Sexual

Misconduct Policy throughout the investigation and hearing and there is substantially more than "some" evidence supporting its decisions, accordingly, it did not act illegally, arbitrarily, capriciously, or in bad faith. IU also argues the breach of contract claim is barred by the University's Eleventh Amendment sovereign immunity.

The relationship between a student and an educational institution is contractual in nature, and regulations and policies made available to the student form part of the contract. *Amaya v. Brater*, 981 N.E.2d 1235, 1240 (Ind. Ct. App. 2013). In addressing breach of contract claims between students and universities, "the sole function of courts is to determine whether the educational institution acted illegally, arbitrarily, capriciously, or in bad faith." *Id*. John Doe alleges that IU's investigation of him was substantially flawed and biased for its lack of thoroughness and arbitrary relevance determinations. (Filing No. 54 at 4.) In response, IU argues that there is clearly more than "some" evidence to support the Panel's findings, and to show that IU "substantially complied" with its policies. However, the Court need not provide analysis regarding this argument, because IU has not waived its sovereign immunity.

"Indiana University enjoys the same Eleventh Amendment immunity as the State of Indiana itself. . . ." *Woods v. Ind. Univ.-Purdue Univ.*, 996 F.2d 880, 883 (7th Cir. 1993). "[C]laims against Indiana University are clearly barred because the University is the alter ego of the State and no exception to immunity applies." *Bissessur v. Ind. Univ. Bd. of Trs.*, 2008 U.S. Dist. LEXIS 69299, at *7 (S.D. Ind. Sep. 10, 2008). *See also Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Ath. Dep't*, 510 F.3d 681, 695 (7th Cir. 2007) ("Board of Trustees of Indiana University is an agency of the state"); *Shannon v. Bepko*, 684 F. Supp. 1465, 1470 (S.D. Ind. 1988) ("Indiana University and IUPUI are instrumentalities of the state of Indiana and [] they, therefore, share in its sovereign immunity"). "[T]he Supreme Court 'has consistently held that an

unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State.'" *Peirick*, 510 F.3d at 694–95 (quoting *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974)).

In support of their sovereign immunity argument, IU points to *Bull v. Board of Trustees of Ball State University*. In that case, the district court explained that the "Eleventh Amendment prohibits the Court from adjudicating state-law claims where, as here, the state agency objects." *Bull v. Bd. of Trs.*, 2011 U.S. Dist. LEXIS 147774, at *11 (S.D. Ind. Dec. 22, 2011) (citing *Raygor v. Regents of the Univ. of Minn.*, 534 U.S. 533, 542 (2002) ("§ 1367(a)'s grant of [supplemental] jurisdiction does not extend to claims against nonconsenting state defendants")).

John Doe points to the Seventh Circuit opinion in *Kashani v. Purdue University* to counter IU's Eleventh Amendment sovereign immunity argument. While the *Kashani* decision explains that the Eleventh Amendment does not bar lawsuits against state defendants for prospective injunctive relief, the decision also notes that the Eleventh Amendment does bar state law damages claims against states and their agencies in federal court. *See Kashani v. Purdue Univ.*, 813 F.2d 843, 847–48 (7th Cir. 1987). John Doe's counsel argued during the preliminary injunction hearing that the Eleventh Amendment does not bar a claim for injunctive relief in the form of reinstatement; however, counsel conceded that the Eleventh Amendment does bar claims for breach of contract.

Based on IU's assertion of Eleventh Amendment sovereign immunity against the state law claim for breach of contract, the Court concludes that John Doe does not have a reasonable likelihood of success on the merits of his breach of contract claim, and thus, he is not entitled to a preliminary injunction based upon his contract claim.

**B.**     **Title IX Claim**

Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). To support a Title IX claim, a plaintiff must show that an educational institution discriminated against them because of their gender. 20 U.S.C. § 1681(a). Title IX requires "intentional discrimination because of [] sex." *Ludlow v. Northwestern Univ.*, 125 F. Supp. 3d 783, 793 (N.D. Ill. 2015). A plaintiff must show that "gender was a motivating factor in the decision to impose the discipline." *King v. DePauw Univ.*, 2014 U.S. Dist. LEXIS 117075, at *27 (S.D. Ind. Aug. 22, 2014) (citing *Yusuf v. Vassar College*, 35 F.3d 709 (2nd Cir. 1994)). *See also Ayala v. Butler Univ.*, 2018 U.S. Dist. LEXIS 179806, at *20 (S.D. Ind. Oct. 19, 2018) (must show that "gender bias was a motivating factor behind the erroneous finding").

One category of Title IX claims attacking a university's disciplinary proceeding is the "erroneous outcome" claim, where "the plaintiff was innocent and wrongly found to have committed an offense." *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994). "A plaintiff alleging an 'erroneous outcome' claim under Title IX must first 'allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the proceedings' and then also 'allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.'" Doe v. Purdue Univ., 281 F. Supp. 3d 754, 774 (N.D. Ind. 2017) (quoting *Yusuf*, 35 F.3d at 715).

John Doe argues that he is likely to prevail on the merits of his Title IX claim because a gender bias against him tainted IU's investigation, disciplinary hearing, and decision. As an example, John Doe asserts that IU did not develop leads or evidence on its own but rather relied

on him and Jane Doe to provide information, which determined the course of the investigation. He argues that IU failed to corroborate Jane Doe's statements. As an example, John Doe argues that Jane Doe's Facebook pictures from the party are inconsistent with her claim that she wore her clothes in a swimming pool while others at the party wore swimsuits. However, John Doe asserts IU never looked at or considered Jane Doe's Facebook photographs because neither party submitted the photographs to IU's investigators or hearing panelists. He argues that "[r]elevance apparently turns on whether something is submitted rather than the nature of the evidence." ([Filing No. 54 at 5](#).) John Doe also argues that OSC's lead investigator did not watch the recorded videos of he and Jane Doe's statements to IUPD, but instead, the investigator relied on IUPD's summaries of those statements. He contends the lead investigator did not include in the final investigation report statements made to IUPD by male witnesses, which were in the investigator's possession, and "which included a statement by Witness 3 that Jane seemed coherent when he inadvertently walked in on John and Jane having sex." ([Filing No. 54 at 5](#).)

Regarding these arguments, the Court notes that the final investigation report actually did include Witness 3's statement that he thought Jane Doe was conscious because she tried to hide herself and was holding herself up ([Filing No. 46-2 at 16](#)–17). Additionally, Witness 3's statement to IUPD was included in the packet of materials provided to the hearing panelists. *Id.* at 81. And, importantly, this argument and evidence do not show any gender discrimination or bias.

John Doe next argues that IU's investigators arbitrarily determined the relevance of certain witness statements and did not resolve inconsistencies between the witness statements made to IUPD and OSC within the final investigation report. The Court again notes that the witness statements made to both IUPD and OSC were in fact included in the packet of materials given to

the hearing panelists, and the hearing panelists reviewed the entire packet. Again, this argument and evidence do not show any gender discrimination or bias.

John Doe asserts that IU selectively enforced its policy of not allowing evidence of sexual history when IU did not interview his past sexual partners about his practice of obtaining consent, but it allowed evidence that Jane Doe was a virgin at the time of the incident. However, the hearing panelists were informed that John Doe provided names of past sexual partners who could testify of his practice of obtaining consent because that information was included in the final investigation report and in the packet of materials provided to the hearing panelists (Filing No. 46-2 at 10).

John Doe complains that IU's decision to investigate and charge his case separate from the investigation concerning the photograph was inconsistent and led to him providing statements to OSC as a respondent in one case and as a complainant in the other case. Because of these different roles in the two separate investigations, John Doe asserts he provided different testimony in each interview based on his understanding of what was relevant and important to that particular case. Thus, he provided more details about consent in his interview as a respondent being charged with sexual misconduct. John Doe argues that this prejudiced him in his own case. While this argument is compelling, the Court notes that this argument and evidence do not exhibit a gender bias or discrimination.

Next, John Does asserts, "As the hearing audio demonstrates, there is an appreciable, qualitative difference between the Panel's tone, treatment, and questions posed to male and female witnesses." (Filing No. 54 at 10.) He argues that the panelists were biased against him and the male witnesses. He asserts that the panelists went easy on the female witnesses but grilled the male witnesses, and they excluded information from one male witness without knowing the content of the proposed testimony. John Doe argues, "The stark contrast in the questioning of

male and female witnesses likely stems from panelist training, which addresses 'confronting' and 'challenging' respondent's statements but not complainant's statements." *Id.* at 12.[1]

The Court listened to the audio of the hearing and could not decipher any gender bias against particular witnesses. Some witnesses testified via telephone rather than providing testimony in person, and some witnesses seemed more willing to expand on answers to questions while others were more reserved and provided "yes" or "no" responses. These factors may have affected the interactions between panelists and witnesses. The Court distinguished no difference in the tone and examination toward the male witnesses. Where witnesses had given inconsistent statements, rather male or female, those witnesses were questioned more extensively. John Doe's argument is based more upon speculation and personal perception than on an actual gender bias by IU.

In his pre-hearing brief, John Doe points to statistics to support his claim of gender bias:

> [B]ased on the University's reports of sexual assault allegations from July 2017 to the present, 17 out of 33 males were ordered to attend a hearing after being investigated. In contrast, 0 out of 2 females proceeded to a hearing after being investigated. (Ex. 37, IU00000705–707.) This means that a male is 51% more likely to have to defend charges at a hearing after being investigated. Although this is a small sample size, it suggests that the University more vigorously pursues sexual assault allegations against male respondents.

(Filing No. 54 at 13.)

IU responds to these statistics presented by John Doe with an explanation of the statistics:

> [T]here is no evidence that IU engages in a pattern of discriminatory decisions toward men. From July 1, 2017 through December 10, 2018, IU conducted approximately 32 investigations into allegations of sexual harassment, sexual assault, and/or sexual exploitation. [*See generally* DE 44-30.] Of the 32 investigations, only two involved a male complainant making allegations against a

---

[1] This does not show gender bias because, "even viewing these allegations in the light most favorable to Plaintiff, they all are indicative, at best, of a bias in favor of sexual assault complainants and against those accused of sexual assault, regardless of gender." *Doe v. Columbia Coll.*, 299 F. Supp. 3d 939, 955 (N.D. Ill. 2017). *See also Doe v. Purdue Univ.*, 281 F. Supp. 3d 754, 778 (N.D. Ind. 2017) ("these facts may be victim-biased, but there is nothing that is specifically gender-biased").

female respondent, and two involved a male complainant and respondent. In addition, 15 of the 32 investigations resulted in a hearing, while the others concluded by alternative resolution or an acceptance of responsibility or are still ongoing. Of the 15 hearings (all involving male respondents), four resulted in a "no finding" of responsibility, eight resulted in a finding of responsibility for a policy violation(s), one resulted in a no finding on one alleged incident and a finding of responsibility on a second alleged incident, and two are still pending.

(Filing No. 55 at 19, n.41.)

At the preliminary injunction hearing, IU argued that the two women respondents facing sexual misconduct charges accepted responsibility after being investigated. Thus, the female respondents conceded that they violated IU's policies, and there was no need to proceed to a disciplinary hearing against them. Therefore, IU asserts, John Doe's assertion that IU does not pursue disciplinary hearings against females is false and misleading and cannot be used to show gender bias or discrimination.

John Doe also argues that the panelists lacked a proper understanding of the definition of consent and how to analyze consent when deliberating and issuing the panel's decision. He points to evidence presented during the hearing and argues that the panelists weighed that evidence incorrectly when determining consent and incapacitation. John Doe also takes issue with how the panelists weighed the inconsistencies in his testimony and weighed the inconsistencies in Jane Doe's testimony. He contends that Mr. Zorn's review of the appeal was nothing more than a rubber stamp of the panel's decision and suffered the same deficiencies as the panel's decision. However, these arguments also fail to show that IU's decision and actions were based upon a gender bias or discrimination.

Importantly, at his deposition, when asked about gender bias or discrimination to support his claims against IU, John Doe acknowledged that the panelists and Mr. Zorn did not make their decisions against him because he is male, and he explained that he was not aware of any different

procedures in the disciplinary process when the respondent was female ([Filing No. 44-1 at 28](#)).

As noted earlier, John Doe admitted that he believed the hearing was conducted in the same manner that IU normally conducts its sexual misconduct hearings. He also acknowledged that he did not have any information that would indicate Jane Doe had greater access than he did to information and reports prior to the hearing and that he was not aware of other parties in other cases being given greater access to information than he was in his case. *Id.* at 18–22, 28.

John Doe's arguments simply consist of his desire to have different or additional procedures in place to handle sexual misconduct investigations, hearings, and determinations. His arguments exhibit his disagreement with weighing evidence and making credibility determinations. However, his arguments and evidence do not show gender discrimination or bias. This is what is required for a Title IX claim. While John Doe attacks the procedural protections afforded him during the disciplinary process, he has not provided any evidence of specific statements or conduct that suggests gender bias or discrimination.

Based upon the Court's review and analysis of the evidence and arguments explained above, the Court concludes that John Doe does not have a reasonable likelihood of success on the merits of his Title IX claim because at this stage of the litigation there is a lack of evidence of gender bias or discrimination.

Having found that John Doe's Title IX claims show no likelihood of succeeding on the merits, the Court need not analyze John Doe's irreparable harm claim or balance the hardship between the parties or determine the public interest.

## IV.   CONCLUSION

John Doe has failed to satisfy the threshold requirements for injunctive relief—likelihood of success on the merits, as there is no evidence that IU found him responsible for sexual

misconduct and ultimately suspended because he is male. For the foregoing reasons, John Doe's

Motion for Preliminary Injunction (Filing No. 4) is **DENIED**.

      **SO ORDERED.**

Date: 1/28/2019

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Jessica Laurin Meek
BINGHAM GREENEBAUM DOLL LLP
jmeek@bgdlegal.com

Margaret M. Christensen
BINGHAM GREENEBAUM DOLL LLP
mchristensen@bgdlegal.com

K. Michael Gaerte
BINGHAM GREENEBAUM DOLL LLP
mgaerte@bgdlegal.com

Melissa A. Macchia
TAFT STETTINIUS & HOLLISTER LLP
mmacchia@taftlaw.com

Michael C. Terrell
TAFT STETTINIUS & HOLLISTER LLP
mterrell@taftlaw.com